## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

SARAH WALKER,                                )
20 E. 40th Street                            )
Minneapolis, MN 55409                        )          **Case No.:**  1:22-cv-3312
                                             )          **Judge:**
      *Plaintiff,*                 )
                                             )
      **v.**                        )          **VERIFIED COMPLAINT**
                                             )
NEW VENTURE FUND                             )
1828 L Street, NW, Suite 300                 )          **FOR DECLARATORY,**
Washington, DC 20036                         )          **INJUNCTIVE, AND**
                                             )          **MONETARY RELIEF**
SECURE DEMOCRACY                             )
611 Pennsylvania Ave SE, #143                )
Washington, DC 20003                         )          **JURY TRIAL DEMANDED**
                                             )
**and**                                      )
                                             )
SECURE DEMOCRACY USA                         )
611 Pennsylvania Ave SE, #143                )
Washington, DC 20003                         )
                                             )
      *Defendants.*                )
_____ )


## <u>COMPLAINT</u>

      This is a civil action for declaratory, injunctive and monetary relief for injuries Plaintiff

Sarah Walker sustained as a result of the hostile work environment and her discriminatory and

retaliatory termination from New Venture Fund and Secure Democracy USA on the basis of her

race, color, sex, age, disability, and protected activity in violation of the Civil Rights Act of 1866,

42 U.S. Code § 1981, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §

2-1402.11 *et seq.* Ms. Walker also makes common law claims including wrongful discharge of Ms.

Walker in violation of public policy, tortious interference with contracts, and the intentional infliction of emotional distress. In support of her claims, Plaintiff states as follows:

## NATURE OF THE ACTION

1.      New Venture Fund ("NVF") is exempt from taxation as a public charity under section 501(c)(3) of the Internal Revenue Code. NVF acts as a fiscal sponsor for public-interest projects and grant-making programs that either have not yet received 501(c)(3) tax exemption from the IRS or do not plan to receive it.

2.      NVF is one of the largest and most well-funded public interest nonprofits in the country. The projects and programs of NVF tend to be politically left-leaning and affiliated with the Democratic Party. In 2020 alone, NVF disbursed nearly $500 million to address progressive issues such as racial justice.

3.      Voting Rights Lab ("VRL") was one such project. Voting Rights Lab was co-founded in 2018 by Megan Lewis and Samantha Tarazi, who are President and Vice President, respectively, of the organization. VRL works at the state level to support progressive electoral policy changes. On February 19, 2020, Voting Rights Lab became a fiscally-sponsored project of New Venture Fund and was among the many registered trade names for NVF.

4.      Secure Democracy ("SD") and its successor Secure Democracy USA ("SD USA") are exempt from taxation as social advocacy organizations under section 501(c)(4) of the Internal Revenue Code. SD lobbies in state legislatures to protect secure and fair elections.

5.      SD was established in 2018 at the direction of Megan Lewis in order to work with Republicans on voting rights issues and to maintain a distance from the Democratic Party-affiliated

work of VRL. SD and VRL have always been affiliated entities, working closely together. The chair of the board of SD is Heather Smith, a white female.

6.     When VRL became a fiscally-sponsored project of NVF, SD also became affiliated with NVF. All employees of VRL and SD became employees of NVF at that time. This included Sarah Walker.

7.     Sarah Walker is an African American woman with lupus, a physical disability with symptoms triggered by stress. She began working for VRL and SD in September 2019 as an Associate Director, and rose in the ranks to become Vice President of Advocacy at VRL and Executive Director at SD, one of few Black women to hold a VP role for an extended period.

8.     NVF has made a very public commitment to Race Equity, Equity, Diversity, and Inclusion in its "Mission and Values" statement: "We envision a more equitable world, built on fair treatment, access, opportunity, and advancement for all. As changemakers building the most effective charitable projects, we know that advancing race equity, equity, diversity and inclusion (REDI) is essential to solving our world's most pressing problems. As such, we dedicate ourselves to integrating REDI into our work and our culture. As we learn more, we will do more — ours is a continuous journey of learning, growth, and innovation."[1]

9.     In contrast to its public messaging, the experience for NVF employees of color was very different. The progressive public image of NVF did not translate to a progressive work environment. Ms. Walker faced discrimination during the entirety of her employment, and called out the workplace injustices experienced by her and others.

10.     Due to her position, Ms. Walker discovered that NVF and SD were discriminating against numerous employees, particularly female employees of color, by paying them less than

---

[1] https://newventurefund.org/who-we-are/mission-and-values/ (last visited Oct. 25, 2022).

their white counterparts, denying them equal opportunity for advancement, and denying them equal access to benefits, among other forms of discrimination. In addition, Ms. Walker discovered that NVF and SD were engaged in numerous violations of the Internal Revenue Code, jeopardizing their tax exempt status. The Defendants' pattern of employment discrimination and intentional tax violations indicate that NVF and SD are simply unconcerned about following the law.

11.     When Ms. Walker spoke up about the workplace injustices and non-compliant tax practices engaged in by NVF and SD, those organizations swiftly retaliated against her. In addition to furthering a hostile work environment that severely compromised her ability to perform her duties for SD and NVF, the organizations terminated her in such a way so as to severely damage her reputation and inflict emotional distress that exacerbated her disability, negatively impacting her physical and mental health. Unsurprisingly, in seeming acknowledgement of the unlawful tax practices Ms. Walker alleged, SD, the 501(c)(4) enmeshed in the misconduct was *dissolved* less than two months after she reported the improper federal tax practices.

12.     This case involves a plethora of race-, sex-, age-, and disability-based workforce discrimination encompassing benefit eligibility and potential ERISA violations, failure to accommodate a disability, and retaliation for opposing these practices and for whistleblowing about potential tax fraud. Defendants engaged in a civil conspiracy and numerous acts of retaliation to silence Ms. Walker from exposing the flagrant financial irregularities and hypocrisy of NVF and SD.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this action because it presents a federal question under 42 U.S. Code § 1981.

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S. Code § 1332 because the amount in controversy exceeds $75,000 and the action is between citizens of different states.

15.     The Court has supplemental jurisdiction over this action under the District of Columbia Human Rights Act, D.C. Code § 2-1402.11 *et seq.*

16.     The Court has personal jurisdiction over Defendants New Venture Fund, Secure Democracy, and Secure Democracy USA because each has or had its principal place of business in the District of Columbia for the purposes of Fed. R. Civ. P. 4, and is or was an employer within the definition of D.C. Code § 2-1401.02(10).

17.     The Court is a proper venue under 28 U.S. Code § 1391 because the discriminatory decisions to place Plaintiff on leave and to terminate Plaintiff's employment were made in the District of Columbia.

## PARTIES

18.     Plaintiff Sarah Walker is a citizen of the State of Minnesota. She is an African-American female aged 46 years with a disability within the meaning of the Americans with Disabilities Act and the DCHRA. During the relevant time, Ms. Walker was employed as that term is used in the DCHRA for both New Venture Fund and Secure Democracy.

19.     Defendant New Venture Fund ("NVF") is a District of Columbia nonprofit corporation with its principal place of business at 1828 L Street, NW, Suite 300, Washington, DC 20036. Voting Rights Lab ("VRL") is or was one of many fiscally-sponsored projects of NVF and is among the many registered trade names for New Venture Fund. All VRL employees were NVF

employees for the relevant timeframe. The NVF general counsel and other NVF non-project employees are located in the District of Columbia.

