# APPENDIX

## Employment Discrimination and Retaliation

*Unlawful discrimination against S. Walker on the basis of race, sex, age, and disability; Retaliation against S. Walker for opposing discriminatory practices.*

| EXHIBIT | ACTION | COMMENT |
|---|---|---|
| **1** (Pages 3-8) | Text communication with A. Harrington after she realized that 50% SD employees were being denied benefits. She acknowledges that a recent hire was also misled about STD, LTD and life insurance. A. Harrington also shared internal Slack communications involving her, A. Dale and M. DeSmedt regarding A. Harrington's classification as part-time or full-time NVF employee. | Employee classifications as part-time or full-time NVF were arbitrary and discriminatory, immediately affecting eligibility for benefits. |
| **2** (Pages 9-11) | S. Walker being informed by S. Mankin that the leadership retreat would be scent-free. Her concerns about not being able to meet that requirement due to problems associated with her lupus characterized as a "lifestyle" choice. | Failure to accommodate her disability. |
| **3** (Pages 12-29) | SW's memo to NVFL/VRL management sent in June 2020 related to concerns of pay inequity and unethical pay-to-play activity.  Sent to M. Lewis, S. Tarazi, and C. LoBue, then Chief of Staff. | This was one of several times when S. Walker raised discrimination concerns. |
| **4** (Pages 30-31) | S. Walker communication to M. DeSmedt and A. Dale asking for an accommodation. S. Walker had inquired about accommodations and part-time work on multiple occasions in the prior weeks. | One of many requests for an accommodation of S. Walker's disability. |
| **5** (Pages 32-34) | Portion of NVF Employee Handbook concerning whistleblower protections. | |
| **6** (Pages 35-40) | Whistleblower email to A. Schulz of NVF. | |

| | | |
|---|---|---|
| **7**<br>(Pages 41-42) | NVF retaliation against S. Walker. M. Lewis informing SD Board that S. Walker was placed on administrative leave. | Actions were taken without authorization from SD board. |
| **8**<br>(Pages 43-45) | Whistleblower email to H. Smith of SD. | |
| **9**<br>(Pages 46-47) | A. Harrington sending out talking points about how to talk to SD contacts and contractors about SW on administrative leave. | Communication was sent out without SD board's authorization. A. Harrington was not an SD employee. |
| **10**<br>(Pages 48-50) | Email from Google Workspace Support on Nov. 1, 2021 acknowledging that Anthony Dale, an NVF employee, claimed that SW was rogue on the SD Google Workspace in order to shut down her access. | |
| **11**<br>(Pages 51-52) | Email communication from H. Smith acknowledging that M. Lewis had no authority to place SW on administrative leave and deny her access to her SD email. | |
| **12**<br>(Pages 53-54) | NVF acknowledging M. Lewis's conduct, confirming SW's access had been restored, and attempting to minimize the conduct. | |
| **13**<br>(Pages 55-58) | Email from Google Workspace Support to S. Walker on Nov. 20, 2021 informing her that NVF is claiming ownership of the SD account, and that she can no longer have access. | This was the only notification S. Walker received that her position at SD had ended. |
| **14**<br>(Pages 59-62) | Secure Democracy website "Our Leadership" page, accessed November 30, 2021. | |
| **15**<br>(Pages 63-67) | Secure Democracy website "Our Leadership" page, accessed January 4, 2022. | |

# EXHIBIT 1

**Amanda** >

Wed, Oct 20, 12:41 PM

Question - are you working without short term or long term D benefits right now too?

Yes its ridiculous

Megan's tone is so shorty

*shitty

This is fucked

They should make it up w a salary bump til it's fixed d

Really fucked

Is she talking to you about it



8:21

AH

Amanda >

Like why am I the one apologizing here but also: how is it not clear why this is a deal breaker for any woman of repro age and/or anyone w a chronic health condition?

Btw this all sam's doing

That is fucked

Yeah also we literally *just* overstated Will's benefits

On his offer

That's such an unnecessary vulnerbaility

Yep and megan wanted to hide it from the team

I said absolutely not

That's right

AND MKD's point – never would be the same forever – is so beside the point

This is false advertising

Yes we applied for jobs that stated

iMessage

5

8:22   LTE

 **amanda harrington (she/her)** 🌵 11:49 AM
Okay thank you. And I def have iron clad assurance disability policies will be added? (Not planning to use them - but I am dependent upon my income so it is kind of a deal breaker for me)

 **Anthony Dale** 🔒 12:01 PM
A deal breaker for moving over to the split or the role?

 **amanda harrington (she/her)** 🌵 12:05 PM
Well - it's just something I look for in considering any job

So if the org I was applying to didn't have STD and LTD, I'd decline...

But it sounds like this is getting worked out?

 **MKD** 🏳️ 12:19 PM
OK so I have a couple things to clarify here:
1. Benefits (thru NVF, SD, or any employer) are always subject to change and so I'd never say there was an ironclad commitment to any benefit remaining the same forever
2. Our intention (and NVF's intention

Message MKD, Anthony Dale 

 **MKD** 🟫 12:19 PM
OK so I have a couple things to clarify here:

1. Benefits (thru NVF, SD, or any employer) are always subject to change and so I'd never say there was an ironclad commitment to any benefit remaining the same forever
2. Our intention (and NVF's intention as far as we know) is for these benefits to remain the same
3. We are working to set-up insurance policies through SD for disability and life and our goal is to get as close a match as possible for the two, though identical may not be possible
4. Since this is a big deal for you, @amanda harrington (she/her) we should just leave you 100% on VRL payroll for the time being while this gets sorted out, and then we can circle back once the insurance policy details are final

 **amanda harrington (she/her)** 🌵 12:30 PM
Thanks! Completely get benefits subject to change - and I know (and appreciate) that you are working on all this. I'm totally fine to stay NVF paid if that will

Message MKD, Anthony Dale 

   

benefits to remain the same

3. We are working to set-up insurance policies through SD for disability and life and our goal is to get as close a match as possible for the two, though identical may not be possible

4. Since this is a big deal for you, @amanda harrington (she/her) we should just leave you 100% on VRL payroll for the time being while this gets sorted out, and then we can circle back once the insurance policy details are final

 **amanda harrington (she/her)** 🌵 12:30 PM
Thanks! Completely get benefits subject to change - and I know (and appreciate) that you are working on all this. I'm totally fine to stay NVF paid if that will still allow me to be "SD branded" externally while this is sorted. Does that work?

And! Very happy to discuss this if that's easier - currently trying to unlock Alex's mom from our house in VA while we just touched down in Austin :) No rush - and I'm sure we can find a mutually beneficial resolution!

Message MKD, Anthony Dale    

   

# EXHIBIT 2

11:02

< **● Sofia**
View details



**Sofia** 3:58 PM
thank you!

**Today**



**Sofia** 10:47 AM
Hey! Saw you weren't going to be able to make it to the LT retreat & we're going over all the details from the tips & tricks doc today, so thought I'd reiterate here.

**TL;DR:**
- Dress in layers
- Please **do not** wear any perfume or scented products. We will not be able to continue as an entire group if anyone does, so we really appreciate the forethought here!



**Sarah Walker** 📝 11:02 AM
I will not wear perfume or other scented products, but I want to note that do to Lupus I am not able to do some things that seem basic to many like dry my hair or hold a brush. As a result, I have someone come and do my hair once each week.  I also have african american textured hair which requires different care and the hair stylists uses products that may have a scent.  I am on a plane to Portland now so this is awfully late notice for me to adjust anything related to my hair.  So if this is an issue I would like to know.

Message Sofia

Home | DMs | Mentions | Search | You

2:04  LTE 

● **Sofia**
View details

As a result, I have someone come and do my hair once each week.  I also have african american textured hair which requires different care and the hair stylists uses products that may have a scent.  I am on a plane to Portland now so this is awfully late notice for me to adjust anything related to my hair.  So if this is an issue I would like to know.

 **Sofia** 12:04 PM

of course, I totally understand. It was in the note I sent over Friday, but it was buried among many other things - so I totally agree with the late notice aspect. I would never want you to severely alter your lifestyle in that way, and thank you for sharing that with me.

# EXHIBIT 3



Sarah Walker <sarahcwalker@gmail.com>

---

# Documentation of Ongoing Issues
4 messages

---

**Sarah Walker** <sarah@secure-democracy.org>                                                Mon, Jun 8, 2020 at 1:30 PM
To: Megan <megan@votingrightslab.org>
Cc: Sam Tarazi <sam@votingrightslab.org>, Christian <christian@votingrightslab.org>
Bcc: sarahcwalker@gmail.com

Megan, As discussed on Friday, I am submitting written documentation of the ongoing issues related to Colin. I hope that as I stated in the call that this is not taken to be an act of provocation, but rather, as a means of documentation for myself. As the memo indicates and as I have stated to Christian, I began this Memo prior to May 21st with the intention of raising this when Colin left for paternity leave.

Thank you for your understanding in this matter,

Sarah
--


Sarah Walker
State Affairs
Secure Democracy
612-220-2070
sarah@secure-democracy.org

---

📄 **Memo_ Colin.Workplace.June.2020.pdf**
169K

---

**Sarah Walker** <sarahcwalker@gmail.com>                                                Mon, Jun 8, 2020 at 1:34 PM
To: jathilingam@gmail.com

I submitted this to Megan, Sam, and Christian..
[Quoted text hidden]
--


Sarah C. Walker

cell: 612.220.2070

@sarahwalkermn

# **Memo**

---

**Date:** May 21, 2020 - June 7, 2020
**TO:** Christian LoBue, Sam Tirazi, Megan Lewis
**FROM:** Sarah Walker
**RE:** Colin / Toxic Work Environment / Differential Treatment / Failure of Supervision / Denial of Compensation / Illicit Activity / Appropriation of Work Product / Lack of Accountability

Pursuant to my conversation with Megan on June 5, 2020, this Memo is submitted to provide documentation of conversations and communications I have had with members of the leadership team regarding ongoing concerns.  As discussed with Megan, I feel a need to provide written documentation to protect myself and ensure that ongoing organizational issues are addressed.  This document, as will be evidenced in google docs, was first created prior to May 21, 2020 with the intention of sharing this with leadership upon Colin's paternity leave.  I had feared retaliation and alienation by Colin, so my intention was to wait until he had left for paternity leave.  I am also providing the link the google doc for verification and to ensure that event of George Floyd's death are not the impetus of my sharing:
https://docs.google.com/document/d/12Kl-r0zmVvr8jTyi8AD-PrR7vyXSk-g041PAAhvnqK8/edit.
I had been told that his paternity leave would begin June 1.  When it became obvious that his date of departure for paternity leave was farther off, and out of a feeling of utter frustration I reached out Christian.  I would like to note that until that instance, I had never reached out or gone around the organizational hierarchy.  I had believed that it would be easier to address and discuss some of these fundamental issues while Colin was absent.  Colin refused to tell me when he was leaving for paternity leave and only a few days ago after significant organizational upheaval and my stating clearly that I needed to plan for my own time off did he acknowledge that his leave would begin on June 22, 2020.  I appreciate the consideration for many of my concerns.  I have now received the "Acting Director Job Description" offer and have committed to accepting that position.   I also appreciate the offer and commitment to either return to my role as Associate Director and/or reexamine my role after the 10-week period.  While I am comfortable returning to the work of a State Affairs Associate Director, however without fundamental changes in the leadership of state affairs, it seems untenable to foresee a future as an Associate Director.  So, without fundamental changes and accountability I will opt for the later option of re-examining/redefining my role.  This document illuminates the reasons why returning to an Associate Director's position under the current structure is not a tenable option. Each area described below is documentation of ongoing concerns expressed to a member of the leadership team.

