**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | | |
|---|---|---|
| | ) | |
| **SARAH WALKER,** | ) | |
| **20 E. 40th Street** | ) | |
| **Minneapolis, MN 55409** | ) | **Case No.: 1:22-cv-03312-APM** |
| | ) | **Judge:** |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **COMPLAINT FOR** |
| | ) | **DECLARATORY, INJUNCTIVE,** |
| **NEW VENTURE FUND** | ) | **AND MONETARY RELIEF** |
| **1828 L Street, NW, Suite 300** | ) | |
| **Washington, DC 20036** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **SECURE DEMOCRACY** | ) | |
| **611 Pennsylvania Ave SE, #143** | ) | |
| **Washington, DC 20003** | ) | |
| | ) | |
| **MEGAN LEWIS** | ) | |
| **57 Clinton Road** | ) | |
| **Glen Ridge, NJ 07028** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SD USA** | ) | |
| **611 Pennsylvania Ave SE, #143** | ) | |
| **Washington, DC 20003** | ) | |
| | ) | |
| *Defendants.* | ) | |

_____ )

**<u>AMENDED COMPLAINT</u>**

On October 28, 2021, at 6:06 p.m., Plaintiff Sarah Walker ("Ms. Walker"), the executive

director of Secure Democracy ("SD"), sent an email to Andrew Schultz, the general counsel of

New Venture Fund ("NVF"), alerting him to her growing "concerns related to accounting controls

and procedures, conflicts of interest, EEO and legal compliance." SD, NVF, and a third entity,

Voting Rights Lab ("VRL") are affiliated entities. And all SD and VRL employees are also employees of NVF.

Ms. Walker first raised her concerns to NVF several weeks earlier but was ignored. Consequently, she was compelled to identify in her email to Mr. Schultz that her concerns were being submitted "pursuant to" NVF's whistleblower policy. In direct violation of that whistleblower policy, Ms. Walker's email (the "Whistleblower email") triggered a retaliatory reaction. The *next* day, October 29, 2021, NVF placed Ms. Walker on administrative leave and revoked her permission to continue representing SD or NVF's VRL "in any capacity or to perform any work associated with either entity." NVF represented that an investigation into the claims made in her Whistleblower email would be conducted.

The Whistleblower email was prompted by Ms. Walker's discovery that NVF was using its tax-deductible donations in violation of the internal revenue laws in several ways. First, tax-deductible donations received by NVF were used to pay the wages of employees who performed work for SD. Other operating costs of SD were also subsidized using NVF's tax-deductible donations, such as SD employee travel, SD office equipment, and SD vendors. As Ms. Walker has since learned, this is common practice at NVF, which shares funding with other 501(c)(4)s, through its affiliation with Arabella Advisors. Second, NVF and SD engaged in prohibited partisan political activity. Third, NVF resources were used to secure a donation for the political campaign of Brad Raffensperger, an action that is strictly prohibited by the Internal Revenue Code.

Several weeks after the Whistleblower email, NVF abruptly dissolved SD and terminated its employees—but immediately replaced SD with an entity named "SD USA" (a Defendant herein) at the same address. All SD employees were rehired by SD USA except Ms. Walker who was not hired nor asked to apply for her former Executive Director position. As a "shared

employee" of NVF and SD (i.e., each entity was paying half her salary) this caused her to lose one-half of her salary beginning in January 2022. Although Ms. Walker remained employed by NVF, NVF kept her on administrative leave and then ultimately discharged her in October 2022. In addition to being prohibited by state statute, the retaliation against Ms. Walker is expressly prohibited under the Taxpayer First Act (the "TFA"). The Department of Labor has recently affirmed Ms. Walker's ability under the TFA's Kickout Provision to pursue her claim(s) in federal district court for the retaliation against her.

This is a civil action for declaratory, injunctive, and monetary relief for injuries Plaintiff Sarah Walker sustained as a result of the hostile work environment and her discriminatory and retaliatory termination from New Venture Fund and SD USA on the basis of her race, color, sex, disability, and protected activity in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.11, *et seq.*, and the TFA, 26 U.S.C. § 7623(d). Ms. Walker also brings a common law claim of intentional infliction of emotional distress.

## **NATURE OF THE ACTION**

1.     NVF is exempt from taxation as a public charity under section 501(c)(3) of the Internal Revenue Code. NVF acts as a fiscal sponsor for public-interest projects and grant-making programs that either have not yet received 501(c)(3) tax exemption from the Internal Revenue Service ("IRS") or do not plan to receive it.

2.     NVF is one of the largest and most well-funded public interest nonprofits in the country. NVF is part of a network of 501(c)(3) and 501(c)(4) tax exempt organizations affiliated with Arabella Advisors, a for-profit consulting firm that provides compliance, human resources, and other administrative services to the nonprofits and the projects that comprise them. The projects and programs of NVF tend to be politically left-leaning and affiliated with the Democratic

Party. In 2020 alone, NVF disbursed nearly $500 million to address progressive issues such as racial justice.

3.      VRL was one such project. VRL was co-founded in 2018 by Megan Lewis and Samantha Tarazi, who are President and Vice President, respectively, of the organization. Both are white females. VRL works at the state level to support progressive electoral policy changes. On February 19, 2020, Voting Rights Lab became a fiscally-sponsored project of New Venture Fund and was among the many registered trade names for NVF.

4.      SD and its successor SD USA are exempt from taxation as social advocacy organizations under section 501(c)(4) of the Internal Revenue Code. SD lobbies in state legislatures to protect secure and fair elections.

5.      SD was established in 2018 at the direction of Megan Lewis in order to work with Republicans on voting rights issues and to maintain a distance from the Democratic Party-affiliated work of VRL. SD and VRL have always been affiliated entities, working closely together. The chair of the board of SD is Heather Smith, a white female.

6.      When VRL became a fiscally-sponsored project of NVF, SD also became affiliated with NVF. All employees of VRL and SD became employees of NVF at that time. This included Sarah Walker.

7.      Sarah Walker is an African American woman with lupus, a physical disability with symptoms triggered by stress. She began working for VRL and SD in September 2019 as an Associate Director, and rose in the ranks to become Vice President of Advocacy at VRL and Executive Director at SD, one of few Black women to hold a VP role for an extended period.

8.      NVF has made a very public commitment to Race Equity, Equity, Diversity, and Inclusion in its "Mission and Values" statement: "We envision a more equitable world, built on

fair treatment, access, opportunity, and advancement for all. As changemakers building the most effective charitable projects, we know that advancing race equity, equity, diversity and inclusion (REDI) is essential to solving our world's most pressing problems. As such, we dedicate ourselves to integrating REDI into our work and our culture. As we learn more, we will do more — ours is a continuous journey of learning, growth, and innovation."[1]

9.      In contrast to its public messaging, the experience for NVF employees of color was very different. The progressive public image of NVF did not translate to a progressive work environment. Ms. Walker faced discrimination during the entirety of her employment, and called out the workplace injustices experienced by her and others. NVF's public messaging deceived the public into providing financial support based on a material misrepresentation about the values in place at NVF and the practices it followed as a nonprofit entity.

10.      Due to her position, Ms. Walker discovered that NVF and SD were discriminating against numerous employees, particularly female employees of color, by paying them less than their white counterparts, denying them equal opportunity for advancement, and denying them equal access to benefits, among other forms of discrimination. In addition, Ms. Walker discovered that NVF and SD were engaged in numerous violations of the Internal Revenue Code, jeopardizing their tax exempt status. The Defendants' pattern of employment discrimination and intentional tax violations indicate that NVF and SD are simply unconcerned about following the law.

11.      When Ms. Walker spoke up about NVF's and SD's workplace injustices and non-compliant tax practices, NVF and SD swiftly retaliated against her. In addition to furthering a hostile work environment that severely compromised Ms. Walker's ability to perform her duties for NVF and SD, NVF and SD terminated her in such a way so as to severely damage her reputation

---

[1] https://newventurefund.org/who-we-are/mission-and-values/ (last visited Oct. 25, 2022).

and inflict severe emotional distress which exacerbated her disability, negatively impacting her physical and mental health. Unsurprisingly, in seeming acknowledgement of the irreparable level of unlawful tax practices of the kind Ms. Walker alleged in her Whistleblower email, SD (the 501(c)(4) entity), was *dissolved* less than two months after she reported the improper federal tax practices and a new similarly named entity, SD USA, sprouted up in its same place: 611 Pennsylvania Ave SE, #143.