20.     Defendant Secure Democracy USA ("SD USA") is a District of Columbia nonprofit corporation located in the District of Columbia. It was incorporated on November 17, 2021 by Megan Lewis, who is also listed as the executing officer of the organization. Its predecessor organization, Secure Democracy ("SD"), was a District of Columbia nonprofit corporation dissolved on or around December 20, 2021. The principal place of business of both SD and SD USA is 611 Pennsylvania Ave SE, #143, Washington, DC 20003. SD USA and NVF entered into an agreement with SD to acquire SD's assets and liabilities on or around November 30, 2021.


## FACTUAL ALLEGATIONS

### Defendants Paid Minority Female Employees Less

21.     All employees of VRL, SD, and SD USA are hired by VRL. Employees are then employed either as full-time VRL/NVF employees, or as shared employees between NVF and SD, with their salaries paid 50% by each organization.

22.     VRL co-founders Megan Lewis and Sam Tarazi are both white females. Ms. Lewis is an attorney. Ms. Lewis and Ms. Tarazi made most or all hiring decisions for VRL and SD.

23.     Sarah Walker was hired at SD and VRL on September 26, 2019. At the time of her hire, she had over 20 years of management, government affairs, and public relations experience. Ms. Walker has master's degrees in both political science and sociology and is all but dissertation in both fields. Her graduate studies focused on voting rights restoration. She was interviewed by Ms. Lewis and Ms. Tarazi told Ms. Walker, when making her a job offer, that she was over-qualified for the position as Associate Director. Indeed, Ms. Walker's education and experience

were greater than that of her initial direct supervisor, Colin Weaver. Ms. Lewis and Ms. Tarazi both indirectly supervised Ms. Walker when she was hired.

24.     At the time of her hire, Ms. Walker was paid $110,000 per year, with half of her salary coming from SD and half from NVF. At the time of her hire, Ms. Walker was told that her pay was above the salary scale for her position and was non-negotiable.

25.     Colin Weaver, a white male, was Director of State Government Affairs and was Ms. Walker's direct supervisor at the time of her hiring. As of June 30, 2020, Mr. Weaver was paid $175,000 per year, with half of his salary coming from SD and half from NVF.

26.     On or around February 19, 2020, VRL became a fiscally-sponsored project of NVF. All VRL and SD employees were hired by NVF at this time. Some employees became full-time NVF employees and some employees, like Ms. Walker, were part-time NVF employees, with their salary split evenly between NVF and SD.

27.     In late March 2020, Ms. Walker was assigned additional responsibilities, including management of the State Affairs division staff as Acting Director of State and Federal Advocacy. More responsibilities were assigned in April and May 2020, including filling in for Mr. Weaver while he would be on paternity leave starting in June 2020. These new assigned responsibilities were in addition to her existing workload and responsibilities. While Mr. Weaver was on leave, Ms. Walker reported directly to Ms. Lewis and to Ms. Tarazi.

28.     In late March 2020, Soncia Coleman, an African-American female, was also assigned additional work, including supervisory responsibilities, for a period exceeding three months, as Acting Director of Law and Policy, with no compensation change at the time of reassignment. She had education and experience greater than did Liz Avore, the white female director whose work she was assigned.

29.    Ms. Lewis told Ms. Walker on or around June 4, 2020 that it was NVF policy that employees could be reassigned to a different role for three months with no change in compensation, and that her compensation and role would be reexamined after ten weeks in the reassigned role. At the same time, Ms. Lewis told Ms. Walker that the reassignment would last through Mr. Weaver's paternity leave, and at least the election, early November 2020. That this period of time would be at least seven months was known at the time she was reassigned to a different role.

30.    Luis Rodriguez, a Hispanic male, was hired in early May 2020 as Associate Director of State Government Affairs. At the time of his hire and through at least June 30, 2020, Mr. Rodriguez was paid $115,000 per year, with half of his salary coming from SD and half from NVF. Mr. Rodriguez had fewer years of experience and less education than Ms. Walker and reported directly to Ms. Walker.

31.    Sarah Jane Higginbotham, a white female, was hired in early May 2020 as Associate Director of State Government Affairs. At the time of her hire and through at least June 30, 2020, Ms. Higginbotham was paid $132,000 per year, with half of her salary coming from SD and half from NVF. Ms. Higginbotham had fewer years of experience and less education than Ms. Walker and reported directly to Ms. Walker.

32.    Ms. Walker was not given salary information or told the reasons for hiring Mr. Rodriguez or Ms. Higginbotham. The hiring of both individuals deviated from the standard hiring processes used for other SD and VRL employees.

33.    On or around June 24, 2020, Ms. Walker was sent the SD payroll by mistake. This enabled her to learn that Mr. Rodriguez and Ms. Higginbotham were both being paid more than her, although they reported to her. She was told by Ms. Lewis and Ms. Tarazi that Mr. Rodriguez

had negotiated for more money, in contrast to Ms. Walker being told at the time of her hiring that she could not negotiate for a higher salary.

34.     On or around June 25, 2020, Ms. Tarazi told Ms. Walker that NVF equally weighed experience and education in its hiring and promotion decisions.

35.     On or around the end of August 2020, Christian LoBue, Chief of Staff of VRL and an African American female, was sent the VRL payroll by mistake. Ms. LoBue identified that she was paid less than Ms. Tarazi despite having more experience, more responsibilities, and a more senior role at VRL than Ms. Tarazi. She also identified that unlike Ms. Tarazi, she did not have access to VRL payroll information, despite her title as Chief of Staff. Ms. LoBue left VRL a few months later.

**Defendants Denied Minority Employees Equal Access to Resources**

36.     As part of a restructure on or around December 1, 2020, Ms. Walker was promoted to Vice President of Advocacy at Voting Rights Lab and Executive Director of Secure Democracy. Ms. Walker was responsible for VRL's policy change advocacy at the federal, state, and local levels. She was the head of the Advocacy Department, which includes regional, campaign, program, engagement, and administrative staff.

37.     When Ms. Walker was given the title Executive Director of SD, Ms. Lewis informed her that the title was for public facing interactions only, and that she would continue to be supervised by Ms. Lewis, not the board of SD. Ms. Walker had little insight into the organization's budget, could only approve invoices, and was not allowed access to salary negotiations or individualized payroll information for SD staff. This meant not only that Ms. Walker did not know anyone's salary information, but also that she did not know who was actually on SD's payroll. At that time, all other VRL Vice Presidents were white and were given access to

payroll information and involved in salary negotiations with new VRL and SD staff. In addition, Ms. Lewis primarily engaged with the SD board and at no time did Ms. Walker report directly to the SD board.

38.     At all times during Ms. Walker's employment, SD did not advertise available positions. Instead, all job postings are advertised as VRL positions. Employees are then employed either as full-time VRL/NVF employees, or as shared employees between NVF and SD, with their salaries paid 50% by each organization. Whether an employee is a full-time NVF employee or a part-time NVF employee is entirely disconnected from where they actually do most of their work. Many employees are entirely paid by NVF but performed most of their work for SD. Defendants never explained the business reasons for these employee classifications or why NVF, a 501(c)(3) entity which could receive tax-deductible donations, would allow so many of its employees to perform the majority of their work for SD. Because SD was a 501(c)(4) entity, this practice had the effect of unlawfully subsidizing SD's operations with tax-deductible donations.

39.     VRL and SD misled employees of color about the work that they would be doing. After applying for jobs at VRL, most employees of color were made to work for SD, regardless of whether they were classified as full-time VRL/NVF employees. Work for SD primarily involved partnering with Republicans on state-level voting issues, rather than working with larger Democratic-aligned groups on progressive racial justice work. This isolated people of color from the progressive nonprofits and donors with whom they had expected to work with by applying for jobs at VRL, and with whom they had sought to gain important professional networks. This impacted the terms and conditions of their employment because it limited their professional opportunities compared to their white colleagues and in response, most employees of color left VRL and SD within short periods of time.