- **Leadership Team +** - In late March I was asked to assume additional work responsibilities which included supervision/management of State Affairs staff and additional work.  Over the course of the last few months that work has only increased in

1

its breadth.   When I was asked to assume these additional responsibilities I assumed it would come with a job description and compensation for the work.  Neither came to fruition until this Thursday, June 4, 2020 after conversations with Colin and Megan indicating that I would no longer accept this ambiguous role without a job description and associated compensation for the additional work.   When speaking with Megan on Thursday, June 4, 2020 she indicated that NVF policy only required a status change if a temporary reassignment was expected to last for more than 3 months.   I spoke with Megan again on Friday, June 5, 2020 to express my concerns about her comment and to request that she consider paying back compensation for the period between late March and early June.   The reasons are as follows:

- ○ **Reassignment Length & Failure to Follow NVF Policy -** When I was asked to assume this role of what has been deemed "Leadership Team +" I was told by Colin that this work would likely continue until either the elections or fall.   This was always what was stated.   This was reaffirmed in our weekly calls when multiple members of the leadership team noted that the work in front of us would carry on throughout the Summer.   If NVF's policy states that any temporary reassignment of more than 3 months requires an HR status change Secure Democracy / Voting Rights Lab was in violation of the state policy.

- ○ **Paternity Leave Makes Claims of Temporary Reassignment Erroneous -** Specific to my circumstances, in addition to being told that these responsibilities would potentially last through the November 2020 elections I was also told that I would be assuming Colin's work throughout his paternity period.  His paternity was to last through the end of summer.  So, even if the organization would like to claim that the timeline was not clear for how long Leadership Team + would exist, it is clear that in my case the time period from the end of March through the end of August is well over the NVF guidelines which only allows for temporary reassignments for a period of 3 months.

- ○ **Denial of Pay to Women of Color -** There were two individuals within the organization that were told to assume increased responsibility and supervisory authority.  I, of course, am on the two women, but it must be noted that both myself and the other woman, Soncia, are women of color.   We were both asked to assume additional work and supervisory responsibilities without compensation. The work we assumed was the work of our caucasian division directors.  This raises concerns of either intentional or unintentional racial marginalization and concerns of racialized wage theft.   The two women of color who were placed in Leadership Team + roles have equal if not greater education and experience than the directors whose work they were assuming.   There is no legitimate basis for denial of compensation for work based on experience or education.

- ○ **Failure to Provide Job Description or Articulate Role and Expectations -** Despite numerous requests to Colin to clarify my roles and responsibilities within this new "Leadership Team Plus" structure no guidance or job description was ever offered.  There were never clear expectations or understanding of simple management tasks like approval of timesheets, role in hiring, and role in the organizational approval process.  Despite the lack of clearly defined roles and responsibilities I was continuously held accountable and asked questions about organizational responsibilities that were never articulated to me.   Additionally, the work was constantly shifting without any clear communication, training, or warning.  I would point to the assumption of the Election Administration work and

2

the management of the GOP consultants.  Both bodies of work were given to me with zero warning and with expectations that were often not clear.

○ **Failure to Transition or Notify of Paternity Leave** - Colin refused to inform me of his paternity leave dates until last week when I essentially compelled him to tell me by expressing that I needed to make my own summer plans combined with the fact that the POC staff had issued that statement.  I spoke with Christian about not being informed of his departure date and was shocked to learn that not even the Chief of Staff had been informed of his date of departure.   It is impossible to plan or transition without basic information.  Both Luis and Sarah Jane had asked me on multiple occasions and I had no answer.  In addition, there have been no efforts to transition work or approval authority.  Colin has not scheduled a single meeting or had one conversation about what this period would look like and what of his work I would need to assume.

○ **Everytown Culture and Clique** - There is a widespread feeling among associate directors that the organization is insular and that the organization is dominated by an Everytown Culture and Everytown personnel.  The Everytown staff are exclusively white and dominate the leadership structure.  This makes it difficult for associate directors who are overwhelmingly people of color to express their concerns because we are all aware of the long-standing working relationships.  A recent example of how this plays out in a dysfunctional and marginalizing manner is in a conversation that took place among members of SA.  Colin used the MI Drop Box Guidance document as an example to highlight issues.   During that conversation, despite the fact that Sarah Jane was not a part of the MI work, she spoke up and indicated that Liz had already discussed this with her and asked her for her thoughts.   What is so troubling about this is that Liz could have reached out to me, as part of LT+, but instead reaches out to someone who is my supposed direct report to have this conversation.  It is undermining my ability to supervise, breaks management structure, and evidences the way in which it is difficult for those who are not former Everytown staff and are overwhelmingly people of color to feel that they are on equal footing.

○ **Denial of Authority and Information to Perform in Leadership Team + -** When the Leadership Team + structure was established there was not clarity on roles and responsibilities.  There was also no clear designation of authority or approval thus rendering membership in Leadership Team + ineffective or unable to provide meaningful leadership or supervisory management.

■ As part of Leadership Team + I was not included in decision making and decisions were often delayed or never communicated.

■ We were given supervisory responsibility without the ability or authority of decision making.  Examples of the aforementioned include, but are not limited to:

● **Hiring:** Sarah Jane and Luis were both hired without any inclusion or input in the hiring process.  I have never witnessed an organization that places someone in a supervisory position, yet denies them input in the hiring process of individuals they are intended to Supervise.

● **Luis:** I learned of Luis' hiring on a public slack post.  In addition, the job position had only been posted one week prior to the announcement.  Based upon my experience going through the

3

Secure Democracy / VRL hiring process there is no way that it would be possible to complete that hiring process in less than one-week.  This was clearly a pre-negotiated deal made between Luis and Colin that flagrantly failed to observe the regular hiring process.   Since I was not part of the hiring process I am not able to confirm or deny what the hiring process took place, but I am skeptical that Luis was made to go through the same hiring process that the other women of color went through that included multiple rounds of interviews and a written assignment.   This appears to be continuation of preferential treatment made for former members of the Everytown Staff.  Luis was brought on as a full-time employee and not as a contractor or as a temporary position. Luis was also given the ability to continue to consult with Everytown for the next few months and this information was only provided to me after I raised the issue of Sarah Jane's work and Scope.

- **Sara Jane:**  I was only notified of Sarah Jane's hire a day or two before the announcement.   I was not included in the hiring process or given any information about her role, capacity or tenure.   I was told she would be consulting with us through this period.   In conversations with Sarah Jane I learned that there was an agreed upon scope of work and timeline.  I was not provided either piece of information.   Additionally, Sarah Jane informed us that she was going to continue to consult with her previous employer throughout this period and would not be available at certain times throughout the week.  Like Luis, Sarah Jane, is a former Everytown staffer who used to report to Colin.  It appears that there was no formal hiring process or consultant position posted.  I had assumed that Sarah Jane's work as a consultant was being handled like many or our lobbyists and communications consultants.  Even if her employment was being handled as our lobbyist contract is - it is concerning that both of our validator outreach positions are being forced to go through one process, but former Everytown staff are not forced to go through any of our normal hiring processes.   Subsequently, I also found out that she is actually an employee and not a consultant.  I was only made aware of this arrangement when an approval/late timesheet request on Replicon was sent to me on behalf of Sarah Jane's Timesheet.  I was never made aware that I would be approving her timesheets.  I reached out to Sarah Jane to ask her why her timesheet had not been submitted and she indicated that she was never onboarded and that no one had told her.  She also stated that she had never submitted her paperwork through Secure Democracy to get paid.  Colin never informed me that this was needed and failed to do any of this administrative work.
- **Sarah Jane & Luis -**  When Sarah Jane and Luis are hired it served to further the belief among staff that the only people who trusted or respected within the organizational structures were from

4

Everytown.   This was bolstered by the facade of a hiring process and the move of Charley to Campaigns and Partnerships.

- **Charley -** I was given no warning and was not included in the decision to move Charley from State Affairs to Campaigns and Partnerships.   Charley immediately reached out and asked if there was a problem with her performance.  Because I was not included in the decision making or the conversation despite the fact that I was supposed to be supervising her I was left with little to say except to convey the message to Charley.  Additionally, I am still not certain of the length and timeline of her reassignment or the reason behind the move.   Colin provided no coaching or training even prior to my assuming her "supervisory responsibility." The only coaching and support offered to Charley throughout her tenure came at my request and suggestion to Colin that I go with her on her first trip to Kentucky to help her integrate into the organization and hear someone discuss the issues in a Secure Democracy frame.

- **Supervising Sarah Jane and Luis** - Colin explicitly told me it was my responsibility to supervise Sarah Jane and Luis.  However, throughout the majority of their short tenure Colin would Slack with them privately, hold meetings without me, and did not share or communicate what was said.  Both Sarah Jane and Luis asked about how to handle this and discussed how it was redundant.  In addition, it made clear that I did not have supervisory authority and undermined my ability to perform my work.