12.     This case involves a plethora of race-, sex-, and disability-based workforce discrimination encompassing benefit eligibility and potential ERISA violations, failure to accommodate a disability, and retaliation for opposing these practices and for whistleblowing about potential tax fraud. Defendants engaged in numerous acts of retaliation to silence Ms. Walker from exposing the flagrant financial irregularities and hypocrisy of NVF and SD.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this action because it presents a federal question under 26 U.S. Code § 7623.

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S. Code § 1332 because the amount in controversy exceeds $75,000 and the action is between citizens of different states.

15.     The Court has supplemental jurisdiction over this action under the DCHRA, D.C. Code § 2-1402.11 *et seq.*

16.     The Court has personal jurisdiction over Defendants New Venture Fund, Secure Democracy, and SD USA because each has or had its principal place of business in the District of Columbia for the purposes of Fed. R. Civ. P. 4, and is or was an employer within the definition of D.C. Code § 2-1401.02(10).

17.    This Court has personal jurisdiction over Defendant Megan Lewis because she is an employer within the definition of D.C. Code § 2-1401.02(10) and has the actual or perceived right to hire or terminate Plaintiff.

18.    The Court is a proper venue under 28 U.S. Code § 1391 because the discriminatory decisions to place Plaintiff on leave and to terminate Plaintiff's employment were made in the District of Columbia.

## PARTIES

19.    Plaintiff Sarah Walker is a citizen of the State of Minnesota. She is an African-American female with a disability within the meaning of the Americans with Disabilities Act and the DCHRA. During the relevant time, Ms. Walker was employed as that term is used in the DCHRA for both New Venture Fund and Secure Democracy.

20.    Defendant NVF is a District of Columbia nonprofit corporation with its principal place of business at 1828 L Street, NW, Suite 300, Washington, DC 20036. VRL is or was one of many fiscally-sponsored projects of NVF and is among the many registered trade names for NVF. All VRL employees were NVF employees for the relevant timeframe. The NVF general counsel and other NVF non-project employees are located in the District of Columbia.

21.    Defendant SD was a District of Columbia nonprofit corporation with its principal place of business at 611 Pennsylvania Ave SE, #143, Washington, DC 20003. It was dissolved on or around December 20, 2021. Defendants SD USA and NVF entered into an agreement with SD to acquire SD's assets and liabilities on or around November 30, 2021.

22.    Defendant SD USA is a District of Columbia nonprofit corporation with its principal place of business at 611 Pennsylvania Ave SE, #143, Washington, DC 20003. It was

incorporated on November 17, 2021 by Megan Lewis, who is also listed as the executing officer of the organization.

23.    Defendant Megan Lewis is a co-founder and President of Voting Rights Lab. Defendant Lewis is a white female resident of the State of New Jersey. Ms. Lewis is also an attorney. Ms. Lewis made the decision to hire Ms. Walker and the decision to place Ms. Walker on administrative leave. Ms. Lewis indirectly supervised Ms. Walker starting in September 2019 and then directly supervised Ms. Walker starting in June 2020.

## FACTUAL ALLEGATIONS

### A.    Defendants Paid Minority Female Employees Less

24.    All employees of VRL, SD, and SD USA are hired by VRL. At all times during Ms. Walker's employment, SD did not advertise available positions. Instead, all job postings were advertised as VRL positions. Employees are then paid either as full-time VRL/NVF employees, or as shared employees between NVF and SD, with their salaries paid 50% by each organization regardless of whether the vast majority of their time is spent working for SD.

25.    VRL co-founders Megan Lewis and Sam Tarazi are both white females. Ms. Lewis and Ms. Tarazi made most or all hiring decisions for VRL and SD.

26.    Sarah Walker was hired at SD and VRL on September 26, 2019. At the time of her hire, she had over 20 years of management, government affairs, and public relations experience. Ms. Walker has master's degrees in both political science and sociology and has completed all but her dissertation in both fields for her PhD. Her graduate studies focused on voting rights restoration, and it has been the defining focus of her career. She was initially interviewed by Ms. Lewis and when making her a job offer, Ms. Tarazi told her that she was over-qualified for her initial position as Associate Director. Indeed, Ms. Walker's education and experience were greater

8

than that of her initial direct supervisor, Colin Weaver. Ms. Lewis and Ms. Tarazi both indirectly supervised Ms. Walker when she was hired.

27.     At the time of her hire, Ms. Walker was paid $110,000 per year, with half of her salary coming from SD and half from NVF. At the time of her hire, Ms. Walker was told that her pay was above the salary scale for her position and was non-negotiable.

28.     Colin Weaver, a white male, was Director of State Government Affairs and was Ms. Walker's direct supervisor at the time of her hiring. As of June 30, 2020, Mr. Weaver was paid $175,000 per year, with half of his salary coming from SD and half from NVF.

29.     On or around February 19, 2020, VRL became a fiscally-sponsored project of NVF. All VRL and SD employees were hired by NVF at this time. Some employees became full-time NVF employees and some employees, like Ms. Walker, were part-time NVF employees, with their salary split evenly between NVF and SD.

30.     In late March 2020, Ms. Walker was assigned additional responsibilities for a period that would exceed three months. These responsibilities included management of the State Affairs division staff as Acting Director of State and Federal Advocacy. More responsibilities were assigned in April and May 2020, including filling in for Mr. Weaver while he would be on paternity leave starting in June 2020. These new assigned responsibilities were in addition to her existing workload and responsibilities. While Mr. Weaver was on leave, Ms. Walker reported directly to Ms. Lewis and to Ms. Tarazi.

31.     In late March 2020, Soncia Coleman, an African-American female, was also assigned additional work, including supervisory responsibilities, for a period exceeding three months, as Acting Director of Law and Policy, with no compensation change at the time of

9

reassignment. She had education and experience greater than did Liz Avore, the white female director whose work she was assigned.

32.     Ms. Lewis told Ms. Walker on or around June 4, 2020 that it was NVF policy that employees could be reassigned to a different role for three months with no change in compensation, and that her compensation and role would be reexamined after ten weeks in the reassigned role. At the same time, Ms. Lewis told Ms. Walker that the reassignment would last through Mr. Weaver's paternity leave, and at least the election, early November 2020. That this period of time would be at least seven months was known at the time she was reassigned to a different role.

33.     Luis Rodriguez, a Hispanic male, was hired in early May 2020 as Associate Director of State Government Affairs. At the time of his hire and through at least June 30, 2020, Mr. Rodriguez was paid $115,000 per year, with half of his salary coming from SD and half from NVF. Mr. Rodriguez had fewer years of experience and less education than Ms. Walker and reported directly to Ms. Walker.

34.     Sarah Jane Higginbotham, a white female, was hired in early May 2020 as Associate Director of State Government Affairs. At the time of her hire and through at least June 30, 2020, Ms. Higginbotham was paid $132,000 per year, with half of her salary coming from SD and half from NVF. Ms. Higginbotham had fewer years of experience and less education than Ms. Walker and reported directly to Ms. Walker.

35.     Ms. Walker was not given salary information or told the reasons for hiring Mr. Rodriguez or Ms. Higginbotham. The hiring of both individuals deviated from the standard hiring processes used for other SD and VRL employees.

36.     On or around June 24, 2020, Ms. Walker was sent the SD payroll by mistake. This enabled her to learn that Mr. Rodriguez and Ms. Higginbotham were both being paid more than

her, although they reported to her. She was told by Ms. Lewis and Ms. Tarazi that Mr. Rodriguez had negotiated for more money, despite Ms. Walker being told at the time of her hiring that she could not negotiate for a higher salary.

37.     On or around June 25, 2020, Ms. Tarazi told Ms. Walker that NVF equally weighed experience and education in its hiring and promotion decisions.