40.     When employees of color were allowed to interact with donors or partners, it was because Ms. Lewis said that the presence of employees of color would lend "credibility" to the work of VRL, thus reducing the value of minority employees to their skin color.

41.     On or around June or July 2020, Ms. Lewis told several employees of color at SD they should be doing more work to get their issues in the media, and were compared unfavorably to white VRL employees who were getting strong favorable media stories. The white VRL employees had access to contractors that SD employees of color did not. However, during this time, Ms. Walker also found out that the favorable media stories came from one of VRL's communications contractors who was paying reporters to write stories and was asking for more money for the under the table payments. Ms. Walker notified Ms. Lewis that this was unethical and forced VRL to cancel the contract.

**Defendants Denied Minority Employees**

**and Older Employees Equal Access to Benefits**

42.     When VRL became a fiscally sponsored project of NVF, all VRL and SD employees were told that they would be eligible for short-term disability insurance, long-term disability insurance, and life insurance, in addition to healthcare benefits. Ms. Walker learned in September 2021 that SD employees, including herself, were not eligible for disability and life insurance benefits. It is unknown when Ms. Lewis and Ms. Tarazi knew of this difference in eligibility, but they told Ms. Walker that they were not going to inform employees of the discrepancy. Starting in at least September 2021, Ms. Lewis and Ms. Tarazi and other VRL employees made knowingly false statements regarding benefit eligibility for SD employees in job postings and conversations with applicants. They told employees of the discrepancy only when Ms. Walker insisted upon it.

43. On or around October 20, 2021, Amanda Harrington, a white female under age 40 who was being hired by SD, learned that as an employee of SD, she would be ineligible for disability and life insurance benefits. Megan DeSmedt, Human Resources ("HR") Director at VRL and a white female under age 40, informed Ms. Harrington that instead of being hired by SD, Ms. Harrington could be a full-time NVF employee explicitly so that she could access disability and life insurance benefits (Exhibit 1).

44. Two employees of color also hired in or around October 2021 – Nina Patel, Associate Director of Law and Policy and an Indian American female, and Carson Malbrough, Campaign Associate and an African American male – were classified as SD employees. They were not given the same option as was Ms. Harrington to be misclassified as full-time NVF employees. All three employees performed the vast majority of their work for SD and should have appropriately been employed by SD and NVF.

45. Most of the employees classified as part-time VRL/NVF employees were over age 40, as was Ms. Walker. Many employees misclassified as full-time VRL/NVF employees who in fact performed most of their work for SD were under age 40. Age was a factor motivating the classification of employees as full- or part-time VRL/NVF employees and their eligibility for certain benefits.

**Defendants Discriminated Against Plaintiff Because of Her Disability**

46. Ms. Walker has a diagnosis of lupus, an auto-immune disease in which periods of stress can cause flareups of symptoms. Ms. Walker also has pericarditis, arthritis and neuropathy in the hands related to her lupus. All of these conditions are disabilities within the meaning of the DCHRA and the Americans with Disabilities Act. Ms. Walker received treatment for these chronic conditions for the duration of her employment with NVF and SD.

47.     Ms. Walker's diagnosis and details of her ongoing medical treatment were known to Defendant SD and to Ms. Lewis, Ms. Tarazi, and several VRL employees through consulting work Ms. Walker had performed prior to being hired. Additionally, employees at SD shared public calendars to which VRL leadership had access. All of Ms. Walker's medical appointments for treating her lupus were on her public calendar. These appointments occurred approximately once per month, and included blood work, infusions, and regular doctor visits. Ms. Walker often took video conference calls from her lupus infusion chair.

48.     Defendants NVF and SD learned of Ms. Walker's lupus diagnosis and treatment when or shortly after she was hired by NVF, as their health insurance carrier's approval process of her infusion treatments took over a month, during which time accommodations had to be made for Ms. Walker to continue on her previous insurance so that her treatments would not stop.

49.     In ongoing conversations during the summer of 2021, Ms. Walker informed Ms. Lewis that her workload was negatively impacting her health due to her disability and asked about working part-time. In September 2021, Ms. Walker asked Ms. Lewis and Ms. DeSmedt of HR about the organization's policy regarding the availability of utilizing her disability benefits or working part-time. This conversation occurred prior to Ms. Walker learning that she in fact did not have disability benefits.

50.     In contrast, Ms. Tarazi, a similarly situated white woman under age 40, worked a modified schedule in 2021. Like Ms. Walker, Ms. Tarazi was a director who supervised people in 2020 and was promoted to Vice President on or around December 1, 2020. Unlike Ms. Walker, Ms. Tarazi was able to change to a limited, part-time schedule in 2021. Ms. Walker was not privy to the disability suffered by Ms. Tarazi, and did not question whether her accommodation was justified. In September 2021, Ms. Walker pointed out to Ms. Lewis that if the organization allowed

Ms. Tarazi to work a part-time schedule and reduce her workload while keeping her title, all employees should be able to do this.

51.     In response to Ms. Walker's request for a reasonable accommodation, Defendants did not engage in the DCHRA's interactive process to determine what accommodation would be appropriate. Instead, Ms. Lewis suggested that VRL and SD would have to reduce the scope of their work to accommodate Ms. Walker's disability. Ms. Lewis assumed that providing an accommodation for Ms. Walker would be an undue hardship for the business, and thus no accommodation was even proposed, much less provided.

52.     Furthermore, VRL and SD held a leadership retreat October 26–28, 2021 that was planned around Ms. Tarazi and required others to accommodate Ms. Tarazi's disability. Although the other attendees were located in the eastern or central U.S., the retreat was held in Portland, Oregon to accommodate Ms. Tarazi's mold sensitivity and desire to avoid travel. Ms. Walker, who unlike Ms. Tarazi, had to travel frequently for work, was traveling for work immediately prior to the retreat.

53.     On or around October 24, 2021, Sophia Mankin, Ms. Lewis's Executive Assistant, informed Ms. Walker that the retreat would be scent-free, also due to Ms. Tarazi's sensitivity to scents. Ms. Walker expressed concerns about the short notice to Ms. Mankin, and told her it would be difficult to accommodate this since she was already traveling for work. Ms. Walker explained to Ms. Mankin that because of the neuropathy and arthritis in her hands, and given that she has faced prejudice due to her African American hair texture, she gets her hair done weekly, causing it to be scented, and might not be able to get the scent out of her hair prior to the retreat.

54.     In contrast to the seriousness with which Defendants accommodated Ms. Tarazi's sensitivity to mold and scents, Ms. Walker's concerns regarding symptoms of her chronic disease

and its impact regarding her appearance were dismissed as "lifestyle" choices by Ms. Mankin (Exhibit 2). And despite Ms. Walker's request for accommodations made only a month prior, no attempt was made to inquire what accommodations might be made for Ms. Walker at the retreat.

55.     In perhaps even starker contrast, Ms. Harrington was diagnosed with lupus in 2022, while still an employee of NVF and SD. Like Ms. Walker, Ms. Harrington is a Vice President at VRL and supervises people. Unlike Ms. Walker, Ms. Harrington is white and under age 40 and was given accommodations for lupus that were denied to Ms. Walker.

**Defendants Created a Hostile Work Environment**

56.     A group consisting of all female minority employees at VRL, including Ms. Walker, started meeting in January 2020 to discuss equity issues, culminating in a letter sent to Ms. Lewis and Ms. Tarazi on June 2, 2020. The statement noted that VRL's mission around voting disenfranchisement was a fundamental issue of racial justice. The statement noted that this is at odds with a "white supremacist culture throughout the organization," in which "Black and Brown workers frequently feel disrespected, mistrusted, talked down to and micromanaged. Positive feedback is sporadic." The statement concluded that it was being shared "with deep reservations about whether or not it is safe for us to do so. We fear retribution during a time when we need our salaries. We know that we have individually shared the above feedback with people, so we find it hard to believe that management is unaware of these issues." Defendants made no effort to address these claims of discrimination and concerns of retaliation.