- **Disparate Treatment Among Leadership Team +**  MKD has approval authority in areas where the two women of color do not. This was recently highlighted in the Iowa Slack channel on June 6, regarding budget approval for Iowa patch through calls.  The conversations between Colin and I and Sam, Colin and I are in slack, but for me, this points to the ongoing lack of clarity and continuous confusion in our processes and lack of clear communication or guidance.   All of this evidenced by Colin's response which indicated that he also did not know why MKD had approval authority and Soncia and I do not.  If the person I report to is not able to answer the question it is unreasonable to think that anyone who is not on LT understands the change and where approval authority lies within the organization.  For folks who are not in LT we are continuously held to a process that often our own managers are not able to articulate.  Second, without this understanding and perhaps even with the understanding the appearance is of racially disparate treatment among the leadership team +.  It appears the MKD was given approval authority and the trust and information to make those decisions while Soncia and I were not.  Additionally, MKD has always maintained some role of approval authority over other areas like "creative" on digital.  This is particularly weird because this was often within a tripod structure where both Soncia and I were part of

5

the tripod and MKD was not.   Hence, MKD is approving the work of two of her black and brown leadership team + peers.   One example, and there are others festooned through slack, is in the Arizona slack channel on April 24th during a discussion over digital ads.  This is not the only case of this happening.  Another glaring example is found in private slack messages between MKD, Soncia and I.  MKD is sharing budget approval information.  None of this information was shared with us from LT.  In fact, I only learned that the Veterans Engagement position was approved when she shared it with me.  She asked us to add information about anticipated costs.  I tried and it was deleted.  This occurred on May 14th, prior to organization changes that resulted in elevating Christian.  Neither Soncia or I were ever privy to this kind of information yet Megan was privy to information about our budget approval before we were even notified.

It is this kind of situation that creates ongoing frustrations and tensions within the organization and continues to alienate the POC.  Additional times where MKD was approving or weighing in on work of her Leadership Team + peers.

- **AZ -** MKD approving Creative Ads in a tripod with two LT+
- **CT** June 3rd Ping Colin and I once you are done
- **FL** – May 28th approving op-ed process
- **IA** - Asking question about path forward documents on April 17th; June 2nd approval of budget, June 6th approval of budget
- **MI** - MKD April 13th Michigan is acting as a defacto manager of Soncia and I in the MI tripod.
- **MN** - April 13th MN MKD is acting as an approver of my work product
- **WI** - Wisconsin May 7th MKD is included in all important communication whereas Soncia and I are left out even though we are supposed to be serving in the same function.  This is habitual.

- **<u>Taking Credit For Others Work Product / Failure to Acknowledge Mistakes</u>** Colin has a pattern of taking credit for my work product and appropriating my ideas without credit or attribution.  This is made more problematic by the fact that he fails to acknowledge his own mistakes and then blames or scapegoats others.  This has been an ongoing issue, but recently came to a head after he (1) berated me on issues related to the FL and MN Polling, and (2) I spoke with Christian and Megan and both confirmed that he both took credit for my ideas and work products.   The result is that I am not able to trust that Colin will accurately represent my thoughts and concerns and or take responsibility for his own failures.  Below I offer some examples that demonstrate Colin's patterns of appropriation and obfuscating of responsibility:

  - **Florida Poll Release & Poll Memo -** Colin dropped the GOP consultant work on a Wednesday and expected me to schedule a meeting and get multiple polls placed in each state by the following week. He was particularly focused on

getting the FL poll out.  He encouraged me to pressure the consultants to work fast and get things out.  The problems with this scenario is that 1) this work was thrown at me with no warning and no information at the last minute (further documented below) and 2) that the work on the Florida memo had been sitting with Colin for over two weeks.  I had shared the FL poll and memo with colin over two weeks prior to this request.   On multiple occasions I slacked him about it privately, attempted to discuss the memo with him and posted it in public slack. Colin never acknowledged or reviewed the memo.   I specifically wanted to address the challenges with the FL memo and the partisan breakdown and the unique circumstances related to our pollster that would lead to possible issues in a release.  I had also shared that I thought one memo with partisan breakdowns may be shared privately with the Governor through our lobbyist and that the release poll should be different.  So for two weeks nothing.  Then I am urged to get this out the door within days.  Keep in mind that Colin had still not reviewed the florida memo or had a discussion with me.   So, I spend all weekend going back and forth fighting with the pollster and working with Marathon.  Colin approved everything and yet then after the story is complete I am criticized by Colin for the FL Memo.  To this day I am unclear why the GOP consultant work was dropped in my lap with no warning and why Colin failed to even look at the Florida polling memo until there was an urgent moment.

○ **Minnesota Poll -** When the polling work related to Covid began Colin told me that I was going to be responsible for state polling.  I immediately flagged that MN needed to be a priority because of the timing of the legislative session.   I immediately get to work on the drafting polls with tripod input in the states identified as priorities.   When I am about to post them for review, Colin begins posting poll drafts including on for MN.  I immediately slacked him to inquire whether he was doing all of the polls because I was already working on many and did not want to duplicate efforts.  He apologized for not communicating this to me.  But, I must point out that my poll draft for MN had the witness signature requirement.   In addition, Colin wasted so much of my time and the tripod's time working on drafts.   Moreover, at one point we were both talking to the same polling firm POS about polls because Colin never communicated that he was negotiating with them despite the fact that I posted their proposal.   So, I was shocked when Colin berated me for failing to catch the witness signature requirement since he 1) failed to tell me he was working on a poll for mn 2) my poll draft included it 3) he wrote and approved the MN poll.

○ **Conservative Talking Points Absentee Balloting-** From the beginning of the Covid Crisis there has been an expressed need both internally and from our lobbyists for conservative talking points related to absentee balloting.  This has been discussed with Colin on countless occasions and expressed by multiple people.  I asked Colin if he would like me to take a stab at them.  He said that he had been working on something from a while ago and he would share it.  After multiple requests and multiple weeks he finally shares his "conservative braindump document."  I immediately get to work editing it and adding current information and additional sections.  When I am done I ask about the next steps in the progress.  The work just sits there.  I had two conversations with Malia about this and she even expressed that Colin was not engaging.   To date,

7

despite effort from both Malia and I and a continued need, this work remains in limbo with no communication about the status or the path forward.

○ **Conservative Talking Points Voting Rights Restoration -** When I joined SD/VRL many of my states were focused on Voting Rights Restoration.  The Republican and often very conservative lobbyists we hire had zero history or knowledge of VRR issues.  I immediately indicated a need for conservative talking points for our lobbyists.  I offered to do a first draft.  Colin insisted that he was doing them.  This was in November.  By the end of January nothing had been done despite a clear need.  Then one day in February Colin asks if I could do a first draft.  It was late in the week and I suggested that I get him a draft on monday.  He told me he was hoping that I would have it by the next day.  So, I wrote every bullet in a nearly 15 page document and shared them with Colin.  The document proceeded to take multiple weeks to get approved and no acknowledgement that the entire document was created by me and dropped in my lap after Colin did not do anything.  Moreover, I could have had the document done in November and offered them to our lobbyists immediately.  Finally, the document is still not 100 percent complete and the promise was that we would finish off the remaining sections, but it has never happened.

○ **R-Street -** Working with R-Street was my idea.  In fact, I had suggested a meeting with R-Street prior to Covid.  I suggested to Colin that he and I make time to meet with R-street while we were in NYC for our communications training.  He responded with a great idea.   When I followed back up with him I received no response.   When Covid hit in one of his so called "thought partner" sessions, I suggested it again.  He pushed back and said he didn't think they would be interested in absentee balloting.  I made the case that I thought they would and suggested reaching out.  I then heard nothing until one-day he told me they gave R-street a 100K grant to help with this work.  He never included me in the conversation and never acknowledged my idea.  I suspect he also never acknowledged that this was done at my suggestion and urging.

○ **GOP Consultants -** Colin was supposed to add a section in the SD Veterans/EA's/Crisis Management section for approval.   He never did.  The result is that this body of work did not go through the same scrutiny, was not shared broadly with staff and is still a mystery to most.  On multiple occasions Colin said he was filling out this section, but he never did.  Then out of the blue with literally no input, no information provided, and after he had hired the consultants and had the body of work for a month, he abruptly told me that he would like me to assume this work.  He tells me this on Wednesday and says I should call a meeting.  Wednesday afternoon I told him I will try to schedule a meeting with the almost 20 people early the next week.  He informs that this must happen before the end of the week and he wants polls for FL, MO, and other states out by the end of the following week. Despite the unrealistic timeline I get a meeting scheduled.  However, he told me nothing about the scope of work or agreements between each consultant.  So, I was ill-equipped to understand roles and responsibilities.   Here are a few examples that occurred over the following weeks:

■ *Marathon* - Asking for a slush fund of 7-10 k per month
■ *Stateside* - no understanding of their role or length of contract yet Colin is telling me to make sure they work

- ■ *R-Street* - Informing me that they only agreed to do 10 op-eds making it impossible for me to know which states to prioritize
- ■ *EIS - I am still unclear on how we ended up with two firms and how those buckets of work are separated.*
  - ○ **Consolidation of Polling Information in One Report -** In another one of Colin's "Thought Partnership" conversations when asked about how we can use the consultants and polling info I said, "I think the state polling and national polling sets us apart and can be used to help bolster our credibility, drive media stories and as a toll for advocates if we consolidate it into one presentation and perhaps put in on our website, I also said it would be a good tool to pitch broader national stories.  He said - great idea.   Then a week or two later I receive an email from Marathon with a first draft/mock up of my idea.   I was accidentally copied and Marathon even asked me on the phone if they were supposed to share that with me.  Clearly, Colin consciously kept me out of the loop to claim credit for my work.  To this day, Colin has not acknowledged that he is moving forward with my idea, has not included me in the process and has clearly not given me the attribution.  He has also told me to manage the GOP consultants but frequently works around me which creates ongoing confusion for me and the consultants.
  - ○ **MI Consultant -** When SA hired Jill Alper as a consultant I was opposed to bringing her on.  I expressed this in every way possible.  It seemed ludicrous because she 1) would not lobby and 2) already was working with Represent Us.  Colin made it abundantly clear that he believed we needed additional support.  So, her firm was hired and to this date has offered zero benefit.   I learned from Christian that Colin expressed that we were aligned.  We were never aligned, but at some point when your manager is telling you what he wants you get on board and make the best of it.   Given the dynamics of this hire and the fact that tripod was not included when I had my tripod meeting and informed them we had brought on Alper Strategies they were confused.  Soncia even remarked "what is the purpose of the tripod then."  So, this put me in a difficult situation 1) because the hire was not necessary and I did not support it and the tripod had already aligned on this and 2) because people were not happy about the circumventing of the process when we are always told to follow the process.   So, we had a discussion about the pressure we felt to hire consultants and the fact that Colin really wanted to bring this consultant on in MI.  A few days later, I was lectured by Colin for undermining leadership in this conversation and told that it was not a good look and I should not say things like I disagree or Colin wanted this hire.  This is confusing because since the tripod had already aligned on not needing another consultant at the moment and we had never discussed this firm or this hire I was put in an impossible situation.  Colin never discussed this with his counterparts so the information was shocking to the tripod.   Colin should own his decisions and not force tripods to act as though this happens in a vacuum.   This constant failure of Colin to own his own decision and actions creates confusion, undermines the tripod and places SA in a difficult position that leads to tripod toxicity.
  - ○ **MI Drop Box Guidance -** During our weekly Check-In I expressed to Colin that I had concerns about the MI drop box guidance.  Luis had also expressed similar concerns.  He asked me to be specific and I articulated my concerns.  He was pulling up the document and agreed with everything I said.  I immediately

suggested that I thought this would be a good issue to flag for Liz and discuss the perspectives because I was worried that having Luis who was new to the org or me address them would create problems.   He insisted that Luis and I address the issue and again pushed me to both weigh in more and push Luis and Sarah Jane to do the same thing.  When, as I suspected, the feedback was not received well, rather than taking ownership of the fact that he should have flagged this for Liz, he proceeds to tell me that I should have been more clear in the request and timeline, despite the fact that the timeline was discussed on the tripod and Jiggy and Soncia both agreed that while we did not have specifics about timing that we should get this done ASAP.  We also discussed numerous aspects of the needs including the fact that the Sec of State was working with Vote at Home and had the federal guidance already.  Colin frequently asks SA to push back and be direct, but as soon as anyone raises it as a concern he then finds a way to blame his staff even though it was done at his request.