38.     On or around the end of August 2020, Christian LoBue, Chief of Staff of VRL and an African American female, was sent the VRL payroll by mistake. Ms. LoBue identified that she was paid less than Ms. Tarazi despite having more experience, more responsibilities, and a more senior role. She also identified that, unlike Ms. Tarazi, she did not have access to VRL payroll information, despite her title as VRL Chief of Staff. Ms. LoBue left VRL a few months later.

**B.     Defendants Denied Minority Employees Equal Access to Resources**

39.     As part of a restructure on or around December 1, 2020, Ms. Walker was promoted to Vice President of Advocacy at Voting Rights Lab and Executive Director of Secure Democracy. Ms. Walker was responsible for VRL's policy change advocacy at the federal, state, and local levels. She was the head of the Advocacy Department, which includes regional, campaign, program, engagement, and administrative staff.

40.     When Ms. Walker was given the title Executive Director of SD, Ms. Lewis informed her that the title was for public facing interactions only, and that she would continue to be supervised by Ms. Lewis, not the board of SD. At no time did Ms. Walker report directly to the SD board while serving as SD's Executive Director. At the time of her promotion to Vice President, all other Vice Presidents were white. Unlike these other Vice Presidents, Ms. Walker had little insight into the organization's budget and was not allowed access to salary negotiations or individualized payroll information for SD staff. Her role was limited to approving all SD

11

invoices and to representing SD publicly. The white Vice Presidents were given payroll information and were involved in salary negotiations. Although Ms. Walker knew which employees had SD emails and the amount of time they devoted to SD tasks and projects, whether an individual was only on NVF's payroll or paid as a "shared" employee by both entities, was not information she learned until much later.

41.     Whether an employee is a full-time NVF employee or a part-time NVF employee was entirely disconnected from where they actually performed most of their work. Many employees entirely paid by NVF performed most of their work for SD. Defendants never explained the business reasons for these employee classifications or why NVF, a 501(c)(3) entity which could receive tax-deductible donations, would allow so many of its employees to perform the majority of their work for SD. Because SD was a 501(c)(4) entity, this practice had the effect of unlawfully subsidizing SD's operations with tax-deductible donations.

42.     Most employees of color were made to work for SD, regardless of whether they were classified as full-time VRL/NVF employees. Although told in interviews that they would work with progressive Democratic-aligned groups, once they were hired, most employees of color found out that they would work for SD, which primarily involved partnering with Republicans. This isolated people of color from the progressive nonprofits and donors with whom they had expected to work, and with whom they had sought to gain important professional networks. This impacted the terms and conditions of their employment because it limited their professional opportunities compared to their white colleagues, and in response, most employees of color left VRL and SD within short periods of time.

43.     When employees of color were allowed to interact with progressive donors or partners, it was because Ms. Lewis believed that the presence of employees of color would lend "credibility" to the work of VRL, thus reducing the value of minority employees to their skin color.

**C.     Defendants Denied Minority Employees Equal Access to Benefits**

44.     When VRL became a fiscally sponsored project of NVF, all VRL and SD employees were told that in addition to healthcare benefits, they would be eligible for short-term disability insurance, long-term disability insurance, and life insurance. Ms. Walker learned in September 2021 that SD employees, including herself, were not eligible for disability and life insurance benefits. It is unknown when Ms. Lewis and Ms. Tarazi knew of this difference in eligibility, but they told Ms. Walker that they were not going to inform employees of the discrepancy. Starting in at least September 2021, Ms. Lewis and Ms. Tarazi and other VRL employees made knowingly false statements regarding benefit eligibility for SD employees in job postings and conversations with applicants. They told employees of the discrepancy only when Ms. Walker insisted upon it.

45.     On or around October 20, 2021, Amanda Harrington, a white female in the process of being hired by SD, learned that as an SD employee, she would be ineligible for disability and life insurance benefits. Megan DeSmedt, Human Resources ("HR") Director at VRL and a white female, informed Ms. Harrington that instead of being hired by SD, Ms. Harrington could be a full-time NVF employee explicitly so that she could access disability and life insurance benefits (Exhibit 1).

46.     Two employees of color also hired in or around October 2021—Nina Patel, Associate Director of Law and Policy and an Indian American female, and Carson Malbrough, Campaign Associate and an African American male—were classified as SD employees. They were

not given the same option as was Ms. Harrington to be misclassified as full-time NVF employees. All three employees performed the vast majority of their work for SD and should have been paid by SD instead of being characterized as a "shared" employee with NVF paying 50% or more of their salary.

**D.     Defendants Discriminated Against Plaintiff Because of Her Disability**

47.     Ms. Walker has a diagnosis of lupus, an auto-immune disease in which periods of stress can cause flareups of symptoms. Ms. Walker also has pericarditis, arthritis and neuropathy in the hands related to her lupus. All of these conditions are disabilities within the meaning of the DCHRA and the Americans with Disabilities Act. Ms. Walker received treatment for these chronic conditions for the duration of her employment with NVF and SD.

48.     Ms. Walker's diagnosis and details of her ongoing medical treatment were known to Defendant SD and Ms. Lewis, Ms. Tarazi, and several VRL employees through consulting work Ms. Walker had performed prior to being hired. Additionally, employees at SD shared public calendars to which VRL leadership had access. All of Ms. Walker's medical appointments for treating her lupus were on her public calendar. These appointments occurred approximately once per month, and included blood work, infusions, and regular doctor visits. Ms. Walker often took video conference calls from her lupus infusion chair.

49.     Defendant NVF learned of Ms. Walker's lupus diagnosis and treatment when or shortly after she was hired by NVF, as their health insurance carrier's approval process of her infusion treatments took over a month, during which time accommodations had to be made for Ms. Walker to continue on her previous insurance so that her treatments would not stop.

50.     In ongoing conversations during the summer of 2021, Ms. Walker informed Ms. Lewis that her workload was negatively impacting her health due to her disability and asked about

working part-time. In September 2021, Ms. Walker asked Ms. Lewis and Ms. DeSmedt of HR about the organization's policy regarding the availability of utilizing her disability benefits or working part-time. This conversation occurred prior to Ms. Walker learning that she in fact did not have disability benefits.

51.     In contrast, Ms. Tarazi, a similarly situated white woman, worked a modified schedule in 2021. Like Ms. Walker, Ms. Tarazi was a director who supervised people in 2020 and was promoted to Vice President on or around December 1, 2020. Unlike Ms. Walker, Ms. Tarazi was able to change to a limited, part-time schedule in 2021. Ms. Walker was not privy to the disability suffered by Ms. Tarazi, and did not question whether her accommodation was justified. In September 2021, Ms. Walker pointed out to Ms. Lewis that if the organization allowed Ms. Tarazi to work a part-time schedule and reduce her workload while keeping her title, all employees should be able to do this.

52.     In response to Ms. Walker's request for a reasonable accommodation, Defendants did not engage in the DCHRA's interactive process to determine what accommodation would be appropriate. Instead, Ms. Lewis suggested that VRL and SD would have to reduce the scope of their work to accommodate Ms. Walker's disability. Ms. Lewis assumed that providing an accommodation for Ms. Walker would be an undue hardship for the business, and thus no accommodation was even proposed, much less provided.

53.     Furthermore, VRL and SD held a leadership retreat October 26–28, 2021 that was planned around Ms. Tarazi and required others to accommodate Ms. Tarazi's disability. Although the other attendees were located in the eastern or central U.S., the retreat was held in Portland, Oregon to accommodate Ms. Tarazi's mold sensitivity and desire to avoid travel. Despite Ms.

Walker's request for accommodations made a month prior, no attempt was made to inquire what accommodations might be made for Ms. Walker at the retreat.

54.     The accommodations provided to another white employee, Ms. Harrington, provide an even starker contrast. Like Ms. Walker, Ms. Harrington was a Vice President and supervisor at VRL. While an employee of NVF and SD in 2022, Ms. Harrington was diagnosed with lupus. Unlike Ms. Walker, Ms. Harrington was given accommodations for lupus that were denied to Ms. Walker; specifically, Ms. Harrington was allowed to work part-time and to take significant time off.