57.     Among the people who wrote that letter, all but Ms. Walker had left NVF and SD by the end of October 2021. On information and belief, at least one of the letter writers left with a non-disclosure agreement to silence further complaints of discrimination.

58.     In addition to the previously mentioned pay differentials, Ms. Walker was constantly reminded of her racial identity. Ms. Walker essentially was made to act as a "race coach" for Liz Avore, Vice President of Law and Policy and a white female, who struggled to supervise her two direct reports, who were Black females. Ms. Walker told Ms. Lewis in early 2021 that Ms. Avore's insistence on discussing race and racial dynamics in all their meetings was impacting her ability to perform her job. On or around February 16, 2021, Ms. Walker told Ms. Avore that one of her subordinates had missed a deadline and her work frequently had to be done by others. In response, Ms. Avore told Ms. Walker that the employee's inability to perform was due to racial microaggressions from Ms. Walker. She said to Ms. Walker, "Well you and Soncia don't experience the world the same way as Black women because you have lighter skin." Ms. Walker explained that no two Black people experience the world the same way and that racial identity and skin color did not change basic management principles. Ms. Avore did not discipline Ms. Coleman for poor performance.

59.     On or around March 11, 2021, Ms. Walker spoke to Ms. Lewis about the ongoing performance problems of Ms. Coleman. Ms. Lewis responded that Ms. Walker's skin is much lighter than Ms. Coleman's and questioned Ms. Walker's identity as a Black woman because of her light skin color. Ms. Lewis further said that Ms. Walker was acting in a racist way towards Ms. Coleman by calling out her performance problems. Ms. Lewis also refused to discipline Ms. Coleman.

60.     By this time, Ms. Walker had repeatedly and consistently spoken out about discrimination by Defendants (Exhibit 3). The VRL and SD leadership organized a retreat in October 2021, that although was purportedly done to address concerns, was intentionally designed to intimidate Ms. Walker and to stop her from continuing to raise concerns in the future. The

attendees of the retreat were the following: (a) Ms. Lewis, (b) Ms. Tarazi, (c) Ms. Mankin, a white female who had just dismissed concerns related to Ms. Walker's disability, and (d) Ms. Harrington, a white woman and close friend of Ms. Tarazi who just prior to the retreat had been sending Ms. Walker unsolicited job postings, even after Ms. Walker assured her that she was not looking for a new job.

61.     Also attending the retreat was Anthony Dale, a newly hired African American male who was Vice President and the Chief of Staff of VRL. Ms. Walker had shared her claims of discrimination to him in confidence, yet prior to the retreat, he told her that she should share those claims of discrimination at the retreat in order to help build trust among the team. During the first day of the retreat, Ms. Walker was made to publicly state her concerns about racial and disability discrimination directly to Ms. Lewis and Ms. Tarazi, the individuals who discriminated against her. Ms. Lewis and Ms. Tarazi told Ms. Walker this was a necessary part of the retreat, and it was her responsibility to forgive them and trust them again, although no changes had been made to address the ongoing patterns of discrimination.

62.     The "retreat" was one in which an African American employee was coerced into a confrontation against the two white co-founders of the organization who held or had held supervisory authority over her. Witnessing the confrontation were hostile white colleagues. Beyond the humiliation that this caused Ms. Walker, the retreat was designed with willful disregard for her rights as an employee with claims of discrimination. Ms. Walker made clear at multiple points that day that she did not feel comfortable presenting her discrimination claims in this way, and it was so untenable that the first day's session ended early. Yet upon coming to the lobby for dinner that evening, Ms. Walker found that everyone else at the retreat was in the hotel

bar together for happy hour, which only served to compound the isolation and feeling of being singling out that had characterized the retreat for Ms. Walker.

**Plaintiff Opposed Defendants' Discrimination and Acted as a Whistleblower**

63.     On October 28, 2021, after leaving the retreat, Ms. Walker sent several emails to Mr. Dale regarding the discrimination and hostile work environment created by Defendants and reaffirming her opposition to Defendants' discriminatory practices, particularly the availability of benefits being given to white employees but denied to minority employees. In response to this, Ms. Walker was offered full-time employment with NVF so that she could also receive benefits. Ms. Walker informed the Defendants that doing so would be illegal, as the majority of her work was with SD and working full-time for NVF would cause her to violate the Internal Revenue Code.

64.     On October 28, 2021, Ms. Walker emailed Ms. DeSmedt of VRL HR with another request for an accommodation for her disability and reaffirming her opposition to the inequitable availability of benefits for employees (Exhibit 4).

65.     On October 28, 2021, Ms. Walker met with a human resources representative from Arabella Advisors, a consulting company affiliated with NVF that handles HR for NVF employees. Ms. Walker shared her concerns, including her fear of retaliation.

66.     In addition, Ms. Walker also sent several emails on October 28, 2021 regarding her serious concerns about various financial practices engaged in by NVF and SD. The problematic conduct was being directed by NVF's founders and senior executives and appeared to violate the Internal Revenue Code's prohibition against tax-exempt organizations participating in political campaigns. Also, a substantial part of NVF's activities were to influence legislation directly, as well as indirectly through NVF's operational control over SD's activities and employees.

67.     Consistent with guidance published in the NVF Employee Handbook (Exhibit 5), on October 28, 2021, at 6:06 p.m., Ms. Walker sent an email to NVF General Counsel Andrew Schulz communicating her concerns about the specific failures of both NVF and SD to operate in compliance with the Internal Revenue Service ("IRS") rules and regulations for tax-exempt entities (Exhibit 6).

68.     Ms. Walker described in detail her concerns which centered on NVF exercising control over SD and using tax-deductible contributions to NVF to subsidize SD's overhead and pay compensation to numerous employees who performed most of their work for SD, in violation of federal law. Ms. Walker also raised concerns about NVF's illegal involvement in political campaigns.

**Retaliation**

69.     On October 29, 2021, at 9:36 a.m., Defendants suspended Ms. Walker from all her work with no warning to her. Ms. Lewis also directed SD to terminate Ms. Walker's access to her email account and other computer systems so that she could no longer perform her job. Ms. Walker had never been given an NVF email. Ms. Lewis took these actions without consulting with the SD board of directors (Exhibit 7).

70.     On November 1, 2021, Ms. Walker emailed Heather Smith about the concerns that she had raised with NVF and asserted whistleblower status with Defendant SD (Exhibit 8). Ms. Walker also noted that NVF employees were acting as agents of SD although they were neither employees nor directors of SD (Exhibit 9). Actions by NVF employees included: informing the SD board that Ms. Walker was suspended from SD; informing SD employees that all issues needed to be raised to Ms. Harrington, an NVF employee; contacting Google and claiming ownership of the secure-democracy.org domain in order to end Ms. Walker's access to Google Workspace

19

services, including her SD email (Exhibit 10); and suspending Ms. Walker's use of the SD corporate credit card.

71.     On November 3, 2021, Ms. Smith, acting on behalf of SD's board, informed Ms. Lewis that Ms. Lewis had no legal authority to place Ms. Walker on leave and must immediately cease interference with the operations of SD (Exhibit 11).

72.     On November 4, 2021, Defendant NVF's general counsel confirmed that NVF employees had interfered with Ms. Walker's position with SD and that Ms. Walker's access to her email, Google drive and corporate credit card had been restored as of that day (Exhibit 12).