- **Veterans Outreach / Crisis Management Report / Election Administrator Plans -** I was asked to create plans and anticipate the needs from the Secure Democracy perspective.  I wrote a plan that included 3 components: Election Administrator Engagement, Crisis Management and Veterans Engagement/Outreach.  This plan was originally supposed to layout work with Conservative Organizations and a strategy, but I was quickly told by Colin that he would complete that section.  That section remains to be completed.  If that plan exists it was not shared with me or widely within the organization.  My plan was written and distributed to leadership and the entire organization over 2 and half months ago.
    - **Veterans Outreach Consultant -** I received little to no feedback on the Veteran's Engagement Portion.  For many weeks the plan just sat there in the approval abyss.  No one told me whether it was approved or if revisions were needed.   It was not until MKD shared a budget approval document that Soncia and I had never shared that I saw that the Veterans Engagement Consultant position was approved.   I then slacked and chatted with Colin about the status.  There was no response.  Then one day Colin says create a job description and scope of work ASAP.  He tells me this on Friday and I have a document for him within a few days.   Then the job description sat there and sat there without Colin ever even looking at the document.  I slacked Colin multiple times and then finally posted it for his approval in the SD Validator channel.   It still sat there and Colin still never opened the document.   The document sat there for more than three weeks without anyone doing anything with it.   We are now 3 months into Covid and a failure to communicate anything related to the approval of this position or the approval of the job description makes this work less timely and less relevant.  Moreover, while I rushed to complete the plan and the job description/scope of work no one communicated the approval, provided feedback or bothered to look at either for weeks.    All of the aforementioned can be established through slack, documentation creation dating through google docs, documentation sharing dates and viewing in google docs, and private communications and my internal notes.
    - **Crisis Management Report -** This portion of the report was 100% my idea.  I feel the need to state this because I have come to learn that Colin has a tendency to appropriate without credit ideas of mine and particularly women of

color without offering the source or genesis of the idea.   In the presentation of this portion to LT the feedback I received was met with skepticism.  I then heard nothing back about this or any portion of the plan.  Then one day, I receive a message from Soncia asking for clarification of what this report would encompass and how it would differ from the work Jiggy is doing with UCLA.   I ask Colin about this and he tells me that LT determined that this bucket of work should lie in L&P.  This seemed odd since it was part of the Secure Democracy recommendation of needs and ideas and the fact that to my knowledge I am the only person in this org who has created a crisis management plan, worked in management consulting and has a network of crisis managers in my network.  It was also clear that L&P did not see the value.   The end result was multiple back-and-forths with L&P to try and explain the value of this work.   Then I was asked to participate in the conversations with the group that Megan identified to help us find a management consultant. L&P was supposed to create a scope of work for this group to shop around.   L&P then asked me to edit it which essentially became an entire re-write.  This work, like so much other work now stands in limbo with no forward momentum and without any communication of its status.

- ○ **Elections Administrator Outreach -** Part of my directive from Colin was to include a portion on how to conduct EA outreach and engagement.   This was particularly frustrating and baffling because this had been a body of work that Colin had fought to bring into the Secure Democracy and insisted on maintaining control of developing a plan despite my offer to take on this body of work months earlier.  Despite multiple offers to do this work and develop a plan Colin kept this work to himself.  Nothing was accomplished and no plan was developed.  Then, in this moment of COVID crisis, I am asked to develop the plan.  I wrote a plan that articulated that while the work is important it would be constrained by a number of factors: EA's preparing for primaries and the general, lack of ability to do in person meetings, and the fact that they too are in crisis.  Colin repeatedly pushed back on my concerns and told me to add more and suggest broader EA engagement.  So, I added more despite my reluctance.  When we presented this work to LT, Megan pushed back on this portion of the document saying that she did not believe it was realistic and was too broad.   Colin sat on that phone call and never acknowledged that I had said everything that Megan had and had pushed for a scaled back more realistic approach.  He then told me to rewrite it and we scheduled two additional review meetings both of which were abruptly cancelled with no explanation from Colin.  To this day, I have no understanding of why the meetings were cancelled, whether this body of work was approved and what/if any work expectations exist regarding this work.   I have asked Colin multiple times in slack and on the phone regarding the status.  What happened with the Election Administrator Outreach plan is indicative of a pattern of management, lack of communication and being told to assume Colin's work that he failed to complete (i.e. Gop Consultants, Path Forward Documents, Conservative Talking points on absentee voting, Conservative Talking points on VRR).

- ● **Speaking Up -** Throughout my time at Secure Democracy / VRL Colin has often told me to "Speak Up."  It is so frequent that most people in the organization have commented to

me about how weird and inappropriate this repeated request from Colin to have me "Speak Up."  This is particularly baffling because no one else thinks that I do not speak up.   Additionally, anyone who knows the slightest bit about my personal and professional background - as all of the leadership team does - is well aware that speaking up and raising my voice has been central to my identity and work.  My long history of speaking up includes, but is not limited to: speaking out about Sexual Harassment at the MN State Capitol, serving as a spokesperson for MN United, weekly television and radio appearance for nearly a decade, and being an outspoken advocate for criminal justice reform.   Nearly every current and past Associate Director has expressed that this is offensive and troubling.  In addition, I have discussed this with Christian who agreed that this was patronizing and acknowledged that I do not seem to have a problem with speaking up.  This was patronizing to me as a woman and as a person of color.  It also appears to be an explicit attempt to use my voice as women of color to support his positions that often ran counter to larger organization wide consensus.   When I spoke up at times that did support a position of Colins or ran counter to his interests I was scolded.  One example of this is when I posted about the lack of process clarity to the public slack channel and indicated that I felt gas-lighted by the lack of clarity in the process that we were being held accountable for following.  Colin called me and told me not to post such things because it created organizational drama.  The reality is that the organizational drama was created by the lack of articulated and ever changing process.  When Sam quickly responded with processes to follow Colin slacked me and told me I needed to thank Sam.  I am appreciative of peoples work and try to always acknowledge and thank people for their effort, but this seemed particularly weird that I was being told to thank someone for providing me the most basic tools to do the job I was asked for and to articulate the process for which me and others in the tripods were being held accountable for following.  Not only do I have a long history of speaking up in terribly uncomfortable circumstances, but I cannot think of time in this organization where I was timid about speaking my thoughts.  The only exception to this is regarding my concerns about Colin's management and that was for fear of retaliation from my manager.

- **Campaign Plans** - The pressure and confusion about campaign plans continues.
  - **Direction for SA to Push Other Tripod Members -** Colin continues to insist that this work be driven by State Affairs despite the fact that C&P and L&P still seem to operate under different, more collaborative guidance.   When SA is pushed and tries to take ownership over the campaign plans at Colin's direction it creates hostility and confusion within the tripod.  I have asked for him to post this publicly so that all divisions represented on the tripod had an understanding.  He has refused to do so.  I have asked him multiple times to address this with the leadership team.  When SA pushes hard it gives an impression that we are managing the other members of the tripod.  I have told Colin that when this happens it is extremely problematic because we are at the same level as the other members of tripod and that direction or pushback needs to come from their director.  This problem has been ongoing since I began my employment with SD/VRL.  Since Luis and Sarah Jane have joined the SA team I have listened as Colin gives them the directive to essentially take over the process and push hard. A recent example involves L&P's request to participate in lobbyist phone calls. Colin told us he did not agree with this decision and pushed back hard and to

only do it if it makes sense.   Yet, in the meantime it is clear from my private slack messages with Soncia that L&P has given very different guidance.   None of this is discussed publicly so all SA can do is follow the direction of their Director.   This issue has been ongoing and months earlier Colin expressly told me not to include others on the lobbyist calls.   There is no clear direction or expressed intent from Leadership and this results in ongoing tensions and confusion amongst the tripod.

- ○ **Process is too Slow Fails to Acknowledge Timelines** - The process of approval and submission are not relevant at this moment.   Even prior to the unexpected week off I had pointed out that the campaign plans for many states would be irrelevant by the time they were presented.   A few examples include TN and IA.   This work is ongoing.   The schedule for these plans made no sense because the campaign was already happening and the length of their legislative session - 2 weeks - meant that by the time they were reviewed, approved or amended the opportunity would be over.

- **<u>Gop Consultants Ethical Breach / Potential Illicit Activity</u>** -   On June 3, 2020 I sent the following communication via email to the entire leadership team.

    "I no longer feel that I can ethically or legally be responsible for the day-to-day management of this work.   As someone who has spent the last 15 years of her life working in politics and with extensive PR experience, I have never been forced to confront or be complicit in such unethical behavior related to providing "under the table" or "off the record" payments to media or validators.   I had hoped that perhaps it was just Marathon acting unethically, but in our morning conversation the other day you confirmed that EIS was similarly requesting payments for the former FL congressman.   Perhaps I am being naive, but I need to be 100 percent clear that I believe this activity to be completely unethical and antithetical to the espoused values of the organization and that it is at best unambiguously unethical and at worst illegal.