**E.      Defendants Created a Hostile Work Environment**

55.     Race was the basis for differential treatment of non-white employees in terms of pay, access to information and networks, eligibility for benefits, and accommodations for disabilities. Ms. Walker was not alone in pointing out that minority employees were treated differently, though she was perhaps the most persistent in doing so. A group consisting of all female minority employees at VRL, including Ms. Walker, started meeting in January 2020 to discuss equity issues, culminating in a letter sent to Ms. Lewis and Ms. Tarazi on June 2, 2020. The statement noted that VRL's mission around voting disenfranchisement was a fundamental issue of racial justice. The statement noted that this is at odds with a "white supremacist culture throughout the organization," in which "Black and Brown workers frequently feel disrespected, mistrusted, talked down to and micromanaged. Positive feedback is sporadic." The statement concluded that it was being shared "with deep reservations about whether or not it is safe for us to do so. We fear retribution during a time when we need our salaries. We know that we have individually shared the above feedback with people, so we find it hard to believe that management

is unaware of these issues." Defendants made no effort to address these claims of discrimination and concerns of retaliation.

56.     Among the people who wrote that letter, all but Ms. Walker had left NVF and SD by the end of October 2021. On information and belief, at least one of the letter writers left with a non-disclosure agreement to silence further complaints of discrimination.

57.     Racial issues at NVF and SD were not limited to these differentials, however. Under the guise of being "anti-racist," the white leadership at VRL created an atmosphere in which they constantly discussed, analyzed and even questioned the racial identities of non-white employees, and based management decisions on their racist presumptions. One of Ms. Walker's peers, Liz Avore, Vice President of Law and Policy and a white female, insisted on discussing Ms. Walker's race and the racial identities of her direct reports—both of whom were Black women—in all meetings with Ms. Walker, so much so that it interfered with their work. In February 2021, Ms. Walker brought performance issues by Ms. Coleman to Ms. Avore's attention, who supervised Ms. Coleman. Rather than wanting to hear about the performance problems, Ms. Avore focused on the color of Ms. Walker's skin in comparison to Ms. Coleman. She told Ms. Walker that the performance problems were due to racial microaggressions from Ms. Walker. Ms. Avore said, "Well you and Soncia don't experience the world the same way as Black women because you have lighter skin." Ms. Avore then explained to Ms. Walker what it meant to be a Black woman. She excused Ms. Coleman's performance issues and refused to discipline her because of the color of her skin.

58.     On or around March 11, 2021, Ms. Walker spoke to Ms. Lewis about the ongoing performance problems of Ms. Coleman. Like Ms. Avore, Ms. Lewis responded that Ms. Walker's skin is much lighter than Ms. Coleman's and she questioned Ms. Walker's identity as a Black

woman because of her light skin color. Ms. Lewis further said that Ms. Walker was acting in a racist way towards Ms. Coleman by calling out her performance problems. Ms. Lewis also refused to discipline Ms. Coleman.

59.     This explicit race-based performance management, combined with less pay and less access to resources and benefits for minority—especially Black female—employees created an oppressive environment that consistently focused on skin color and devalued the actual work performed by minority employees, including Ms. Walker.

60.     By this time, Ms. Walker had repeatedly and consistently spoken out about discrimination by Defendants (Exhibit 2). The VRL and SD leadership organized a retreat in October 2021, purportedly to address concerns raised by Ms. Walker. In reality, the event was intentionally designed to intimidate Ms. Walker and to stop her from continuing to raise concerns. During the first day of the retreat, Ms. Walker was made to publicly state her concerns about racial and disability discrimination directly to Ms. Lewis and Ms. Tarazi, the individuals who discriminated against her. Ms. Lewis and Ms. Tarazi told Ms. Walker this was a necessary part of the retreat, and it was her responsibility to forgive them and trust them again, although no changes had been made to address the ongoing patterns of discrimination.

61.     The "retreat" was one in which an African American employee was coerced into a confrontation against the two white co-founders of the organization who held or had held supervisory authority over her. Witnessing the confrontation were hostile white colleagues. Beyond the humiliation that this caused Ms. Walker, the retreat was designed with willful disregard for her rights as an employee with claims of discrimination. Ms. Walker made clear at multiple points that day that she did not feel comfortable presenting her discrimination claims in this way, and it was so untenable that the first day's session ended early. Yet upon coming to the

18

lobby for dinner that evening, Ms. Walker found that everyone else at the retreat was already in the hotel bar together for happy hour, which only served to compound Ms. Walker's feelings of being singled out and isolated from the rest of the group, feelings which had characterized the entire retreat for Ms. Walker.

## F.   Plaintiff Opposed Defendants' Discrimination and Acted as a Whistleblower

62.     On October 28, 2021, after leaving the retreat, Ms. Walker sent several emails to Anthony Dale, Chief of Staff of VRL, regarding the discrimination and hostile work environment created by Defendants and reaffirming her opposition to Defendants' discriminatory practices, particularly the availability of benefits being given to white employees but denied to minority employees. In response to this, Ms. Walker was offered full-time employment with NVF so that she could also receive benefits. Ms. Walker informed the Defendants that doing so would be illegal, as the majority of her work was with SD and working full-time for NVF would cause her to violate the Internal Revenue Code.

63.     On October 28, 2021, Ms. Walker emailed Ms. DeSmedt of VRL HR with another request for an accommodation for her disability and reaffirming her opposition to the inequitable availability of benefits for employees (Exhibit 3).

64.     On October 28, 2021, Ms. Walker met with a human resources representative from Arabella Advisors. Ms. Walker shared her concerns, including her fear of retaliation.

## G.   Plaintiff Opposed Defendants' Violations of the Internal Revenue Laws and Acted as a Whistleblower

65.     Ms. Walker's discovery that Ms. Harrington was employed full-time by NVF caused her to also develop serious concerns about various financial practices engaged in by NVF and SD. The problematic conduct was being directed by VRL's founders and senior executives and appeared to violate the Internal Revenue Code's prohibition against 501(c)(3) organizations

participating in political activities. Specifically, Ms. Harrington and other full-time NVF employees publicly represented themselves as working for SD and spent nearly all of their time on political activities, including prohibited activities such as targeting U.S. Senate candidates running as Republicans.

66.     Ms. Walker had not previously known these employees were exclusively employed by NVF in part because NVF and SD employees did not accurately track their time worked for each organization. In fact, the NVF employee time tracking system used for payroll did not even allow for tracking of employee time spent on SD activities or projects (Exhibit 4).

67.     Even if the time tracking system had allowed for accurate time keeping, Ms. Walker knew that she, like all other SD employees, spent far more than half of their time on SD work, even though half of their salaries were paid for by NVF.

68.     NVF also subsidized SD's operational expenses, including paying for computers, electronic communications licenses, travel costs, consultants, and lobbyists. Ms. Walker was particularly concerned about the lack of cost sharing, and SD failing to make a fair value reimbursement to NVF for NVF's subsidies of political work by SD that would otherwise be prohibited for a 501(c)(3) organization. From her years spent working in politics and lobbying, Ms. Walker knew that there were strict limits on political activities by 501(c)(3) organizations.

69.     NVF's illegal involvement in political activities reached its apex with the donation to Brad Raffensperger's political campaign. Starting in December 2020, Daniel Lubetzky, a wealthy donor to NVF, reached out to Ms. Lewis in order to get connected to election officials and judges in political battleground states, including Georgia. Ms. Lewis directed him and his representatives to Ms. Walker for such contacts. In April 2021, when VRL's lobbyists informed Ms. Lewis and Ms. Walker that Mr. Raffensperger, the Secretary of State of Georgia, was seeking

donations, Ms. Lewis directed them to Ms. Walker, who connected Mr. Lubetzky with Mr. Raffensperger. Mr. Lubetzky then made a donation to Mr. Raffensperger's political campaign (Exhibit 5). NVF indirectly intervened in Mr. Raffensperger's campaign by paying for the lobbyists who arranged the donation, paying for the computers and software Ms. Lewis used to direct Ms. Walker to assist with the donation, and paying the full salary of Ms. Lewis and the partial salary of Ms. Walker.