73.     Despite this attempt at restoration, Defendants' actions had already had immediate impacts. In the days after Ms. Walker's suspension, VRL leadership sent out confusing emails that did not reassure SD staff, many of whom started looking for new jobs. VRL employees who were not employed by SD claimed to represent SD both internally to staff and to external partners, with several VRL employees creating fraudulent SD email accounts to do so. SD staff also had the unfortunate experience of arriving in Tampa, Florida for an event SD was hosting at a conference, and the corporate credit card was declined because Ms. Walker had been unable to communicate with their accountant. Ms. Walker was unable to sign or initiate contracts with important state-level lobbyists with whom she had spent months cultivating relationships. She was unable to attend scheduled meetings with contractors or employees. Ms. Walker was unable to authorize lobbyist registrations or travel expenses. The chaos was so obvious that several partners said they would stop working with SD and one SD board member resigned.

74.     When her suspension from SD ended on November 4, 2021, in addition to dealing with all of the above-mentioned repercussions, Ms. Walker had to contend with the fact that SD might not have enough money to pay its existing obligations. On information and belief, previous

money for SD had come from NVF and NVF refused to provide additional funding at this time. Because Ms. Walker had been suspended with no advance notice, SD's accountant refused to provide her with information, undermining her ability to address SD's financial problems. SD's law firm was conflicted out from advising Ms. Walker regarding SD because of their involvement with the concerns at issue in Ms. Walker's whistleblowing complaint. In addition to further causing her stress, this made it nearly impossible for Ms. Walker to perform many aspects of her job. Nevertheless, between November 5, 2022 and November 19, 2022, she was actively involved in budgeting and other meetings planning for the expansion of SD's operations during 2022.

75.     Defendants offered all SD staff full-time NVF positions on or around November 5, 2021. Ms. Walker was not offered a full-time NVF position and remained on leave from NVF.

76.     Defendants created a new nonprofit organization, Secure Democracy USA, on November 17, 2021.

77.     In a brazen additional act of retaliation, NVF effectively terminated Ms. Walker two weeks later, again with no notice to her. On or around November 20, 2021, NVF contacted Google to claim ownership of the SD accounts, ending Ms. Walker's access again. Ms. Walker was informed that she had no access to her SD email not by any of the Defendants, but by an email from Google Workspace services (Exhibit 13). This occurred while Ms. Walker was on a planned vacation overseas, at a time that Defendants knew would make it difficult for her to regain access or to avoid professional embarrassment.

78.     On or around November 30, 2021, representatives of SD, NVF, and SD USA entered into an agreement to dissolve SD and to dispose of its remaining assets and liabilities to NVF and SD USA. The assets included the SD.org website, electronic documents in the SD Google Drive, and SD email accounts. The liabilities of SD included asserted and potential legal

claims for which the parties agreed to cooperate in a good faith effort to settle and liquidate, with the full amounts required under any settlement agreement paid for by NVF and SD USA. Pursuant to this agreement, SD was dissolved on or around December 20, 2021.

79.     Only four weeks earlier—and prior to Ms. Walker's whistleblowing—there had been no discussion of any plans to dissolve Secure Democracy. Defendants SD and SD USA did not give Ms. Walker notice of termination or any information about her last day at SD.

80.     All SD employees were offered new positions with SD USA on or around November 30, 2021, except for Ms. Walker. Other than Ms. Walker's departure, the two organizations appeared to differ very little (Exhibits 14, 15).

81.     Defendant NVF and the Senior Director of HR at Arabella Advisors told Ms. Walker that her suspension was pending an investigation of her complaints. Although an investigator was hired, the investigation was cancelled because Ms. Walker's initial attorney was given inaccurate and conflicting information about who could negotiate resolution of Ms. Walker's claims. To Ms. Walker's knowledge, no investigation was subsequently undertaken.

82.     Ms. Walker continues to be retaliated against as (i) she continues to be suspended from her duties; (ii) continues to be suspended from access to email, the company server, and other company business systems; and (iii) has been constructively discharged from her role and duties as the SD Executive Director.

83.     A letter from NVF counsel dated August 17, 2022 claimed that VRL ceased to be a project of NVF as of June 16, 2022. Yet the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") shows that "Voting Rights Lab" is currently a Registered Trade Name for New Venture Fund, with a registration date of June 15, 2022. NVF commonly registers its fiscally sponsored projects as trade names with DCRA.

84.     In September 2022, Defendant NVF notified Ms. Walker that her last day as an NVF employee would be October 31, 2022.

**Damages Suffered**

85.     Defendants' conduct has caused Ms. Walker pain and suffering, damage to her career and reputation, humiliation, and loss of enjoyment of life.

86.     Defendants' actions caused Ms. Walker significant emotional distress. The suddenness and severity of Defendants' actions triggered Ms. Walker's complex post-traumatic stress disorder. She had to start therapy and receive a nerve blocker to address her symptoms, which include, but are not limited to, hypervigilance, sleep disturbances, nightmares, and anxiety.

87.     Defendants' conduct severely impacted Ms. Walker's physical health. The impact of stress on her auto-immune disorder was known to Defendants, as Ms. Walker had spoken openly with Defendants Lewis and Tarazi about the symptoms of lupus, and the serious complications of her disease were discussed with Defendants at the time of her hiring by NVF. In addition, Ms. Walker had specifically and on multiple occasions told Ms. Lewis that the stress of her job was causing her health to deteriorate. Her emotional distress and its serious impacts on her health were foreseeable to Defendants.

88.     Immediately upon being placed on leave and continuing thereafter, the stress from Defendants' actions caused Ms. Walker to break out in hives and it was almost impossible for her to sleep and eat, further worsening her symptoms. She missed critical doctors' appointments because she had no access to her work calendar, where her appointments were scheduled. The arthritis in her left hand became so excruciating that Ms. Walker was unable to do many daily activities, making even typing extraordinarily difficult. Her blood pressure and ongoing issues with

her heart and lungs also worsened. Her health deteriorated so quickly and so severely that in early December, she had to go to the emergency room for lupus and serositis. The ongoing nature of Defendants' retaliation has caused her emotional and physical symptoms to continue.

89.     Defendants' conduct also significantly damaged Ms. Walker's professional reputation. When Ms. Walker was initially placed on leave, Defendants fraudulently claimed to Ms. Walker's professional contacts that she was out of the office for various reasons that included, but were not limited to, a sudden sabbatical, ill health, and the death of a close friend. They cancelled her speaking engagements at important conferences and because of the loss of access to her work accounts, Ms. Walker was unable to complete a prestigious fellowship.

90.     Defendants also did not inform many SD contractors and lobbyists that the organization was dissolving because they did not want contractors to question what was happening at SD. When Defendants blocked access to Ms. Walker's email a second time, NVF employees provided SD contractors Ms. Walker's personal email so that she was receiving requests for payment on her personal email, which continued through February 2022. Both times she was suddenly blocked from her work accounts caused her to miss meetings, be unresponsive to emails, fail to do necessary follow-ups with contractors and affiliates, and appear completely unprofessional to contacts with whom she had spent years building a reputation. Defendants' actions caused multiple important contacts of Ms. Walker to question her professionalism and stop interacting with her.

91.     Further, Defendants also told SD employees that Ms. Walker was acting maliciously and to not follow any of her directions during the two week period between her suspensions from SD. Besides being false, this damaged her professional reputation among SD employees and NVF employees who were not part of Defendants' retaliatory actions.