    Ray from Marathon asked me for a slush fund of 7-10k to place stories for off the record payments.   He indicated that he had spoken with you and Megan about this and believed that you had a pre-established understanding.   When I asked you about this - you said that we would not do a slush fund, but that I should evaluate each case (meaning offer to pay people under the table for stories or validator work) as a one off.   We have now engaged in this at a minimum of twice once for EIS (1K) and once for Marathon (2,500K).   Since I raised these concerns yesterday you have apologized for putting me in this position.   I appreciate the acknowledgement that it was completely inappropriate to place me this compromised position.   However, it does not just compromise me, it compromises the integrity of our organization and our values.   You have also said that the leadership team signed off these decisions.   You have acknowledged that while they signed off they may have erred in their judgement. If all of the leadership team approved these payments leadership must take accountability not only to me, but to the organization as a whole.   I am not able to continue to manage this work until:

- The leadership team owns this decision and assures me that no payments will be made to or through our consultants for "under the table" payments. This means I must hear from leadership that my concerns have been heard;
- The Leadership team acknowledges the error in judgement internally to the organization and;
- We end our relationships with the consultants who have urged us - and continue to urge us to participate in this unethical and possibly criminal behavior.

It is unfair and unreasonable for me alone to hold this information and for the organizational leadership to not own any accountability.   I am unaware of how these payments were made or handled, so I am not sure if there was illicit financial transactions from our end and I refuse to be held accountable for anything that may be compromising.  It must also be stated that these actions are harmful and undermining to everyone in the organization not only because they are unethical, but because of the standard of work product that is expected across the organization.  While others work to tirelessly find validators and place op-ed, your perceived success in doing so is not actual success; it is, in fact, pay-to-play in the most obvious manner.

You have also offered to speak with the GOP Communications consultants to inform them that this will no longer happen.  While this is important, I question how we can trust their work and how I am expected to return to managing their work.  How am I supposed to know that this is not continuing directly through us or indirectly through them?  My conversations with Marathon made it abundantly clear that this is not an isolated exception, but is rather a way of doing business.  As an African American woman I am particularly sensitive to any potential perception of illicit or unethical behavior.

The issues in question are not minor oversights, they are fundamental questions that go to the heart of organizational integrity.  This is not something that can or should be hidden.  This is not something that can wait to be addressed.  My hope is that this will be addressed by the end of the week.

An organization that is not accountable to itself loses its ability to hold others accountable.  We acquiesce the moral high-ground. "

Over the last few days I have discussed this matter with Christian, Colin and Megan. An agreement has been made to fire Marathon and continue to use EIS for validator work.  It has also been agreed that the leadership team will share what happened with the entire organization.  This internal sharing of this is important because among the things that trouble me in this dynamic is the fact that almost exclusively black and brown women are being told to do more and do it faster.  Some have expressed doubt in themselves as they have seen the work from the GOP consultants begin to materialize. This is what creates doubts among black and brown people and creates the Imposter phenomena.

14

- **Tripods -** The tripod system of organization has become toxic.  Much of this toxicity stems from a lack of overall organizational alignment in our approach to this work.  Most often L&P and C&P are aligned while S&A often holds different perspectives.  While some of this normal organizational jockeying for power I would propose that a great deal of the lack of alignment stems from Colin.  Colin consistently and forcefully expresses his disagreement with L&P and C&P and insists that SA forcefully express our opinions.  This directive is made clearly despite multiple attempts for me to express the negative impact of this dynamic.   Perhaps even more concerning is that when I am pushed by Colin to express his intent and then the tripod pushes back on the directive and asks me if Colin made me do this - if I even remotely acknowledge that I am receiving instructions from Colin - I am then scolded by Colin for not owning the decision.   I have been told not to acknowledge that Colin is driving some of the decisions even if I do not agree and I have been told by Colin that I am undermining LT if and when I state his direction.  This is confusing.  If Colin and/or LT are comfortable with a decision why would they care if it is acknowledged.  Why not own the decision and ensure that everyone on the tripod receives the same information.  What I have come to realize is that it is often Colin's personal position and not a unanimous understanding or directive from all of LT.  This leads to toxicity in the tripod and confusion about LT's alignment.

- **Digging into States -** I was told to dig into my states and it was clearly implied that I was not doing enough.  Colin expressly stated to me, "now, with fewer states maybe this will allow you to do more."   This was baffling to me for the following reasons: (1) my states are moving in the right direction with real opportunities to pass legislation (2) I have repeatedly expressed to Colin and others in LT that I can handle more work, and (3) his basis for saying this to me were based on his erroneous claims that I had mishandled the MN poll and Fl poll release.  Furthermore, to date I have not received a 6 month review or any feedback that was negative.  I have received no coaching and almost no guidance.  Below are brief outlines of where my state work lies:
  - **Nebraska** - Despite being a red state with an extremely conservative Sec of State and Gov - the actions taken to protect the elections were as close to our recommendations as one could possibly expect, I was able to directly communicate with the Deputy Sec of State and our bill that we had been working on prior to Covid is still likely to pass when the legislature returns.
  - **Florida** - From the creation of the path forward documents I have always indicated that this work was going to primarily be working with the Gov and the Florida Supervisors of Elections.  This has turned out to be true.  We have been in direct conversations with both the Governor's office and the FSE's.  The FSE lobbyist communicates with me directly.  While this work is still in progress I believe we have done everything we can to influence a possible Executive Order.
  - **Michigan** -  We originally entered MI to help pass the ballot processing bill.  The bill is slated to pass.  We were barely engaged when Covid hit and when this work began we had not had a single legislative meeting.  We are submitting drop-box guidance and are developing on the ground relationships.  I expressed in the path forward document and to Colin that we may need different lobbying support given the change in our goals and potential conflicts of interest.  Luis has taken over this work and is not initiating this change.   Additionally, the Sec of State and Gov have been and continue to be supportive of almost all of the changes we put forth in policy recommendations.

- **Tennessee** -  We are actively placing and boosting stories, doing patch through calls, and are doing what we can with very limited support within the states. Colin has not offered any suggestions to bolster this work.   TN is also one of the most challenging states for our work because Colin left the tripod with extremely toxic relationships with the partners.  Their disdain for Colin and Secure Democracy is openly expressed and spills into all of our attempts to do work.
- **Iowa** - Despite all of the uncertainty regarding Covid and the timing of the session we have been engaged in an active campaign, have been supporting both conservative and progressive partners, have had a faith leader op-ed published, had a conservative op-ed published and have moved the voting rights bill through the Senate Judiciary where it died the last session.  We have engaged the Governor and Legislative leadership and already have the implementing language through the legislature and signed by the governor - all within a two-three week session.
- **Arizona** -  AZ as was acknowledged in our path forward document discussion is a particularly difficult state to make progress given the Governor, the legislature and the fact that over 70% of Arizonians already use PEVL.  There was also huge uncertainty about whether the legislature would reconvene and whether they will return for a special session.   Only much later in the process did we begin discussing county level work.   Since this time, Luis has taken over the AZ work.
- **Connecticut -** We are actively engaging the Sec of State and Governor's office on both voting rights restoration and expansions of absentee balloting. We are working with the coalition and were essential in getting the Governor to issue an EO for the primary.   We are now running boosted posts, assisting with op-eds, have had R-street write in support of absentee balloting, finished a poll and are waiting on the timing of the legislature to reconvene.
- **Minnesota** - This work was late to start despite numerous requests in slack and on the phone urging Colin to engage earlier.  By the time we hired a lobbyist the bill was being heard the next day which limited our ability to influence the strategy.  Nevertheless, until the killing of George Floyd, the Governor was openly discussing and tweeting his support for expanding absentee voting and protecting the health of Minnesotans.  Given recent dynamics in MN this work is more or less on hold for the foreseeable future.
- **Virginia** - This work is more future focused, but we have been in communication and are actively working with the voting rights coalition.

16

# EXHIBIT 4

From: **Megan DeSmedt** megan.desmedt@votingrightslab.org
Subject: following up on your message
Date: October 28, 2021 at 10:52 AM
To: Sarah Walker sarah@secure-democracy.org
Cc: Anthony Dale anthony@votingrightslab.org

Hi Sarah,

I am just following up on your message inquiring about our policies or practices that allow individuals to opt for part time work, as full-time employees.

Anthony will follow-up and help get answers to your questions. Pasting them here for ease.

- Specifically is this an option made available to any full-time employee who has a documentable health concern?
- At what point does someone in a full-time position opt for disability vs be afforded the opportunity for half-time work with benefits?  I understand that these can tricky questions, but once we make one determination I want to make sure the same benefits are distributed equitably and consistently throughout the organization.



**Megan DeSmedt**
Hiring & Onboarding Director
megan.desmedt@votingrightslab.org | 267-574-2200
she/her/hers
******Please check out our current openings here!

**Our freedom to vote is under attack. VRL's State Voting Rights Tracker** is a first-of-its-kind, dynamic tool that lets you examine election bills moving quickly in all 50 states. Check it out now: **tracker.votingrightslab.org**

# EXHIBIT 5

without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or for which she/he has applied.

- "Reasonable accommodation" may (depending on individual circumstances) include the following: making existing facilities readily accessible to and usable by individuals with disabilities; restructuring a job; instituting part-time or modified work schedules; reassigning the individual to a vacant position; acquiring or modifying equipment or devices; adjusting or modifying training materials, or policies, and similar activities.
- "Undue hardship" means an action requiring significant difficulty or expense by the employer. The factors to be considered in determining an undue hardship include: (1) the nature and cost of the accommodation; (2) the overall financial resources of the project; (3) the number of persons employed by the project; (4) the effect on expenses and resources or other impact upon the project; and (5) the operations of the particular project. Other factors may be taken into consideration.
- "Essential job functions" refers to those activities of a job that are essential to the purpose for which the position exists and cannot be modified.

## BREAK TIME FOR NURSING MOTHERS

In accordance with the Fair Labor Standards Act, NVF projects will provide reasonable break time and accommodations to employees to express breast milk for nursing children. NVF projects will provide a private, shielded place other than a restroom in which an employee may express milk. NVF projects will also comply with any local or state law that may provide for reasonable accommodation for pregnant or breastfeeding employees in the locality in which such employee works. Employees who are lactating should reach out to their supervisor, project director, or NVF HR to discuss break times and the accommodations provided at their project workplace.

## WHISTLEBLOWER POLICY

NVF requires its directors, employees, and contractors to observe high standards of business and personal ethics when conducting their duties and responsibilities. In accordance with this whistleblower policy, it is the responsibility of all directors, employees, and contractors to report any activities or practices that may be illegal, could result in harm to NVF or its projects, or may be contrary to NVF's policies, including violations related to:

- Accounting controls and procedures
- Child protection
- Confidential or proprietary information
- Conflicts of interest
- Equal employment opportunity
- Fraud
- Harassment
- Legal compliance

### NO RETALIATION

No employee or contractor who, in good faith, reports a violation shall suffer harassment, retaliation, or adverse employment consequences. An employee or contractor who retaliates against someone who has reported a violation in good faith is subject to disciplinary action, up to and including termination. This policy is intended to encourage and enable stakeholders to promptly raise serious concerns to NVF.