70.     Ms. Walker was not aware in April 2021 that Ms. Lewis was not an officer of SD and able to act on behalf of SD, and therefore did not question whether Ms. Lewis' actions were legally compliant. Ms. Walker was also not aware at that time the extent to which NVF subsidized SD, including the lobbyists and operational systems that enabled the donation to Mr. Raffensperger's campaign. Unlike Defendant Lewis, Ms. Walker is not an attorney, so reasonably relied on the advice of NVF's and SD's attorneys and on Arabella Advisors' expertise in nonprofit compliance. By late October 2021, when Ms. Walker had come to understand the extent to which NVF improperly subsidized SD's work, and learned about more improper practices engaged in by Defendants, she realized that she had to come forward with her concerns.

71.     Consistent with the NVF Employee Handbook (Exhibit 6) statement that employees had a "responsibility" to report activity that "may be illegal" to NVF, on October 28, 2021, at 6:06 p.m., Ms. Walker sent an email to NVF General Counsel Andrew Schulz communicating her concerns about the specific failures of both NVF and SD to operate in compliance with the IRS rules and regulations for tax-exempt entities (Exhibit 7).

72.     Ms. Walker described in detail her concerns, which centered on NVF exercising control over SD and using tax-deductible contributions to NVF to pay compensation to numerous employees who performed most of their work for SD, as well as NVF's extensive subsidies of SD,

in violation of federal law. Ms. Walker also raised concerns about NVF's illegal involvement in political campaigns. Finally, Ms. Walker also raised the concerns about discrimination that she had previously brought to the attention of VRL leadership and NVF HR. She noted that part of the reason she was raising these concerns to Mr. Schulz was that Republican-affiliated groups were targeting VRL and NVF for political purposes, so that it was important that the organization avoid potentially illegal conduct.

**H.    Retaliation**

73.    On October 29, 2021, at 9:36 a.m., Defendants suspended Ms. Walker from all her work with no warning to her. Ms. Lewis also directed SD to terminate Ms. Walker's access to her email account and other computer systems so that she could no longer perform her job. Ms. Walker had never been given an NVF email, so could not perform work for NVF either. Ms. Lewis took these actions without consulting with the SD board of directors (Exhibit 8).

74.    On November 1, 2021, Ms. Walker emailed Heather Smith, the chair of SD's Board, about the concerns that she had raised with NVF and asserted whistleblower status with Defendant SD (Exhibit 9). Ms. Walker also noted that NVF employees were acting as agents of SD although they were neither employees nor directors of SD (Exhibit 10). Actions by NVF employees included: informing the SD board that Ms. Walker was suspended from SD; informing SD employees that all issues needed to be raised to Ms. Harrington, an NVF employee; contacting Google and claiming ownership of the secure-democracy.org domain in order to end Ms. Walker's access to Google Workspace services, including her SD email (Exhibit 11); and suspending Ms. Walker's use of the SD corporate credit card.

75.     On November 3, 2021, Ms. Smith, acting on behalf of SD's board, informed Defendant Lewis that she had no legal authority to place Ms. Walker on leave and must immediately cease interference with the operations of SD (Exhibit 12).

76.     On November 4, 2021, Defendant NVF's general counsel confirmed that NVF employees had interfered with Ms. Walker's position with SD and that Ms. Walker's access to her email, Google drive and corporate credit card had been restored as of that day (Exhibit 13).

77.     Despite this attempt at restoration, Defendants' actions had triggered further impacts. In the days after Ms. Walker's suspension, VRL leadership sent out confusing emails that did not reassure SD staff, many of whom started looking for new jobs. VRL employees who were not employed by SD claimed to represent SD both internally to staff and to external partners, with several VRL employees creating fraudulent SD email accounts to do so. SD staff also had the unfortunate experience of arriving in Tampa, Florida for an event SD was hosting at a conference, and the corporate credit card was declined because Ms. Walker had been unable to communicate with their accountant. Ms. Walker was unable to sign or initiate contracts with important state-level lobbyists with whom she had spent months cultivating relationships. She was unable to attend scheduled meetings with contractors or employees. Ms. Walker was unable to authorize lobbyist registrations or travel expenses. The chaos was so obvious that several partners said they would stop working with SD and one SD board member resigned.

78.     When her suspension from SD ended on November 4, 2021, in addition to dealing with all of the above-mentioned repercussions, Ms. Walker had to contend with the fact that SD might not have enough money to pay its existing obligations. On information and belief, previous money for SD had come from NVF and NVF refused to provide additional funding at this time. Because Ms. Walker had been suspended with no advance notice, SD's accountant refused to

provide her with information, undermining her ability to address SD's financial problems. SD's law firm was conflicted out from advising Ms. Walker regarding SD because of their involvement with the concerns at issue in Ms. Walker's whistleblowing complaint. In addition to further causing her stress, this made it nearly impossible for Ms. Walker to perform many aspects of her job. Nevertheless, between November 5, 2022 and November 19, 2022, she was actively involved in budgeting and other meetings planning for the expansion of SD's operations during 2022.

79.     Defendants offered all SD staff full-time NVF positions on or around November 5, 2021. Ms. Walker was not offered a full-time NVF position and remained on leave from NVF.

80.     Defendants created a new nonprofit organization, SD USA, on November 17, 2021.

81.     On or around November 20, 2021, NVF contacted Google to claim ownership of the SD accounts, ending Ms. Walker's access again. Ms. Walker was informed that she had no access to her SD email not by any of the Defendants, but by an email from Google Workspace services (Exhibit 14). This occurred while Ms. Walker was on a planned vacation overseas, at a time that Defendants knew would make it difficult for her to regain access or to avoid professional embarrassment.

82.     On or around November 30, 2021, representatives of SD, NVF, and SD USA entered into an agreement to dissolve SD and to dispose of its remaining assets and liabilities to NVF and SD USA. The assets included the SD.org website, electronic documents in the SD Google Drive, and SD email accounts. The liabilities of SD included asserted and potential legal claims for which the parties agreed to cooperate in a good faith effort to settle and liquidate, with the full amounts required under any settlement agreement paid for by NVF and SD USA. Pursuant to this agreement, SD was dissolved on or around December 20, 2021.

83.     Only four weeks earlier—and prior to Ms. Walker's whistleblowing—there had been no discussion of any plans to dissolve Secure Democracy. Defendants SD and SD USA did not give Ms. Walker notice of termination or any information about her last day at SD.

84.     All SD employees were offered new positions with SD USA on or around November 30, 2021, except for Ms. Walker. Other than Ms. Walker's absence, the two organizations appeared to differ very little (Exhibits 15, 16).

85.     Defendant NVF and the Senior Director of HR at Arabella Advisors told Ms. Walker that her suspension was pending an investigation of her complaints. This was consistent with the NVF Policy Handbook stating the General Counsel—the individual who received the Whistleblower email from Ms. Walker as required—was responsible for this action. On information and belief, although an investigator was hired, the investigation was cancelled. To Ms. Walker's knowledge, no investigation was subsequently undertaken despite representations there would be an investigation of the problems identified in her Whistleblower email.

86.     However, on information and belief, several months after the Whistleblower email employee time reports from 2021 were altered to appear as if certain employees in fact worked some of the time for the a 501(c)(4) entity.  Further, NVF may have even received a reimbursement payment form an affiliated 501(c)(4) entity.

87.     Ms. Walker continues to be retaliated against as (i) she continues to be suspended from her duties; (ii) continues to be suspended from access to email, the company server, and other company business systems; and (iii) has been constructively discharged from her role and duties as SD's Executive Director.

88.     A letter from NVF counsel dated August 17, 2022 claimed that VRL ceased to be a project of NVF as of June 16, 2022. Yet the District of Columbia Department of Consumer and

Regulatory Affairs ("DCRA") shows that "Voting Rights Lab" is currently a Registered Trade Name for New Venture Fund, with a registration date of June 15, 2022. NVF commonly registers its fiscally sponsored projects as trade names with DCRA.

89.     In September 2022, Defendant NVF notified Ms. Walker that her last day as an NVF employee would be October 31, 2022.   Since then, she has ceased receiving any compensation or fringe benefits.