92.     As a consequence of Defendants' conduct, Ms. Walker has suffered and will suffer economic harm, including lost past and future income and employment benefits, damage to her career, and lost wages, overtime, unpaid expenses, and penalties, as well as interest on unpaid wages at the legal rate from and after each payday on which those wages should have been paid. Ms. Walker lost half of her income, approximately $117,500, when she was constructively discharged from SD. Her upcoming discharge from NVF will cause her to lose her remaining income as well as her insurance benefits.

93.     Finally, Defendant NVF and Ms. Smith are very influential in progressive elections policy organizations and many positions to which Ms. Walker would apply are connected to one or the other. Ms. Walker has only been able to secure contract work, and it has not been at her previous level of compensation or reflective of her level of experience.

## CLAIMS

### FIRST CAUSE OF ACTION
### Discriminatory Discharge in Violation of 42 U.S. Code § 1981

94.     Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

95.     Plaintiff is an African American woman.

96.     The leaders at Defendant NVF involved with this matter are white, including the NVF General Counsel, the Senior Director of Human Resources at Arabella Advisors, Ms. Lewis and Ms. Tarazi. Plaintiff, an African American woman, was discriminated against due to her race, made to work in a hostile work environment, placed on leave, and then terminated. These actions were taken due to Plaintiff's race and her consistent opposition to Defendants' racially discriminatory practices.

97.     Defendants SD and SD USA are white, including Ms. Smith. Plaintiff was discharged from her position at SD and was not rehired by SD USA. Similarly situated white employees at SD were rehired, and Plaintiff was replaced as the leader of SD by white people who did not have her same qualifications.

98.     As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

99.     This claim is brought against all Defendants.

## SECOND CAUSE OF ACTION
### Hostile Work Environment in Violation of 42 U.S. Code § 1981

100.     Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

101.     As an African American, Plaintiff is a member of a protected class under 42 U.S. Code § 1981.

102.     As detailed herein, Defendants repeatedly made remarks to, and engaged in acts towards, Plaintiff that indicate Defendants harbored discriminatory animus. Since many of these actions came from Ms. Lewis and Ms. Tarazi, her supervisor and the primary liaisons to NVF and the SD board, Defendants NVF and SD knew or should have known about the harassment.

103.     As detailed herein, the hostile work environment was created and perpetuated by white women, and so, but for race, Plaintiff would not have suffered the loss of her right to work in an environment free from racial discrimination and harassment.

104.     As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

105.     This claim is brought against all Defendants.

**THIRD CAUSE OF ACTION**
**Discrimination on the Basis of Race in Violation of the DCHRA**

106.    Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

107.    Under the DCHRA, it is "an unlawful discriminatory practice" for an employer to, "based upon the actual or perceived race" of an individual, "discriminate . . . with respect to his or hers compensation, terms, conditions, or privileges of employment; or to limit, segregate, or classify his or hers employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or hers status as an employee . . ." D.C. Code § 2-1402.11(a)(1)(A).

108.    Under the DCHRA, it is "an unlawful discriminatory practice for any person to aid [or] abet . . . any of the acts forbidden under the provisions of this chapter . . ." D.C. Code § 2-1402.62.

109.    As an African American, Plaintiff is a member of a protected class under the DCHRA.

110.    Plaintiff was fully qualified for her positions as Vice President of Advocacy of VRL and Executive Director of SD and was able to perform all the essential functions of the positions.

111.    As described above, Defendants' actions – paying Plaintiff less than white employees, denying her access to information that was given to similarly situated white employees, and denying her benefits that were given to white employees – violated the DCHRA.

112.    In particular, Defendants told Plaintiff that she could not receive a salary above the pay scale but gave white employees salaries well above the pay scale. Plaintiff was paid less than white employees who had less education and experience than Plaintiff, including white employees

27

who reported to her and had fewer responsibilities. When Plaintiff was assigned additional responsibilities for a period she was told would exceed three months, Defendants did not increase her pay as required by NVF policies.

113.    In particular, Defendants denied Plaintiff access to information about salary and reasons for hiring people who reported to her, and even after she was promoted to Vice President, she was denied information about individuals' salaries, although that information was given to all other Vice Presidents, who all were white. By denying her access to basic financial information about the organization she was purported to lead, Defendants adversely affected the terms and conditions of Plaintiff's employment.

114.    Additionally, Defendants classified Plaintiff and most minority employees as part-time NVF employees so as to deny them access to life insurance and disability benefits that were given to white employees, most of whom were classified as full-time NVF employees. This significantly adversely affected Plaintiff as she had specifically and repeatedly asked about how she could avail herself of the disability benefits given to a similarly situated white employee.

115.    As detailed herein, Defendants failed to make an individualized assessment to determine whether a reasonable accommodation would enable Plaintiff to continue to perform the essential functions of her positions, but made such an assessment and accommodated two similarly situated white employees.

116.    Further substantiating Plaintiff's claims, as described above, Defendants treated minority employees as a whole worse than similarly situated white employees – lower pay with more responsibilities, less access to donor and professional networks, less access to information that was given to white employees, and unequal eligibility for benefits – in violation of the DCHRA.

117.     As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

118.     This claim is brought against all Defendants.

## FOURTH CAUSE OF ACTION
### Discrimination on the Basis of Sex in Violation of the DCHRA

119.     Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

120.     Under the DCHRA, it is "an unlawful discriminatory practice" for an employer to, "based upon the . . . sex" of an individual, "discriminate . . . with respect to his or hers compensation, terms, conditions, or privileges of employment; or to limit, segregate, or classify his or hers employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or hers status as an employee . . ." D.C. Code § 2-1402.11(a)(1)(A).

121.     As a female, Plaintiff is a member of a protected class under the DCHRA.

122.     Plaintiff was fully qualified for her positions as Vice President of Advocacy of VRL and Executive Director of SD and was able to perform all the essential functions of the positions.

123.     As described above, Defendants paid Plaintiff less than male employees in violation of the DCHRA.

124.     Defendants told Plaintiff that she could not negotiate for a salary outside of the pay scale but allowed a new male employee to negotiate his salary. That male employee, who reported to her, was paid more than Plaintiff, even though he had less education, less experience, and had fewer responsibilities. Similarly, Plaintiff's male supervisor also had less education and experience

than Plaintiff and, at the time that she was assigned his responsibilities in addition to her own, his pay was 60% higher.

125. As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

126. This claim is brought against all Defendants.

### FIFTH CAUSE OF ACTION
### Discrimination on the Basis of Age in Violation of the DCHRA

127. Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

128. Under the DCHRA, it is "an unlawful discriminatory practice" for an employer to, "based upon the . . . age" of an individual, "discriminate . . . with respect to his or hers compensation, terms, conditions, or privileges of employment; or to limit, segregate, or classify his or hers employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or hers status as an employee . . ." D.C. Code § 2-1402.11(a)(1)(A).

129. As an adult over 40 years old, Plaintiff is a member of a protected class under the DCHRA, the Older Worker Benefit Protection Act, and the Age Discrimination in Employment Act.

130. Plaintiff was fully qualified for her positions as Vice President of Advocacy of VRL and Executive Director of SD and was able to perform all the essential functions of the positions.

131. As detailed herein, Defendants failed to make an individualized assessment to determine whether a reasonable accommodation would enable Plaintiff to continue to perform the

essential functions of her positions, but did accommodate two similarly situated colleagues who were under age 40.

132.     As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

133.     This claim is brought against all Defendants.

**SIXTH CAUSE OF ACTION**
**Discrimination on the Basis of Disability in Violation of the DCHRA**

134.     Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

135.     Under the DCHRA, it is "an unlawful discriminatory practice" for an employer to, "based upon the actual or perceived . . . disability" of an individual, "discriminate . . . with respect to his or hers compensation, terms, conditions, or privileges of employment; or to limit, segregate, or classify his or hers employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or hers status as an employee . . ." D.C. Code § 2-1402.11(a)(1)(A).