### REPORTING VIOLATIONS

All leaders and directors within NVF encourage employees or contractors to share their questions,

concerns, suggestions, or complaints. In most cases, the project director is in the best position to address an area of concern for an employee or contractor. However, if an employee or contractor is not comfortable speaking with the project director or is not satisfied with the project director's response, the employee or contractor is encouraged to speak with the director of human resources, an account manager, or anyone in a management position with whom he/she is comfortable approaching. All managers are required to report suspected violations to NVF's general counsel, who has specific and exclusive responsibility to investigate all reported violations. For suspected fraud, or when an employee or contractor is not satisfied or is uncomfortable with following NVF's open door policy, individuals should contact NVF's general counsel directly.

For violations related to harassment or child protection, please also refer to the specific sections of this handbook related to harassment and child protection for additional guidance.

### GENERAL COUNSEL

NVF's general counsel, or such other disinterested individual as is appointed by the general counsel, is responsible for investigating and resolving all reported complaints and allegations concerning violations and, at his/her discretion, shall so advise NVF's board of directors. All claims should be directed to generalcounsel@newventurefund.org.

### ACCOUNTING AND AUDITING MATTERS

The board of directors shall address all reported concerns or complaints regarding NVF's accounting practices, internal controls or auditing. The general counsel shall immediately notify the president and board of directors of any such complaint and work with the appropriate parties until the matter is resolved.

### ACTING IN GOOD FAITH

Anyone who files a complaint concerning a violation or suspected violation must act in good faith, having reasonable grounds for believing the information disclosed indicates a violation.

### CONFIDENTIALITY

Violations or suspected violations may be submitted on a confidential basis by the complainant or may be submitted anonymously directly to:

> General Counsel
> NVF
> 1201 Connecticut Avenue, NW
> Suite 300
> Washington, DC 20036

Reports of violations or suspected violations will be kept confidential to the extent possible, consistent with the need to conduct an adequate investigation.

### HANDLING OF REPORTED VIOLATIONS

The general counsel will acknowledge receipt of the reported violation or suspected violation within five business days. All reports will be promptly investigated, and appropriate corrective action will be taken if warranted by the investigation.

# EXHIBIT 6

From: **Sarah Walker** <<u>sarah@secure-democracy.org</u>>
Date: Thu, Oct 28, 2021 at 6:06 PM
Subject: Fwd: FOR ROB, RYAN, SARAH REVIEW: Memo and rollout plan for VRR research
To: <<u>generalcounsel@newventurefund.org</u>>


To Whom It May Concern,
Perhaps this goes without saying, given the the concerns I have brought to your attention over the past few days, but I want to be clear that I am raising these concerns pursuant to my duties and the NVF policy handbook as it related to the whistleblower policy.  Specifically I am raising concerns related to accounting controls and procedures, conflicts of interest, EEO and legal compliance.  As internal conversations have proceeded in regards to my concerns I have been made aware of more legal compliance and accounting concerns.  The below email should make obvious the evident concerns.  I was told by Megan that Amanda would be paid 50% of time by SD and 50% by VRL.  Amanda then told me that Jay, who reports to her, would be spending 50% of his time with Secure Democracy.  I am now informed that despite the fact that both Amanda and Jay spend nearly 90% of their time on matters related to Secure Democracy and Jay has been represented on the Secure Democracy website that they are 100% paid for through NVF and the voting rights lab.  I was only made aware of this potential issue when I questioned the equity of giving Amanda access to short and long term benefits through NVF and raised concerns about legal compliance given her work allocations with Megan D, Megan L and now Anthony.  I have recommended that both cease working on behalf of Secure Democracy until such a point that the costs are shared between the two entities.  This is of particular concern to me because we are actively being targeted by two entities, both of whom are ultimately trying to get access to NVF.  These legal compliance failures put me, Secure Democracy and NVF in legal jeopardy.  Having Amanda represent Secure Democracy to the media when I have come to learn she was paid 100% through NVF seems fraught with compliance and potential legal ramifications.  Jay similarly liaisons with the media on a daily basis and our Republican Comms and lobbyists.  Given that I had been raising these issues for the last few weeks and nothing was done to address them I feel compelled to raise them under the whistleblower NVF policy.  I would also add that there are multiple other employees who are likely not in compliance based on the way that the two entities are run, from managerial authority, to shared slack, to 100% NVF employees frequently participating in political campaign check-ins to our practices and uses of our legislative counsels.

These new legal, accounting and compliance concerns are in addition to my already shared concerns.

Thank you,

Sarah



Screen Shot 2021-10-28 at 5.49.35 PM.png

Screen Shot 2021-10-28 at 5.49.39 PM.png

Screen Shot 2021-10-28 at 5.51.17 PM.png

Screen Shot 2021-10-28 at 5.51.49 PM.png

Screen Shot 2021-10-28 at 5.52.18 PM.png

Screen Shot 2021-10-28 at 5.52.30 PM.png

Screen Shot 2021-10-28 at 5.52.35 PM.png

Screen Shot 2021-10-28 at 5.52.50 PM.png

Screen Shot 2021-10-28 at 5.52.55 PM.png

Screen Shot 2021-10-28 at 5.53.03 PM.png

---------- Forwarded message ---------
From: **Sarah Walker** <sarah@secure-democracy.org>
Date: Thu, Oct 28, 2021 at 3:13 PM
Subject: Re: FOR ROB, RYAN, SARAH REVIEW: Memo and rollout plan for VRR research
To: Anthony Dale <anthony@votingrightslab.org>

Thank you for these responses Anthony.

1. Jay has been referred to as the full-time SD comms person since he was hired.  This has been made clear to him, our team and articulated by Amanda repeatedly.  He was given an SD email and was put on the website.  His work is 90-99% SD and of a political nature (intended to influence legislative action).  So, I am concerned that these decisions were made without compliance considerations.  Furthermore, I was told he would be 50/50 like all other SD branded employees.  I would love to discuss short and long term plans to account for this body of work as we are at a critical moment leading into the legislative session.  If we are not in compliance I do not see another option except to cease the work in SD, but I look forward to hearing what you learn from SD / VRL legal counsel on this matter.  In the meantime, please understand that this is going to create many challenges related to workload and potentially limit our ability to influence and impact.   If this situation is going to continue past next week I would love to discuss how to communicate this to the team and along with a strategy/plan to address the matter.

2. I am looking forward to hearing a response from SD and VRL legal.  Both in the short term and the long term this will create immense operational strain on all of the state based work and team and yes, I would very much like to discuss both short-term and long-term impacts and potential remedies.

3.  Understood.

4.  GSD (get shit done - not my name or my meeting) is run by Amanda/Jay and is the daily 15 min check-in to coordinate and align on campaign deliverables related to political activity like digital ads, paid calls, legislative talking points, SD branded fact sheets and reports, political polls released under SD. etc.  The other area of concern is that Jay sits in on all lobbying and communications calls under the SD brand where the purpose of the call is 100% political in nature.  If these are a problem, then I would question whether the weekly campaign check-ins are compliant for 100% branded VRL people where the entire purpose of the call is to report on political activities from SD.

5.  Obviously we need the support - as you know - on the SD side.  The management structure was split with the understanding that Amanda would be 50/50 SD/VRL.  So, I defer to you and the legal minds if it is compliant to have a 100% VRL person managing an SD body of work.  I think these are the questions that need to be answered i.e. can Amanda and Jay as 100% VRL be involved in the management and oversight of SD work.  It would certainly make life easier, but I was always told that it was not compliant.

I will do my best to fill in the gaps myself until these things are resolved.  Fortunately, many meetings have been cancelled in anticipation of next week's NCSL meeting.

Sarah

On Thu, Oct 28, 2021 at 1:26 PM Anthony Dale <anthony@votingrightslab.org> wrote:
 Sarah,

 Please see the below responses:


 Tony Dale
 Vice-President of Operations & Chief of Staff
 202.317.0858

---

**From:** Sarah Walker <sarah@secure-democracy.org>
**Sent:** Thursday, October 28, 2021 10:53 AM
**To:** Anthony Dale
**Subject:** Re: FOR ROB, RYAN, SARAH REVIEW: Memo and rollout plan for VRR research

Thank you Anthony,

I know you are going to get back to me later today, but a few more follow up questions related to legal compliance.

1. If Amanda is 100% VRL who will supervise Jay. **Yes she is, Jay is also 100% VRL.  I will ask both of them to stop their work until this is resolved if you are okay with that.**
2. Is Amanda legally compliant to manage SD consultant relationships?  **I don't have an answer to the compliance question currently. I'm working to get that answer. In this interim period I have asked that she not manage any relationships.  We should discuss how that impact your work and what supports you need.**
3. Should we change her email address? **Until we get an answer to the compliance I want to hold off making any adjustments to e-mails. However, I have ask her to conduct her official work on behalf of VRL using her VRL e-mail account.**
4. Should she be participating in calls that are solely the space that SD occupies like GSD? **Please provide more context on what do you mean by spaces occupied by SD?**

5.  What about the new hire we just made?  I was told he would be dedicated to SD and working with Jay?  How are his benefits and salary structured is he 50/50 or 100 percent VRL?  Who will be supervising him?

**Will is slated to start Monday. Currently, is is structured to be 50/50 between VRL and SD. Is that okay with you or should we change that prior to his start date? As you know the management structure has been a split between the two orgs. I can adjust that if you would like me too. Unfortunately, I can not discuss his personal HR information without his consent. I can only say he was offered a competitive benefit package that he accepted.**

Thank you,

Sarah

On Thu, Oct 28, 2021 at 12:33 PM Anthony Dale <anthony@votingrightslab.org> wrote:
  Okay, thank you. I have instructed Amanda to cease and engagement on behalf of SD until everything is sorted out. She will not be coming to Tampa next week.

  Thank I will check with legal structure.

  Thank you for the quick response in these things.

  Tony Dale
  Vice-President of Operations & Chief of Staff
  202.317.0858

---

**From:** Sarah Walker <sarah@secure-democracy.org>
**Sent:** Thursday, October 28, 2021 10:29:13 AM
**To:** Anthony Dale <anthony@votingrightslab.org>
**Subject:** Re: FOR ROB, RYAN, SARAH REVIEW: Memo and rollout plan for VRR research

Anthony,

Yes, of course, you can have until the end of the day.  However, I am concerned about the timing of important and relevant media representations being made by Amanda. Since you are unable to answer how her time is accounted for at this moment, I would preemptively suggest that she postpone her media representations or contact with SD contractors until such time that the determination is made for these two days and whether or not she will be a full-time VRL/SD employee.   The legal, management and reputational concerns are too great to get this wrong.  Again, my understanding is that I am responsible for making sure that Secure Democracy is legally compliant and do want to take any unnecessary risks.  I trust you will communicate this to Amanda who I do not manage.