I.      **Damages Suffered**

90.     Defendants' conduct has caused Ms. Walker pain and suffering, damage to her career and reputation, humiliation, and loss of enjoyment of life.

91.     Defendants' actions caused Ms. Walker significant emotional distress. The suddenness and severity of Defendants' actions triggered Ms. Walker's complex post-traumatic stress disorder. She had to start therapy and receive a nerve blocker to address her symptoms, which include, but are not limited to, hypervigilance, sleep disturbances, nightmares, and anxiety.

92.     Defendants' conduct severely impacted Ms. Walker's physical health. The impact of stress on her auto-immune disorder was known to Defendants, as Ms. Walker had spoken openly with Ms. Lewis and Ms. Tarazi about the symptoms of lupus, and the serious complications of her disease were discussed with Defendants at the time of her hiring by NVF. In addition, Ms. Walker had specifically and on multiple occasions told Ms. Lewis that the stress of her job was causing her health to deteriorate. Her emotional distress and its serious impacts on her health were foreseeable to Defendants.

93.     Immediately upon being placed on leave and continuing thereafter, the stress from Defendants' actions caused Ms. Walker to break out in hives and it was almost impossible for her to sleep and eat, further worsening her symptoms. She missed critical doctors' appointments

because she had no access to her work calendar, where her appointments were scheduled. The arthritis in her left hand became so excruciating that Ms. Walker was unable to do many daily activities, making even typing extraordinarily difficult. Her blood pressure and ongoing issues with her heart and lungs also worsened. Her health deteriorated so quickly and so severely that in early December, she had to go to the emergency room for lupus and serositis. The ongoing nature of Defendants' retaliation has caused her emotional and physical symptoms to continue.

94. Defendants' conduct also significantly damaged Ms. Walker's professional reputation. When Ms. Walker was initially placed on leave, Defendants falsely represented to Ms. Walker's professional contacts that she was out of the office for various reasons that included, but were not limited to, a sudden sabbatical, ill health, and the death of a close friend. They cancelled her speaking engagements at important conferences and because of the loss of access to her work accounts, Ms. Walker was unable to complete a prestigious fellowship.

95. Defendants also did not inform many SD contractors and lobbyists that the organization was dissolving because they did not want contractors to question what was happening at SD. When Defendants blocked access to Ms. Walker's email a second time, NVF employees provided SD contractors Ms. Walker's personal email so that she was receiving requests for payment on her personal email, which continued through February 2022. Both times she was suddenly blocked from her work accounts caused her to miss meetings, be unresponsive to emails, fail to do necessary follow-ups with contractors and affiliates, and appear completely unprofessional to contacts with whom she had spent years building a reputation. Defendants' actions caused multiple important contacts of Ms. Walker to question her professionalism and stop interacting with her.

96.     Further, Defendants also told SD employees that Ms. Walker was acting maliciously and to not follow any of her directions during the two-week period between her suspensions from SD. Besides being false, this damaged her professional reputation among SD employees and NVF employees who were not part of Defendants' retaliatory actions.

97.     As a consequence of Defendants' conduct, Ms. Walker has suffered and will suffer economic harm, including lost past and future income and employment benefits, damage to her career, and lost wages, overtime, unpaid expenses, and penalties, as well as interest on unpaid wages at the legal rate from and after each payday on which those wages should have been paid. Ms. Walker lost half of her income, approximately $117,500, when she was constructively discharged from SD. Her discharge from NVF caused her to lose her remaining income as well as her insurance benefits.

98.     Finally, Defendant NVF and Ms. Smith are very influential in progressive elections policy organizations and many positions to which Ms. Walker would apply are connected to one or the other. Ms. Walker has only been able to secure contract work, and it has not been at her previous level of compensation or reflective of her level of experience.

## CLAIMS

### FIRST CAUSE OF ACTION
### Retaliation Prohibited by TFA

99.     Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

100.    The TFA, 26 U.S. Code § 7623(d), makes retaliating against an employee who reports suspected violations of the Internal Revenue Code illegal.

101.    Ms. Walker reasonably believed the reported tax practices of NVF and SD violated the internal revenue laws and that such reports of tax violations were accurate.

102.    Ms. Walker sent a Whistleblower email to Mr. Schultz describing improper tax practices by NVF and SD. The Whistleblower email was accurate, was submitted in accordance with the NVF handbook, and is protected as a lawful act by federal law.

103.    Under, § 7623(d)(1)(A), Ms. Walker's email provided information, caused information to be provided, or otherwise assisted in an investigation regarding underpayment of tax or conduct which Ms. Walker reasonably believed constituted a violation of the internal revenue laws or a provision of Federal law relating to tax fraud, and the email was sent to a person with supervisory authority over the employee and/or working for the employer who has the authority to investigate, discover, or terminate misconduct.

104.    Rather than cease the noncompliant tax practice of using NVF to illegally subsidize SD's political work, NVF's leaders intentionally tried to compromise Ms. Walker by involving her in this illegal practice so she would no longer be a threat to report the improper financial activity.

105.    In violation of § 7623(d)(1), Defendants' discharged, suspended, threatened, harassed, and otherwise discriminated against Ms. Walker in reprisal for reporting noncompliant tax practices. Defendants' acts are prohibited under the TFA and are the precise conduct that the TFA was enacted to prevent.

106.    Accordingly, Plaintiff is entitled to the relief set out in § 7623(d)(3), including, compensatory damages; reinstatement with the same seniority status that she would have had, but for the reprisal; the sum of 200 percent of the amount of back pay and 100 percent of all lost benefits, with interest; and compensation for any special damages sustained as a result of the reprisal, including litigation costs, expert witness fees, and reasonable attorney fees.

107.    This claim is brought against Defendants NVF, SD, and SD USA.

## SECOND CAUSE OF ACTION
## Discrimination on the Basis of Race in Violation of the DCHRA

108.    Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

109.    Under the DCHRA, it is "an unlawful discriminatory practice" for an employer to, "based upon the actual or perceived race" of an individual, "discriminate . . . with respect to his or hers compensation, terms, conditions, or privileges of employment; or to limit, segregate, or classify his or hers employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or hers status as an employee . . ." D.C. Code § 2-1402.11(a)(1)(A).

110.    Under the DCHRA, it is "an unlawful discriminatory practice for any person to aid [or] abet . . . any of the acts forbidden under the provisions of this chapter . . ." D.C. Code § 2-1402.62.

111.    As an African American, Plaintiff is a member of a protected class under the DCHRA.

112.    Plaintiff was fully qualified for her positions as Vice President of Advocacy of VRL and Executive Director of SD and was able to perform all the essential functions of the positions.

113.    As described above, Defendants' actions—paying Plaintiff less than white employees, denying her access to information that was given to similarly situated white employees, and denying her benefits that were given to white employees—violated the DCHRA.

114.    In particular, Defendants told Plaintiff that she could not receive a salary above the pay scale but gave white employees salaries well above the pay scale. Plaintiff was paid less than white employees who had less education and experience than Plaintiff, including white employees such as Ms. Higginbotham, who reported to her and had fewer responsibilities. When Plaintiff was

assigned additional responsibilities for a period she was told would exceed three months, Defendants did not increase her pay as required by NVF policies.

115.    In particular, Defendants denied Plaintiff access to detailed salary information about her direct reports, reasons for hiring people who reported to her, and information about whether employees were classified as full-time or part-time NVF employees. A similarly situated African American Vice President, Ms. LoBue, also did not receive such information. In comparison, all white Vice Presidents had access to this information. By denying her access to basic financial information about the organization she was purported to lead, Defendants adversely affected the terms and conditions of Plaintiff's employment.

116.    Additionally, Defendants classified Plaintiff and most minority employees as part-time NVF employees so as to deny them access to life insurance and disability benefits that were given to white employees, most of whom were classified as full-time NVF employees. In direct comparison, when Ms. Harrington was hired, she was classified as a full-time NVF employee specifically so she could access disability insurance, despite the fact that most of her work would be for SD. Ms. Harrington, a white female, was given this option although non-white employees hired at the same time were not, nor was Ms. Walker. This significantly adversely affected Plaintiff as she had specifically and repeatedly asked about how she could avail herself of the disability benefits given to a similarly situated white employee.