136.     Because lupus, pericarditis, arthritis, and neuropathy substantially limit at least one of Plaintiff's major life activities, Plaintiff is an individual with a disability under the DCHRA.

137.     Plaintiff was fully qualified for her positions as Vice President of Advocacy and Executive Director and was able to perform all the essential functions of the positions. Indeed, Plaintiff was repeatedly promoted at NVF and SD because of her capabilities.

138.     Prior to her hiring by VRL and SD, Ms. Lewis and Ms. Tarazi knew of Plaintiff's disability. Prior to or at the time of her hiring by NVF, Defendants NVF and SD knew of Plaintiff's disability.

31

139.     As described above, Plaintiff's increasingly demanding work and travel schedule in 2021 caused flare-ups of her lupus and other conditions, and she requested a modified work schedule. Defendants made no individualized assessment to determine whether a reasonable accommodation would enable her to continue to perform the essential functions of her positions, as is required under the DCHRA.

140.     The termination of Plaintiff by Defendants SD and SD USA and their failure to make an individualized assessment to determine whether a reasonable accommodation would enable her to continue to perform the essential functions of her position as Executive Director of SD violated the DCHRA.

141.     The failure by Defendant NVF to make an individualized assessment to determine whether a reasonable accommodation would enable Plaintiff to continue to perform the essential functions of her position as Vice President of VRL violated the DCHRA.

142.     As a result of Defendants' actions and inactions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

143.     This claim is brought against all Defendants.

**SEVENTH CAUSE OF ACTION**
**Hostile Work Environment in Violation of the DCHRA**

144.     Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

145.     The DCHRA covers discrimination and harassment based on race, color, sex or other protected classes. D.C. Code § 2-1402.11(a).

146.     As detailed herein, Defendants repeatedly made remarks to, and engaged in acts towards, Plaintiff that indicate Defendants harbored discriminatory animus.

147.    Defendants consistently treated Plaintiff and other female employees of color worse than white female employees or male employees in ways that materially affected the terms, conditions, and privileges of their employment. Defendants paid non-white female employees less, classified them so as to deny them access to insurance benefits and to important professional networks, gave them more responsibilities without simultaneous salary increases, prevented them from accessing information necessary to perform their jobs, and made repeated racist and colorist comments that created a hostile working environment. When Plaintiff opposed these practices, Defendants retaliated against her.

148.    Defendants' harassing conduct toward Plaintiff was committed with malice, including that (a) Defendants acted with intent to cause injury to Plaintiff and/or acted with reckless disregard for Plaintiff's injury, including by retaliating against Plaintiff, terminating Plaintiff's employment and/or taking other adverse job actions against Plaintiff because of her race, color, sex, and/or good faith complaints, and/or (b) Defendants' conduct was committed in willful, wanton, and reckless disregard of Plaintiff's rights, health, and safety, including Plaintiff's right to be free of discrimination, harassment, retaliation, and wrongful employment termination.

149.    As a proximate result of Defendants' willful, knowing, and intentional harassment and intimidation of Plaintiff, Plaintiff has suffered and continues to suffer both economic and non-economic harm.

150.    This claim is brought against all Defendants.

### EIGHTH CAUSE OF ACTION
### Retaliation in Violation of the DCHRA

151.    Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

152.    Under the DCHRA, it is "an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected under this chapter." D.C. Code § 2-1402.61(a).

153.    Under the DCHRA, it is "an unlawful discriminatory practice . . . to . . . retaliate against, interfere with, intimidate or discriminate against a person, because that person has opposed any practice made unlawful by this chapter . . ." D.C. Code § 2-1402.61(b).

154.    As detailed herein, Plaintiff spoke with Arabella on October 28, 2021 about the discrimination and hostile work environment she experienced, her opposition to Defendants' discriminatory practices, and her concerns about retaliation.

155.    On the evening the October 28, 2021, Plaintiff emailed Defendant NVF and opposed Defendants' discriminatory treatment based on race, sex, age, and disability.

156.    The next morning, NVF placed Plaintiff on immediate leave from both NVF and SD. Her email access and access to all SD electronic assets were suspended without warning to her or even to the SD board. These actions prevented Plaintiff from: performing her job (including her management and leadership of employees), attending high-profile meetings, authorizing expenses, and communicating with contractors and funders. These actions made her completely unable to work and perpetuated the hostile work environment.

157.    Further, even after the SD board demanded that Plaintiff be reinstated to SD, Defendants once again retaliated against her by blocking her access to her email and work accounts a second time, on November 20, 2021. In a pattern of antagonism, this was again done with no warning or explanation to Plaintiff, indicating both hostility towards Plaintiff and a reckless disregard of her rights. Defendants' actions additionally were accompanied by fraudulently informing Google that Plaintiff was not an authorized user of SD accounts.

158.    The conduct of Defendants towards Plaintiff would have dissuaded a reasonable worker from making or supporting a charge of discrimination. Plaintiff had made a good faith attempt to oppose discriminatory practices, and had been immediately placed on leave upon doing so. Although she was temporarily reinstated to her position at SD, Defendants' actions continued to materially harm Plaintiff. During her two-week reinstatement, Plaintiff attempted to mitigate the harms caused by Defendants' actions. When Defendants again terminated Plaintiff's access to her work accounts without notice nor explanation, their actions exacerbated the harms already done to Plaintiff.

159.    Defendant NVF had no legitimate, non-discriminatory reasons for placing Plaintiff on leave from SD. Defendant NVF's actions placing Plaintiff on leave from SD was done purely for retaliatory, discriminatory reasons, as Ms. Lewis was not authorized to take this action on SD's behalf. The decision to place Plaintiff on leave from NVF at the same time was done for the same discriminatory, retaliatory reasons. The post hoc claim that Plaintiff was placed on leave pending an investigation was quickly proven false, as the attempt at investigation ended quickly thereafter and Plaintiff was not reinstated. Nor was the decision to keep Plaintiff on ongoing administrative leave done in order to shield Plaintiff from further discrimination or retaliation. To the contrary, additional retaliatory actions were taken against Plaintiff after she was placed on leave.

160.    Furthermore, if Defendant NVF's relationship with VRL ended June 16, 2022, then Plaintiff's employment with NVF should have ended that same day. There would be no legitimate business reason to keep her employed after that date since Plaintiff's position with NVF would have ended along with every other employee of VRL. If, in the alternative, Defendant NVF's relationship with VRL did not end on June 16, 2022, then Defendants have had one year in which to resolve Plaintiff's concerns and ensure that Plaintiff could exercise her rights to a workplace

free of discrimination, harassment, or retaliation. Yet during that year, Defendants made no good faith attempt to resolve the claims raised by Plaintiff.

161.    Defendants SD and SD USA, acting by and through Ms. Smith and others,  had no legitimate, non-discriminatory reasons for discharging Plaintiff. Plaintiff's position with SD ended with no formal notice to her, nor to the many vendors and contractors of SD who continued to contact Plaintiff regarding invoices and other matters long after her position with SD ended. Indeed, for all intents and purposes, SD USA was identical to SD, with the critical distinction that Plaintiff was not employed by SD USA. If there had been a legitimate business reason to dissolve SD, then as Executive Director, Plaintiff would have been involved in its dissolution and winding up. Instead, Plaintiff was denied access to her email and SD Google accounts, denied assistance from SD's accountant and attorney, and denied any information about what was happening.

162.    If the creation of SD USA was for legitimate, non-discriminatory reasons, then Plaintiff would have been offered a position at SD USA, as was every other SD employee.