In regards to your second question I would suggest reaching out to the Secure Democracy attorney to obtain legal documents of board appointments.  In regards to your question about whether or not there was formal communication about my appointment as Executive Director I am unaware of any such document.  My understanding, like in most organizations I have run, is that the Executive Director is not an officer of the organization, but rather is an employee under the guidance and reporting to the board.  But, again, you will have to discuss that with the Secure Democracy attorney.

Thank you,

Sarah

On Thu, Oct 28, 2021 at 12:15 PM Anthony Dale <anthony@votingrightslab.org> wrote:

Thank you for the quick response. Please allow me until the end of the day to get these questioned addressed and present any recommendations.

Also, I want to understand the legal structure between SD and VRL to help answer the above questions. One thing I want to confirm was the appointment of officers at SD. Do you have the letter that appointed you as ED and and other officer appointments?

Thank you in advance

Tony Dale
Vice-President of Operations & Chief of Staff
202.317.0858

---

**From:** Sarah Walker <sarah@secure-democracy.org>
**Sent:** Thursday, October 28, 2021 10:00:27 AM
**To:** Anthony Dale <anthony@votingrightslab.org>
**Subject:** Re: FOR ROB, RYAN, SARAH REVIEW: Memo and rollout plan for VRR research

Anthony, Yes, there is an issue. For many months Amanda was operating as a Secure Democracy consultant and not as a full-time VRL/NVF employee. Second, she was then made a temporary employee in which I was told she would be 50/50 SD / VR to remain compliant - I was not a part of those HR processes to hire Amanda so I am not sure if this actually occurred - you will have to ask Megan and Sam. I am legally obligated to ensure we are compliant and to make sure this happens. So, one, was or is she 50/50 NVF and VRL currently (until Nov 1)? If not, we have legal and compliance issues. If she is 100% VRL it creates legal issues for her to manage SD work and represent us in the media and in activities that are considered political activity and lobbying. I am particularly concerned because our Secure Democracy 990s have been requested and will continue to be and Amanda is scheduled to talk to the Media as an SD representative tomorrow on a hit piece about our lilberal orientation as a representative of Secure Democracy. In addition, we are being targeted by Americans for Accountability. It seems intuitively that it would be beyond legal and lobbying compliance to have someone full-time at another organization representing Secure Democracy to the media and managing that work as a liason.

In regards to your 2nd question the answer is that all employees who are engaged in SD political and lobbying work currently are compliant and should maintain their SD email accounts. During the Restructure scheduled for Nov 1 - in my role as Senior VP - the associate directors who will be under my management structure - will become legally compliant to represent the work and the process of ensuring lobbying compliance and registration will be completed by the end of this week and then on Nov 1 they will placed on the SD payroll and on the website. My one question is regarding Jay (who I do not manage) and whether he is 100% VRL or 50% VRL and 50% SD. He falls under Amanda's management and those compliance issues should have been vetted through Amanda and MKD and you. Jay is currently on the Secure Democracy website and maintains a secure democracy email. If he is not 50/50 he should immediately be made 50/50.

I hope this answers your questions. Please feel free to reach out with follow up questions.

Sarah

On Thu, Oct 28, 2021 at 11:34 AM Anthony Dale <anthony@votingrightslab.org> wrote:
  Can I check on this and provide an answer to you before the end of the day?

  I have two questions that will help me get the right answers:

# EXHIBIT 7

1:11

< **Inbox**      ∧   ∨



From: **Megan Lewis** >
To: **Heather Smith** >
      **DarioanselmoMN@gmail.com** >
      **Ryan Else** >
Cc: **David Mitrani** >
Today at 12:50 PM

## Update

Dear Secure Democracy Board:

I am writing to notify you that Sarah Walker, who is an employee of Secure Democracy, has been placed on administrative leave pending the resolution of an investigation into a series of allegations that she has made.

In the meantime, please do not hesitate to reach out with any questions or concerns. And I appreciate your patience as we resolve this matter.

Thanks -- feel free to be in touch.

Best,

         

# EXHIBIT 8

Dear Secure Democracy Board Chair Heather Smith,

I am aware that I have been placed on paid administrative leave during an investigation into my claims of 1) patterns of racial disrctimination within the organization 2) Denial of Benefits and 3) assertion of whistleblower status related to improper accounting and legal compliance. I will note that my placement on administrative leave by Secure Democracy is an act of retaliation.

I am writing because I asserted whistleblower status with Secure Democracy's affiliated C3 New Venture Fund/Voting Rights Lab. I am writing to formally assert whistleblower status with Secure Democracy.

There are three primary areas of concern related to illicit Affiliated C3 and C4 operations of New Venture Fund Project, The Voting Rights Lab and Secure Democracy.

- **Maximum feasible separation of Charity and C4, legally, financially, and operationally;** Megan Lewis, the Executive Director of the Voting Rights Lab, operated both the C3 and C4 as one entity with combined staff, financials, and operational control. For all intensive purposes, the C4 operated as an arm of the C3.

- **Avoidance of any subsidy by Charity of C4 operations;** Employees, equipment and other expenditures related to C4 operation were subsidized extensively by the C3 without any attempt or agreement to repay the C3 for accrued C4 expenses.

- **And no day-to-day control by Charity of C4, although Charity may exercise strategic control over C4.** Day-to-day operational control was wholly controlled by Megan Lewis of the Voting Rights Lab and New Venture Fund. Megan Lewis approved all activities related to the C4 operation including, but not limited to: approval of contracts, approval of expenditures, approval of campaign action, approval of documents prepared for C4 activity. In addition, without standing as an officer or employee of the C4, Megan has been approving payments and communicating with Secure Democracy Attorney and Accountants. I have two years of documentation that will affirm the aforementioned without question.

I think you should be aware that Megan has been acting as an agent of Secure Democracy without having any standing as an employee or officer of the organization. Until I began investigating my concerns about disparate treatment related to denial of benefit I had not been aware that multiple employees who I thought were being paid or that their time was being reimbursed were paid wholly by the New Venture Fund/Voting Rights Lab.

This includes Megan Lewis, Anthony Dale, Samantha Tarrazi, Sofia Mankin, Amanda Harrington and many other employees. This is particularly troubling given that Anthony Dale, an employee of the New Venture Fund/Voting Rights Lab took it upon himself to notify me that I was being placed on paid administrative leave by BOTH Secure Democracy & the New Venture Fund. Additionally, the operations staff who are also wholly paid by the New Venture Fund immediately shut down my access to email, slack etc. With my new understanding that none of these employees are paid by or are officers of Secure Democracy, and that no cost sharing agreement exists between the two entities, that they acted in violation of c3 and c4 affiliates and with no authority. To my knowledge, no formal notice of paid administrative leave has been sent to me from Secure Democracy.

I feel obliged to raise these concerns to the Secure Democracy Board Chair and to fulfil my legal, fiduciary and ethical requirements.

Sarah Walker

--

Sarah C. Walker

cell: 612.220.2070

@sarahwalkermn

www.sarahcwalker.com

--

Sarah C. Walker

cell: 612.220.2070

@sarahwalkermn

www.sarahcwalker.com

# EXHIBIT 9



KEY POINTS:

- **[NEWS]** Sarah Walker has had to take an unplanned leave of absence from Secure Democracy. All inquiries you would ordinarily send to her can come to me (*IF NEEDED: and I will route it to the right person at Secure Democracy*).

- **[WHAT THIS MEANS FOR YOUR WORK TOGETHER]** Fortunately, we have a close and collaborative team and I am confident we can continue our work together as planned.

- **[DOOR IS OPEN]** If you wish to contact Sarah personally to wish her well, you are welcomed to do so; however, I would ask that any and all work-related matters come to me for the time being.

POTENTIAL Q&A

**When will Sarah be returning?**
I don't have an answer for that right now. We will keep you posted, and in the meantime we are grateful for your understanding.

**Is Sarah OK?**
There's not much I know right now, but we have a close team here at Secure Democracy and we all wish her well.

**May I have Sarah's personal contact information?**
If you don't already have it, I can't share her personal information without her consent. I hope you understand.

**I have an outstanding invoice/unresolved issue in need of escalation…**
Thank you so much for raising this with me. I will connect you with our Chief of Staff, Anthony Dale, who can assist you with this matter. His email address is anthony@secure-democracy.org.

# EXHIBIT 10

  

**Google Workspace Support 36488927: Rogue child case for 3645593**

 **Google Workspace Support** 1:17 PM
To: Sarah ⌄

## Google Workspace

Hi Heather,

Thank you for the response. We appreciate your time and patience on this case.

I had called you on this number  +1 202-368-1728 and reached your voicemail.

I would like you to know the suspension of the admin account has happened due to the request raised by Anthony. He had claimed that there is a rogue on the account and a review was raised due to which the admin account was suspended. Kindly share the confirmation of the CNAME records by replying to this email to assist you further on this case and provide a resolution.

    

I had called you on this number  +1 202-368-1728 and reached your voicemail.

I would like you to know the suspension of the admin account has happened due to the request raised by Anthony. He had claimed that there is a rogue on the account and a review was raised due to which the admin account was suspended. Kindly share the confirmation of the CNAME records by replying to this email to assist you further on this case and provide a resolution.

Looking forward to your response.

Regards,

Anuroop S

Google Workspace Support

ref:_00Df423Flu._5004Mnsiv0:ref

Google

© 2021 Google LLC 1600 Amphitheatre Parkway, Mountain View, CA 94043

# EXHIBIT 11

Case 1:22-cv-03312-APM    Document 1-1    Filed 10/28/22    Page 52 of 67



Sarah Walker <sarahcwalker@gmail.com>

---

## From the Secure Democracy board of directors

Heather Smith <heather@alliedadvisors.us>                                    Wed, Nov 3, 2021 at 9:05 AM
To: Sarah Walker <sarahcwalker@gmail.com>, Megan Lewis <megan@votingrightslab.org>, anthony@votingrightslab.org
Cc: "Joseph E. Sandler" <sandler@sandlerreiff.com>, Ryan Else <Ryancelse@gmail.com>

Sarah, Megan and Anthony:

The Board of Directors of Secure Democracy was not made aware of any of the actions taken with respect to Sarah Walker before they were taken.  Megan had no legal authority to put Sarah on administrative leave. No authorization to do so was sought or received from the Board.  The Board's obligation is to ensure that Secure Democracy as an organization is protected legally and can continue to operate to carry out its mission, while the various allegations are appropriately investigated and resolved.