117.    As detailed herein, Defendants failed to make an individualized assessment to determine whether a reasonable accommodation would enable Plaintiff to continue to perform the essential functions of her positions, but made such an assessment and accommodated two similarly situated white employees, Ms. Tarazi and Ms. Harrington.

118.    Further substantiating Plaintiff's claims, as described above, Defendants treated minority employees as a whole worse than similarly situated white employees—lower pay with more responsibilities, less access to donor and professional networks, less access to information that was given to white employees, and unequal eligibility for benefits—in violation of the DCHRA.

119.    As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm. Plaintiff is entitled to all relief deemed appropriate, including economic damages, emotional damages, punitive damages, and equitable relief.

120.    This claim is brought against Defendants NVF, SD, and SD USA.

### THIRD CAUSE OF ACTION
### Discrimination on the Basis of Sex in Violation of the DCHRA

121.    Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

122.    Under the DCHRA, it is "an unlawful discriminatory practice" for an employer to, "based upon the . . . sex" of an individual, "discriminate . . . with respect to his or hers compensation, terms, conditions, or privileges of employment; or to limit, segregate, or classify his or hers employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or hers status as an employee . . ." D.C. Code § 2-1402.11(a)(1)(A).

123.    As a female, Plaintiff is a member of a protected class under the DCHRA.

124.    Plaintiff was fully qualified for her positions as Vice President of Advocacy of VRL and Executive Director of SD and was able to perform all the essential functions of the positions.

125.    As described above, Defendants paid Plaintiff less than male employees in violation of the DCHRA.

126.     Defendants told Plaintiff that she could not negotiate for a salary outside of the pay scale but allowed a new male employee to negotiate his salary. That male employee, Luis Rodriguez, who reported to her, was paid more than Plaintiff, even though he had less education, less experience, and had fewer responsibilities. Similarly, Plaintiff's male supervisor, Colin Weaver, also had less education and experience than Plaintiff and, at the time that she was assigned his responsibilities in addition to her own, his pay was 60% higher.

127.     As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm. Plaintiff is entitled to all relief deemed appropriate, including economic damages, emotional damages, punitive damages, and equitable relief.

128.     This claim is brought against Defendants NVF, SD, and SD USA.

**FOURTH CAUSE OF ACTION**
**Discrimination on the Basis of Disability in Violation of the DCHRA**

129.     Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

130.     Under the DCHRA, it is "an unlawful discriminatory practice" for an employer to, "based upon the actual or perceived . . . disability" of an individual, "discriminate . . . with respect to his or hers compensation, terms, conditions, or privileges of employment; or to limit, segregate, or classify his or hers employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or hers status as an employee . . ." D.C. Code § 2-1402.11(a)(1)(A).

131.     Because lupus, pericarditis, arthritis, and neuropathy substantially limit at least one of Plaintiff's major life activities, Plaintiff is an individual with a disability under the DCHRA.

132.     Plaintiff was fully qualified for her positions as Vice President of Advocacy and Executive Director and was able to perform all the essential functions of the positions. Indeed, Plaintiff was repeatedly promoted at NVF and SD because of her capabilities.

133.     Prior to her hiring by VRL and SD, Ms. Lewis and Ms. Tarazi knew of Plaintiff's disability. Prior to or at the time of her hiring by NVF, Defendants NVF and SD knew of Plaintiff's disability.

134.     As described above, Plaintiff's increasingly demanding work and travel schedule in 2021 caused flare-ups of her lupus and other conditions, and she requested a modified work schedule. Defendants made no individualized assessment to determine whether a reasonable accommodation would enable her to continue to perform the essential functions of her positions, as is required under the DCHRA.

135.     In violation of the DCHRA, Defendants SD and SD USA terminated Plaintiff instead of making an individualized assessment to determine whether a reasonable accommodation would enable her to continue to perform the essential functions of her position as Executive Director of SD violated the DCHRA.

136.     In violation of the DCHRA, Defendant NVF failed to make an individualized assessment to determine whether a reasonable accommodation would enable Plaintiff to continue to perform the essential functions of her position as Vice President of VRL.

137.     As a result of Defendants' actions and inactions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm. Plaintiff is entitled to all relief deemed appropriate, including economic damages, emotional damages, punitive damages, and equitable relief.

138.     This claim is brought against Defendants NVF, SD, and SD USA.

**FIFTH CAUSE OF ACTION**
**Hostile Work Environment in Violation of the DCHRA**

139.    Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

140.    The DCHRA covers discrimination and harassment based on race, color, sex or other protected classes. D.C. Code § 2-1402.11(a).

141.    "'Harassment' means conduct, whether direct or indirect, verbal or nonverbal, that unreasonably alters an individual's terms, conditions, or privileges of employment or has the purpose or effect of creating an intimidating, hostile, or offensive work environment." § 2-1402.11(c-2)(2)(A).

142.    Plaintiff is a member of a protected class.

143.    Plaintiff has been subjected to unwelcome harassment. As detailed herein, Defendants repeatedly made remarks to, and engaged in acts towards, Plaintiff that indicate Defendants harbored discriminatory animus.

144.    The harassment was based on Plaintiff's membership in the protected class. Defendants consistently treated Plaintiff and other female employees of color worse than white female employees or male employees in ways that materially affected the terms, conditions, and privileges of their employment. Defendants paid non-white female employees less, classified them so as to deny them access to insurance benefits and to important professional networks, gave them more responsibilities without simultaneous salary increases, prevented them from accessing information necessary to perform their jobs, and made repeated racist and colorist comments that created a hostile working environment. When Plaintiff opposed these practices, Defendants coerced Plaintiff into stating her discrimination claims directly to the people who discriminated against her, in front of hostile coworkers who had been comparatively better treated.

35

145.    The harassment was objectively and subjectively offensive, and severe and pervasive enough to affect a term, condition, or privilege of Plaintiff's employment.

146.    Defendants' harassing conduct toward Plaintiff was committed with malice, including that (a) Defendants acted with intent to cause injury to Plaintiff and/or acted with reckless disregard for Plaintiff's injury, including by retaliating against Plaintiff, terminating Plaintiff's employment and/or taking other adverse job actions against Plaintiff because of her race, color, sex, and/or good faith complaints, and/or (b) Defendants' conduct was  committed in willful, wanton, and reckless disregard of Plaintiff's rights, health, and safety, including Plaintiff's right to be free of discrimination, harassment, retaliation, and wrongful employment termination.

147.    As a proximate result of Defendants' willful, knowing, and intentional harassment and intimidation, Plaintiff has suffered and continues to suffer both economic and non-economic harm. Plaintiff is entitled to all relief deemed appropriate, including economic damages, emotional damages, punitive damages, and equitable relief.

148.    This claim is brought against Defendants NVF, SD, and SD USA.

## SIXTH CAUSE OF ACTION
### Retaliation in Violation of the DCHRA

149.    Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

150.    Under the DCHRA, it is "an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected under this chapter." D.C. Code § 2-1402.61(a).

151.    Under the DCHRA, it is "an unlawful discriminatory practice . . . to . . . retaliate against, interfere with, intimidate or discriminate against a person, because that person has opposed any practice made unlawful by this chapter . . ." D.C. Code § 2-1402.61(b).

152.    As detailed herein, Plaintiff spoke with Arabella Advisors on October 28, 2021 about the discrimination and hostile work environment she experienced, her opposition to Defendants' discriminatory practices, and her concerns about retaliation.

153.    On the evening the October 28, 2021, Plaintiff emailed Defendant NVF and opposed Defendants' discriminatory treatment based on race, sex, age, and disability. Specifically, Plaintiff stated that the misclassification of Ms. Harrington as a full-time NVF employee was done so that Ms. Harrington could access benefits that were being denied to Plaintiff and to other employees of color, notably Ms. Patel and Mr. Malbrough, both of whom were hired around the same time as Ms. Harrington. Plaintiff also opposed the differential treatment of Ms. Tarazi's disability, who was given an accommodation when Plaintiff was not. Plaintiff reasonably believed that these differential treatments constituted unlawful discrimination.