163.    In addition, Defendants' decision to terminate Plaintiff from SD were accompanied by numerous fraudulent actions. The decision to dissolve SD and create SD USA was intentionally kept quiet, with no explanation given to employees of SD and NVF, and an explicit attempt to prevent contractors of SD from learning that SD had dissolved. Employees of NVF misrepresented themselves as employees of SD. Defendants misled employees and contractors about what was happening. NVF employees misled employees, vendors, contractors, funders, and others about why Plaintiff was on leave.

164.    As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

165.    This claim is brought against all Defendants.

## NINTH CAUSE OF ACTION
### Wrongful Discharge in Violation of Public Policy

166.    Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

167.    Numerous statutes have recently been enacted at the federal, state, and local level to protect whistleblowers. These include: the Sarbanes-Oxley Act,  18 U.S.C. § 1514A; the D.C. Whistleblower Protection Act, D.C. Code § 1-615.51 et seq.; the Taxpayer First Act of 2019, 26 U.S.C. § 7623(d).

168.    As detailed herein, Plaintiff acted as a whistleblower and her actions in doing so are protected under the Taxpayer First Act of 2019, 26 U.S.C. § 7623(d).

169.    Similar to these public policies protecting whistleblowers, the District of Columbia has recognized a public policy exception to at-will employment when employees are terminated due to their refusal to violate the law.

170.    As detailed herein, Ms. Walker refused an offer to work full-time for NVF as she stated that doing so would violate the Internal Revenue Code. Defendants therefore terminated Plaintiff by dissolving Secure Democracy, forming a new entity, and rehiring all of the employees other than Plaintiff.

171.    As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

172.    This claim is brought against all Defendants.


## TENTH CAUSE OF ACTION
### Tortious Interference with Contractual Relations

173.    Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

174.    As described above, Plaintiff was employed by both NVF and by SD. All Defendants knew of this employment relationship.

175.    On October 29, 2021, Defendant NVF placed Plaintiff on leave from her position with SD and intentionally prevented her from performing her job with SD. Defendant NVF's lack of authority to interfere with Plaintiff's job with SD was documented by Ms. Smith and confirmed by Defendant NVF's general counsel.

176.    On November 20, 2021, Defendant NVF again terminated Plaintiff's access to her SD systems a second time. Unlike the first instance of retaliation on October 29, 2021, Defendant NVF did not take steps to ensure that Plaintiff's access was restored. This caused Plaintiff to stop being able to perform her position at SD.

177.    As described above, Defendant NVF acted with malicious intent to harm Plaintiff.

178.    As a result of Defendants NVF's actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

179.    This claim is brought against Defendant NVF.

**ELEVENTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**

180.    Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

181.    As described above, Defendants' discriminatory, harassing, and retaliatory actions against Plaintiff constituted severe and outrageous misconduct and caused Plaintiff extreme emotional distress.

182.     Defendants knew or should have known that their actions would be distressing to Plaintiff. Defendants knew that Plaintiff would be particularly susceptible to emotional distress as they were on notice that the symptoms of her chronic diseases are exacerbated by stress.

183.     In addition, Defendants had previously failed to take any action to accommodate Plaintiff's disability, so Plaintiff was already at a high level of emotional and physical distress.

184.     As a direct result of Defendants' extreme and outrageous conduct, Plaintiff did suffer and continues to suffer severe emotional distress.

185.     As a proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, mental pain and anguish, and her physical health has deteriorated.

186.     Defendants' misconduct was committed intentionally, in a malicious and fraudulent manner.

187.     This claim is brought against all Defendants.


**REQUESTED RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment on her behalf on all counts contained herein, and grant her the following relief:

(a)  Declaratory judgment that Defendants' conduct violated Plaintiff's rights. In particular, that the Court declare the actions of Defendants complained of herein to be in violation of: the Civil Rights Act of 1866, 42 U.S. Code § 1981 and the District of Columbia Human Rights Act, D.C. Code § 2-1401.1 *et seq.*; that Defendants intentionally and recklessly inflicted emotional distress upon Plaintiff; that Defendants discharged Plaintiff in violation of public policy; and that Defendant NVF intentionally interfered with Plaintiff's contracts;

(b)  Injunctive relief permanently enjoining Defendants, their agents, employees, and successors from discriminating on the basis of race, sex, age, or disability, or retaliating against Plaintiff or any persons in violation of the aforementioned acts;

(c)  Appropriate compensatory and punitive damages be awarded to Plaintiff and against Defendants, in an amount to be determined by the jury;

(d)  Prejudgment and post-judgment interest on all damages;

(e)  Reasonable attorneys' fees, litigation expenses, and costs; and

(f)  Such other and further relief as the Court deems appropriate based on the facts and applicable law.

## JURY DEMAND

Plaintiff requests a trial by jury as to all issues of fact and damages raised in this case.


Dated: October 28, 2022

Respectfully submitted,

  /s/  Matthew J. Hefti
Matthew J. Hefti
Bar ID: TX0031
State Bar of Texas #24099300
matthew.hefti@parlatorelawgroup.com
Jennifer Hoffpauir
jennifer.hoffpauir@parlatorelawgroup.com
**Parlatore Law Group, LLP**
One World Trade Center, Suite 8500 New
York, NY 10007
(212) 603-9918 (tel)
(212) 202-4784 (fax)


W. Mark Lanier
Mark.Lanier@LanierLawFirm.com
Zeke DeRose III
Zeke.DeRose@LanierLawFirm.com
Matt Przywara
Matt.Przywara@LanierLawFirm.com
**THE LANIER LAW FIRM**
10940 W. Sam Houston Pkwy N.
Suite 100
Houston, TX 77064
(713) 659-5200 (tel)
(713) 659-2204 (fax)


K. Lawson Pedigo
Bar ID: TX0186
SBOT: 15716500
klpedigo@mkp-law.net
**Miller, Keffer & Pedigo, Pllc**
3100 Monticello Ave., Suite 480
Dallas, Texas 75205
(214) 696-2050 (tel)
(214) 696-2482 (fax)

*Counsel for Plaintiff Sarah Walker*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **SARAH WALKER,** | ) | |
| **20 E. 40th Street** | ) | |
| **Minneapolis, MN 55409** | ) | |
| | ) | |
| _Plaintiff,_ | ) | |
| | ) | |
| v. | ) | **Docket No.: 22-cv-_____** |
| | ) | |
| **NEW VENTURE FUND** | ) | **VERIFIED COMPLAINT** |
| **1828 L Street, NW, Suite 300** | ) | |
| **Washington, DC 20036** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **SECURE DEMOCRACY** | ) | |
| **611 Pennsylvania Ave SE, #143** | ) | |
| **Washington, DC 20003** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SECURE DEMOCRACY USA** | ) | |
| **611 Pennsylvania Ave SE, #143** | ) | |
| **Washington, DC 20003** | ) | |
| | ) | |
| _Defendants._ | ) | |

_____ )

## PLAINTIFF'S VERIFICATION OF COMPLAINT

I, Sarah Walker, declare as follows:

1.      I am the named plaintiff in the above captioned case and a citizen of the United States of America. I am an adult, over eighteen (18) years of age, of sound mind, capable of making this statement, and I am personally acquainted with the facts stated. I declare that the information herein is true, correct, and complete.

2.      I have reviewed the contents of the Complaint. I have knowledge of the matters contained in the Complaint. I verify that the statements contained in the Complaint are true to the

best of my knowledge, except as to matters alleged on information and belief, and as to those matters, I believe them to be true.

3.    I, Sarah Walker, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Sarah Walker

Executed on: October 28, 2022

43