Accordingly, the Board:

1. Confirms that Sarah remains the Executive Director of Secure Democracy and is not on leave of any kind.
2. Requires that Megan, Anthony and all of those with whom they work at Voting Rights Lab or elsewhere immediately restore Sarah's access to her email account, Google drive and corporate credit card and cease any other form of interference with the operations of Secure Democracy.
3. Requires that Megan, Anthony and all of those with whom they work at Voting Rights Lab or elsewhere immediately refrain from accessing Sarah's mail account.
4. Intends to have an independent investigation of Sarah's allegations promptly conducted by an outside firm, which will also interview and obtain information from everyone else involved in this dispute.

If you have any questions at all concerning the above, please contact us.

Sincerely,
Heather Smith, on behalf of the board of directors

# EXHIBIT 12



Mr. Joseph Sandler
Sandler, Reiff, Lamb, Rosenstein & Birkenstock, P.C
1090 Vermont Ave. NW Suite 750
Washington, DC 20005
VIA EMAIL (sandler@sandlerreiff.com)

November 5, 2021

**Re: Secure Democracy**

Dear Joe:

In response to communications and emails that we have received from Heather Smith, President of Secure Democracy, and Sarah Walker, Executive Director of Secure Democracy, I want to confirm the steps New Venture Fund has taken to respond to specific concerns raised. This is not intended to be a comprehensive response, and is largely confined to addressing emails received on November 3rd and 4th regarding access to Secure Democracy's email and related accounts.

1. As of November 4th, 2021, Sarah's access to her Secure Democracy email account, Google drive and corporate credit card has been restored. We regret any inconvenience caused and have worked promptly to address these requests as soon as they were received. If there are any similar requests that have not been resolved, I would ask that you please direct them to my attention and we will review them promptly.
2. As of November 4th, Voting Rights Lab staff have been instructed to take all reasonable steps to cease communications with Secure Democracy staff and consultants and to refrain from interactions with Secure Democracy generally. Given the historical relationship between Voting Rights Lab and Secure Democracy, we cannot ensure that there will be no communications between and among staff. Further, to the extent that an individual is employed by both Secure Democracy and Voting Rights Lab, Voting Rights Lab staff may, of course, communicate with Voting Rights Lab staff about Voting Rights Lab and other matters not related to Secure Democracy. In the short term, we look forward to working together to institute additional procedures if necessary.
3. To this end, again in the short term, we ask that individual staff and consultants (in their capacity with Secure Democracy) similarly refrain from contacting New Venture Fund/Voting Rights Lab staff and that any contacts are made through counsel.
4. With respect to other issues and concerns raised in emails and communications, New Venture Fund has undertaken an internal process with counsel to review them. Again, we are committed to a constructive and collaborative process for moving forward to address these issues to allow both Voting Rights Lab and Secure Democracy to advance their important work and missions.

Sincerely

Andrew Schulz,
General Counsel

1828 L Street, NW, Suite 300A, Washington, DC 20036

# EXHIBIT 13

---------- Forwarded message ---------
From: **Google Workspace Support** <workspacesupport@google.com>
Date: Sat, Nov 20, 2021 at 6:07 PM
Subject: Google Workspace Support 36488927: Rouge child case for 36455937
To: sarah@secure-democracy.org <sarah@secure-democracy.org>



Hello Sarah,

Hope this email finds you well. My name is Kubra from Google Workspace Support. I am reaching out to you on behalf of my colleague Anuroop.

I am contacting you to let you know that another user is claiming ownership of secure-democracy.org. As per the Google Workspace terms of service 'https://workspace.google.com/terms/premier_terms.html' domain ownership is a requirement for Google Workspace services. Google Cloud Support has revoked your administrative privileges while ownership of the domain is under debate.

Within seven days, you must successfully complete the actions listed below in order to prove ownership. If you fail to do so, you will not be granted administrative access to your Google Workspace account or any assets associated with it: user accounts, domains, Gmail content, Google Drive data, Google Cloud Platform projects, YouTube channel(s), Google Play developer account, etc.

This change on your Google Workspace account implies loss of administrative privileges to all assets associated within the Google Workspace account.$

$

If you no longer own this domain, you have terminated the agreement with Google Workspace. $

$

If you still own the primary domain name - secure-democracy.org, please reply to this message as soon as possible and provide us with proof of your ownership. $

You can provide proof of domain ownership for your primary domain secure-democracy.org by following the steps below:$

1. Create the following CNAME record through your domain hosting provider:36488927.secure-democracy.org points to google.com $

$

Create a CNAME record through your domain hosting provider:$

$

- Label/Host: 36488927$

$

- Destination/Target: google.com$

$

- Time to live (TTL): 3600 seconds / 60 minutes / 1 Hour$

$

For more information on how to create a CNAME record, please visit https://support.google.com/a/answer/47283. If you need assistance creating the CNAME record, please contact your hosting provider for support.$

$

2.  Please answer the following account knowledge questions:$

$

Please verify you are the owner of the data within the domain by answering all of the questions to the best of your knowledge, specifying a single answer to each one. If you are uncertain about some of the answers, it is a good idea to check the inbox of the personal email address you have specified while registering the Google Workspace account, or the bank that manages the payment method you're using.$

52   - What is the username (username@domain.com) of the Super Administrator account you are trying to access?$

62   - When did you last sign in to this Super Administrator account (MM/DD/YYYY)?$

72   - What is the original secondary/recovery email address?$

82   - Why are you unable to access this secondary/recovery email address?$

92   - How many users are on your Google Workspace account?$

If you paid with a credit/debit card:$

52   - When was the last charge for this Google Workspace account (MM/DD/YYYY)?$

62   - How much was your credit/debit card charged?$

72   - What type of credit/debit card was charged (e.g. MasterCard, Visa)?$

8٪   - What are the last four digits of this card?$

92 - What is the expiration date of this card?

:2 - What is the billing address associated with this card?

;2 - If you made the transaction through Google Wallet, what is the order number?

If you paid by bank transfer:

52 - What is the date of the most recent invoice (MM/DD/YYYY)?

62 - How much was your most recent bank transfer?

72 - What is the reference number for this transfer?

82 - What are the last four digits of this bank account?

92 - What is the billing address associated with this bank account?

If you paid by PayPal:

52 - When was the last charge for this Google Workspace account (MM/DD/YYYY)?

62 - How much was your PayPal account charged?

72 - What email is associated with the Paypal account used to pay?

82 - What is the ID of your last invoice?

Once you have replied, I will check your answers to the account knowledge questions. After I have verified your ownership of secure-democracy.org, we will be able to confirm Google Workspace account ownership.

I appreciate your patience and your understanding regarding our commitment to account security. If you have any further case related questions, please feel free to contact me by responding to the email and I will be happy to assist you further.

Regards,

Kubra
Google Workspace Support

vijːx44Hj867Jɓɣ2x9448Q rwᴎx4xvij

Google

> $465$ᛕssкpi$PPG$:44$q tlᴎdiexwiᛐevo{ e}Ѻ syrxemr$ᛉᴎi{ ѺᛝE$-8487$

# EXHIBIT 14

# Our Leadership

Our leadership team has decades of experience in advancing policy solutions at the local, state, and federal level. Secure Democracy staff and in-state lobbyists work across the country to craft advocacy strategies that benefit all Americans by making our elections free, fair, and trustworthy.



**Sarah Walker**
*Executive Director*

Sarah Walker, a veteran election policy specialist, oversees all of Secure Democracy's state and federal legislative work and partnership management. Prior to joining Secure Democracy, Sarah served in state government and held various roles in government relations.

As an expert on voting and elections legislative issues, Sarah Walker frequently speaks to

Secure Democracy. Sarah has been quoted in The New York Times, USA Today, Politico, The Hill, Business Insider, the Dallas Morning News, the Houston Chronicle, the Atlanta Journal-Constitution, the Tampa Bay Times, the Louisville Courier-Journal, the Center for Public Integrity, The Fulcrum, and numerous other national and local outlets.



**Kay Cook**
*Regional Director*

Kay Cook brings legislative leaders and advocates together to build trust in our elections and protect voter access, with an emphasis in Georgia, Florida, Montana, North Carolina, Pennsylvania, and Texas.

**Diego Echeverri**
*Regional Director*

Diego Echeverri brings legislative leaders and advocates together to

61



emphasis in Alabama, Mississippi, New Hampshire, West Virginia, and Wisconsin.



**Maya Ingram**
*Regional Director*

Maya Ingram brings legislative leaders and advocates together to build trust in our elections and protect voter access, with an emphasis in Iowa, Michigan, Missouri, Nebraska, New York, and Oregon.



**Charley Olena**
*Regional Director*

Charley Olena brings legislative leaders and advocates together to build trust in our elections and protect voter access, with an emphasis in Alaska, Arizona, Connecticut, Kentucky, Ohio, and Washington.

# EXHIBIT 15



# Our Leadership

Our leadership team has decades of experience in advancing policy solutions at the local, state, and federal level. Secure Democracy staff and in-state lobbyists work across the country to craft advocacy strategies that benefit all Americans by making our elections free, fair, and trustworthy.



**Kay Cook**
*Senior Director of Advocacy*

Kay Cook brings legislative leaders and advocates together to build trust in our elections and protect voter access, with an emphasis in Georgia, Florida, Montana, North Carolina, Pennsylvania, and Texas.

64





**Diego Echeverri**

*Director of Advocacy*

Diego Echeverri brings legislative leaders and advocates together to build trust in our elections and protect voter access, with an emphasis in Alabama, Mississippi, New Hampshire, West Virginia, and Wisconsin.



**Maya Ingram**

*Director of Advocacy*

Maya Ingram brings legislative leaders and advocates together to build trust in our elections and protect voter access, with an emphasis in Iowa, Michigan, Missouri, Nebraska, New York, and Oregon.

**Charley Olena**

*Director of Advocacy*

SECURE
DEMOCRACY



advocates together to build trust in our elections and protect voter access, with an emphasis in Alaska, Arizona, Connecticut, Kentucky, Ohio, and Washington.



**Jay Riestenberg**

*Director of Communications*

Jay Riestenberg creates strategic communications programs to support Secure Democracy's advocacy work and improve our elections for all Americans, with a focus on message development, media outreach, and content creation.

**Will Soltero**

*Communications Associate*

Will Soltero implements and supports strategic communications



advocacy work to improve our elections for all Americans, with a focus on messaging landscape analysis, content creation, and partner coordination.

Want to get in touch? Use this form to contact us.