154.    The next morning, Defendant NVF placed Plaintiff on immediate leave from both NVF and SD. Her email access and access to all SD electronic assets were suspended without warning to her or even to the SD board. These actions prevented Plaintiff from: performing her job (including her management and leadership of employees), attending high-profile meetings, authorizing expenses, and communicating with contractors and funders. These actions made her completely unable to work and perpetuated the hostile work environment.

155.    Further, even after the SD board demanded that Plaintiff be reinstated to SD, Defendants once again retaliated against her by blocking her access to her email and work accounts a second time, on November 20, 2021. In a pattern of antagonism, this was again done with no warning or explanation to Plaintiff, indicating both hostility towards Plaintiff and a reckless disregard of her rights. Defendants' actions additionally were accompanied by fraudulently

informing Google that Plaintiff was not an authorized user of SD accounts. Plaintiff had no ability to continue to work for SD as a result of Defendants' actions.

156.     The conduct of Defendants towards Plaintiff would have dissuaded any reasonable employee from making their own, or from supporting another's, charge of discrimination. Plaintiff had made a good faith attempt to oppose discriminatory practices, and had been immediately placed on leave upon doing so. Although she was temporarily reinstated to her position at SD, Defendants' actions continued to materially harm Plaintiff. During her two-week reinstatement, Plaintiff attempted to mitigate the harms caused by Defendants' actions. When Defendants again terminated Plaintiff's access to her work accounts without notice nor explanation, their actions exacerbated the harms already done to Plaintiff.

157.     Defendant NVF had no legitimate, non-discriminatory reasons for placing Plaintiff on leave from SD. Defendant NVF's actions placing Plaintiff on leave from SD was done purely for retaliatory, discriminatory reasons, as Ms. Lewis was not authorized to take this action on SD's behalf. The decision to place Plaintiff on leave from NVF at the same time was done for the same discriminatory, retaliatory reasons. The post hoc claim that Plaintiff was placed on leave pending an investigation was quickly proven false, as the attempt at investigation ended quickly thereafter and Plaintiff was not reinstated. Nor was the decision to keep Plaintiff on ongoing administrative leave done in order to shield Plaintiff from further discrimination or retaliation. To the contrary, additional retaliatory actions were taken against Plaintiff after she was placed on leave.

158.     Furthermore, if Defendant NVF's relationship with VRL ended June 16, 2022, then Plaintiff's employment with NVF should have ended that same day. There would be no legitimate business reason to keep her employed after that date since Plaintiff's position with NVF would have ended along with every other employee of VRL. If, in the alternative, Defendant NVF's

relationship with VRL did not end on June 16, 2022, then Defendants had over a year in which to resolve Plaintiff's concerns and ensure that Plaintiff could exercise her rights to a workplace free of discrimination, harassment, or retaliation. Yet during that time, Defendants made no good faith attempt to resolve the claims raised by Plaintiff.

159.    Defendants SD and SD USA, acting by and through Ms. Smith and others, had no legitimate, non-discriminatory reasons for discharging Plaintiff. Plaintiff's position with SD ended with no formal notice to her, nor to the many vendors and contractors of SD who continued to contact Plaintiff regarding invoices and other matters long after her position with SD ended. Indeed, for all intents and purposes, SD USA was identical to SD, with the critical distinction that Plaintiff was not employed by SD USA. If there had been a legitimate business reason to dissolve SD, then as Executive Director, Plaintiff would have been involved in its dissolution and winding up. Instead, Plaintiff was denied access to her email and SD Google accounts, denied assistance from SD's accountant and attorney, and denied any information about what was happening.

160.    If the creation of SD USA was for legitimate, non-discriminatory reasons, then Plaintiff would have been offered a position at SD USA, as was every other SD employee.

161.    In addition, Defendants' decision to terminate Plaintiff from SD was accompanied by numerous misrepresentations. The decision to dissolve SD and create SD USA was intentionally kept quiet, with no explanation given to employees of SD and NVF, and an explicit attempt to prevent contractors of SD from learning that SD had dissolved. Employees of NVF misrepresented themselves as employees of SD. Defendants misled employees and contractors about what was happening. NVF employees misled employees, vendors, contractors, funders, and others about why Plaintiff was on leave.

162.     As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm. Plaintiff is entitled to all relief deemed appropriate, including economic damages, emotional damages, punitive damages, and equitable relief.

163.     This claim is brought against Defendants NVF, SD, and SD USA.

**SEVENTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**

164.     Plaintiff re-alleges and incorporates by reference the allegations of the paragraphs above, as if fully set forth herein.

165.     As described above, Defendants' discriminatory, harassing, and retaliatory actions against Plaintiff constituted severe and outrageous misconduct and caused Plaintiff extreme emotional distress.

166.     Defendants knew or should have known that their actions would be distressing to Plaintiff. Defendants knew that Plaintiff would be particularly susceptible to emotional distress as they were on notice that the symptoms of her chronic diseases are exacerbated by stress.

167.     In addition, Defendants had previously failed to take any action to accommodate Plaintiff's disability, so Plaintiff was already at a high level of emotional and physical distress.

168.     As a direct result of Defendants' extreme and outrageous conduct, Plaintiff did suffer and continues to suffer severe emotional distress.

169.     As a proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, mental pain and anguish, and her physical health has deteriorated.

170.     Defendants' misconduct was committed intentionally or recklessly.

171.     This claim is brought against all Defendants.

**REQUESTED RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment on her behalf on all counts contained herein, and grant her the following relief:

(a)     Declaratory judgment that Defendants' conduct violated Plaintiff's rights. In particular, that the Court declare the actions of Defendants complained of herein to be in violation of: the TFA, 26 U.S. Code § 7623(d), and the DCHRA, D.C. Code § 2-1401.1 *et seq.*; and that Defendants intentionally and recklessly inflicted emotional distress upon Plaintiff;

(b)     Injunctive relief permanently enjoining Defendants, their agents, employees, and successors from discriminating on the basis of race, sex, age, or disability, or retaliating against Plaintiff or any persons in violation of the aforementioned acts;

(c)     Compensatory damages, including economic and non-economic damages, in an amount to be determined by the jury;

(d)     Punitive damages as a result of Defendants' engaging in discriminatory practices with malice, willfulness, evil motive, or reckless indifference to federally protected rights;

(e)     Equitable relief;

(f)     Prejudgment and post-judgment interest on all damages;

(g)     Reasonable attorneys' fees, litigation expenses, and costs; and

(h)     Such other and further relief as the Court deems appropriate based on the facts and applicable law.

## JURY DEMAND

Plaintiff requests a trial by jury as to all issues of fact and damages raised in this case.


Dated:  April 21, 2023                                    Respectfully submitted,

                                                           /s/  Jennifer Hoffpauir
                                                          Jennifer Hoffpauir (Bar No. 90008692)
                                                          jennifer.hoffpauir@parlatorelawgroup.com
                                                          Parlatore Law Group, LLP
                                                          One World Trade Center, Suite 8500
                                                          New York, NY 10007
                                                          (212) 603-9918 (tel)
                                                          (212) 202-4784 (fax)

                                                          Alex J. Brown
                                                          Alex.Brown@LanierLawFirm.com
                                                          Zeke DeRose III
                                                          Zeke.DeRose@LanierLawFirm.com
                                                          THE LANIER LAW FIRM
                                                          10940 W. Sam Houston Pkwy N.
                                                          Suite 100
                                                          Houston, TX 77064
                                                          (713) 659-5200 (tel)
                                                          (713) 659-2204 (fax)

                                                          K. Lawson Pedigo
                                                          Bar ID: TX0186
                                                          SBOT: 15716500
                                                          klpedigo@mkp-law.net
                                                          Miller, Keffer & Pedigo, Pllc
                                                          3100 Monticello Ave., Suite 480
                                                          Dallas, Texas 75205
                                                          (214) 696-2050 (tel)
                                                          (214) 696-2482 (fax)

                                                          *Counsel for Plaintiff Sarah Walker*