**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SARAH WALKER,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>NEW VENTURE FUND, et al.,<br><br>　　　　　　Defendants. | :<br>:<br>:<br>:<br>:<br>:　Civil Action No. 1:22-cv-3312-APM<br>:<br>:<br>:<br>:<br>: |

**DEFENDANT SECURE DEMOCRACY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS
<u>MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT</u>**

Amy Epstein Gluck, Esq. (D.C. Bar No. 453525)
**FISHERBROYLES LLP**
1200 G Street, N.W., Suite 800
Washington, DC 20005
Tel. 301.526.1184
Fax 301.767.0637

*Attorney for Defendant Secure Democracy*

i

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................. 1

II.  STATEMENT OF FACTS....................................................................................... 3

   A.   SD's Background and Employment of Plaintiff ................................................. 3

III. STANDARD OF REVIEW ..................................................................................... 8

IV.  LEGAL ARGUMENT ............................................................................................ 9

   A.   D.C. CODE § 29–412.06 BARS PLAINTIFF'S TFA CLAIMS AGAINST SD.............. 9

   B.   THE TFA STATUTORY SCHEME TIME-BARS PLAINTIFF'S TFA CLAIM
       AGAINST SD................................................................................................11

   C.   THE DCHRA'S ONE YEAR STATUTE OF LIMITATIONS BARS PLAINTIFF'S
       SEX, RACE, AND HOSTILE WORK ENVIRONMENT CLAIMS............................12

      1.   Plaintiff's "Discrimination on the Basis of Sex Claim in Violation of the DCHRA"
          Is Time-Barred. ......................................................................................... 13

      2.   Plaintiff's "Discrimination on the Basis of Race Claim in Violation of the DCHRA"
          Is Time-Barred. ......................................................................................... 14

      3.   Plaintiff's "Hostile Work Environment in Violation of the DCHRA" Claim Is Time-
          Barred......................................................................................................... 15

   D.   NOT ONLY ARE PLAINTIFF'S DCHRA CLAIMS TIME-BARRED, BUT THE
       AMENDED COMPLAINT FAILS TO ALLEGE DISCRIMINATION CLAIMS
       UNDER THE DCHRA. ................................................................................. 17

      1.   Plaintiff Cannot Establish That SD Discriminated Against Her Based On a
          Disability.................................................................................................... 17

      2.   The Amended Complaint Fails to State A Claim For Sex Discrimination................. 21

   E.   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR INTENTIONAL
       INFLICTION OF EMOTIONAL DISTRESS. ............................................................ 31

V.   CONCLUSION ....................................................................................................... 33

# **TABLE OF AUTHORITIES**

Cases

*Aka v. Washington Hosp. Ctr.*, 156 F. 3d 1284, (D.C. Cir. 1998) .................................. 22

*Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.*, 922 F. Supp. 2d 56,

    (D.D.C. 2013) ........................................................................................... 12

*Ashcroft v. Iqbal*, 556 U.S. 662, (2009) ............................................................. 11, 12

*Baloch v. Kempthorne*, 550 F.3d 1191, (D.C. Cir. 2008) .......................................... 32

*Barrett v. Covington & Burling LLP*, 979 A.2d 1239, (D.C. 2009) ...................... 20, 21

*Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, (D.D.C. 2010) ............ 18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, (2007) ............................................. 11, 36

*Bing v. Architect of Capitol*, 2019 U.S. Dist. LEXIS 169170 (D.D.C. Sept. 30, 2019) ............. 31

*Brackett v. Mayorkas*, 2021 U.S. Dist. LEXIS 231117 ............................................ 22

*Brady v. Houston Independent School District*, 113 F.3d 1419, (5th Cir. 1997) ........................ 29

*Bright v. Copps*, 828 F. Supp. 2d 130, (D.D.C. 2011) ............................................. 18

*Brown v. Sessoms*, 774 F.3d 1016, 1024, 413 U.S. App. D.C. 328 (D.C. Cir. 2014) .................. 26

*Daniels v. District of Columbia*, 894 F. Supp. 2d 61, (D.D.C. 2012) .......................... 34

*Elam v. Bd. Of Trs.*, 530 F. Supp. 2d 4, (D.D.C. 2007) ............................................ 32

*Faragher v. City of Boca Raton*, 524 U.S. 775, (1998) ........................................... 32

*Flemmings v. Howard Univ.*, 198 F.3d 857, 861, 339 U.S. App. D.C. 110 (D.C. Cir. 1999) ...... 22

*George v. Leavitt*, 407 F.3d 405, (D.C. Cir. 2005) ................................................ 32

*Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, (D.C. Cir. 2015) .................... 23

*Grandison v. Wackenhut Servs., Inc.*, 514 F. Supp. 2d 12, (D.D.C. 2007) .................. 36

iii

*Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, (D.C. Cir. 2015) .................................... 12, 32

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, (1993) ........................................................................ 32

*Harris v. Mayorkas*, 2022 U.S. Dist. LEXIS 147683, (D.D.C. Aug. 18, 2022) .......................... 26

*Hatter v. WMATA*, 105 F. Supp. 3d 7, (D.D.C. 2015) .................................................................. 15

*Hawley v. Blackboard, Inc.*, 2005 U.S. Dist. LEXIS 3865, (D.D.C. Mar. 3, 2005) .................... 25

*Hettinga v. United States*, 677 F.3d 471, (D.C. Cir. 2012) ........................................................ 12

*Hoffman v. Hill & Knowlton, Inc.*, 777 F. Supp. 1003, (D.D.C. 1991) ........................................ 35

*Holloway v. Howard Univ.*, 206 F. Supp. 3d 446, (D.D.C. 2016) ................................................ 34

*Homan v. Goyal*, 711 A.2d 812, (D.C. 1998) .............................................................................. 35

Hurd v. Dist. of Columbia, 864 F.3d 671, (D.C. Cir. 2017) ........................................................ 12

*Iyoha v. Architect of the Capitol*, 927 F.3d 561, (D.C. Cir. 2019) .............................................. 31

*Johnson v. District of Columbia*, 225 A.3d 1269, (D.C. 2020) .................................................... 20

Kaempe v. Myers, 367 F.3d 958, (D.C. Cir. 2004) ...................................................................... 12

*Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, (D.C. 1997) ...................................... 35

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, (D.C. Cir. 1994) ................................................ 12

*Lanci v. Arthur Andersen, LLP*, 96 Civ. 4009 (WK), 2000 U.S. Dist. LEXIS 3954, (S.D.N.Y.

    Mar. 28, 2000) ........................................................................................................................ 24

*Leftwich v. Gallaudet Univ.*, 878 F. Supp. 2d 81, (D.D.C. 2012) .......................................... 21, 27

*Lester v. Natsios*, 290 F. Supp. 2d 11, (D.D.C. 2003) ................................................................ 33

*Lively v. Flexible Packaging Assoc.*, 830 A.2d 874, (D.C. 2003) ................................................ 32

*Lurensky v. Wellinghoff*, 167 F. Supp. 3d 1, (D.D.C. 2016) ........................................................ 22

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973) ........................................................ 26

*McFarland v. George Washington Univ.*, 935 A.2d 337, (D.C. 2007) .................................... 27, 29

*McKinney v. G4S Gov't Sols., Inc.*, 711 F. App'x 130, (4th Cir. 2017)........................................ 36

*Munoz v. Bd. of Trustees of Univ. of Dist. of Columbia*, 590 F. Supp. 2d 21, (D.D.C. 2008)...... 16

*Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, (D.C. Cir. 1995)............................. 20

*Newman v. Amazon.Com, Inc.*, 2022 U.S. Dist. LEXIS 60951, (D.D.C. Mar. 31, 2022) ............ 25

*Papasan v. Allain*, 478 U.S. 265, (1986) ...................................................................................... 12

*Peterson v. Archstone*, 925 F. Supp. 2d 78, (D.D.C. 2013)........................................................... 16

*Pitt v. District of Columbia*, 491 F.3d 494, (D.C. Cir. 2007) ........................................................ 34

*Ragsdale v. Holder*, 668 F. Supp. 2d 7, (D.D.C. 2009) ................................................................ 24

*Richards v. Duke Univ.*, 480 F. Supp. 2d 222, (D.D.C. 2007)....................................................... 34

*Savignac v. Day*, 539 F. Supp. 3d 107, (D.D.C. 2021)................................................................. 25

*Schuler v. United States*, 617 F.2d 605, (D.C. Cir. 1979)............................................................. 12

*Sims v. Sunovion Pharms., Inc.*, No. CV 17-2519 (CKK), 2019 WL 690343, (D.D.C. Feb. 19,

2019) ......................................................................................................................................... 16

*Stewart v. Evans*, 275 F.3d 1126, (D.C. Cir. 2002)..................................................................... 32

*Thompson v. Hicaps Inc.,* 2022 U.S. Dist. LEXIS168861, (D.D.C. Sep. 19, 2022) .................... 26

*Tolton v. Jones Day*, 2020 U.S. Dist. LEXIS 87793, (D.D.C. May 19, 2020)............................. 25

*Turner v. Mull*, 784 F.3d 485, (8th Cir. 2015) ............................................................................. 30

*Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, (4th Cir. 1994) ....................................... 24

*Waggel v. George Washington Univ.,* 957 F.3d 1364, 1371, 446 U.S. App. D.C. 390 (D.C. Cir.

2020) .................................................................................................................................... 21, 22

*Walden v. Patient-Centered Outcomes Research Institute*, 177 F. Supp. 3d 336, (D.D.C 2016)  33

*Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, (D.D.C. 2011)....................... 12

*Western Assoc. Ltd. Partnership v. Market Square Assoc.*, 235 F.3d 634, (D.C. Cir. 2001) ....... 12

*Whitaker v. Nash Cnty.*, No. 5:11-CV-15-FL, 2012 WL 3840375, (E.D.N.C. Sept. 5, 2012) 23, 24

*Wicks v. American Transmission Co., LLC*, 701 F. Supp. 2d 28, (D.D.C. 2010) ........................ 32

*Woodruff v. LaHood*, 777 F. Supp. 2d 33, (D.D.C. 2011) ............................................................ 22

## Statutes

42121(b) of title 49, United States Code ...................................................................................... 13

D.C. Code § 2-1403.16 ...................................................................................................... passim

D.C. Code § 29–412.06 .......................................................................................... 2, 11, 13, 19, 20

D.C. Code § 2-1402.11 ................................................................................................................ 19

D.C. Code § 29-412.02 ....................................................................................................... 1, 7, 12

D.C. Code § 2-1402.62 ................................................................................................................ 19

District of Columbia Human Rights Act, D.C. Code §2-1402.11 ................................................ 1

Internal Revenue Code § 501(c)(4) .......................................................................................... 1, 4

Internal Revenue Code. 26 U.S.C. § 7623 ................................................................................ 13

Taxpayer First Act, 26 U.S.C. §7623(d) ..................................................................................... 1

## Rules

Federal Rule of Civil Procedure 12(b)(6) .................................................................. 6, 11, 12, 36

Defendant Secure Democracy, by counsel, and, for its Memorandum of Points and Authorities in Support of Secure Democracy's Motion to Dismiss Plaintiff's Amended Complaint, respectfully submits as follows:

## I.    <u>INTRODUCTION</u>

Secure Democracy ("SD") was a nonprofit organization exempt from taxation under Internal Revenue Code § 501(c)(4) as a social welfare organization. After several promotions, Plaintiff Sarah Plaintiff ("Plaintiff") became SD's Executive Director while jointly employed by another entity, Voting Rights Lab ("VRL"), a former project of Defendant New Venture Fund ("NVF") and nonparty in this action.

On November 9, 2021, Plaintiff advised SD's Board of Directors to dissolve the organization "by the end of November" due to its financial situation. Heeding Plaintiff's recommendation, on November 17, 2021, SD's Board of Directors adopted a resolution for dissolution, effective December 2, 2021, pursuant to District of Columbia Code § 29-412.02. SD's last day of operations was November 30, 2021, at which time Plaintiff's employment – as well as the employment of every other SD employee - was terminated.

Now, in this case, Plaintiff claims (1) retaliation in violation of the Taxpayer First Act, 26 U.S.C. §7623(d) ("TFA"); (2) "discrimination" and a "hostile work environment" on the basis of: (a) race; (b) sex; and (c) disability in violation of the District of Columbia Human Rights Act, D.C. Code §2-1402.11 et. seq. ("DCHRA"); (3) "retaliation" in violation of the DCHRA; and (4) the "intentional infliction of emotional distress." Plaintiff's claims fail.

***First***, the Amended Complaint fails to state a claim under the TFA because Plaintiff failed to timely file a complaint with the United States Department of Labor ("DOL") within the 180-

day statute of limitations following the last alleged act of retaliation purportedly committed by SD. The Amended Complaint equally fails to state a claim against SD for violating the TFA because Plaintiff failed to file the complaint within ninety (90) days of SD's notice of rejection of all such claims, which is required for known claims against dissolved non-profit corporations in this district. (D.C. Code § 29–412.06.)

*Second*, the DCHRA's one (1) year statute of limitations bars Plaintiff's claims for race, sex, failure to accommodate, and a hostile work environment. (D.C. Code § 2-1403.16.)

*Third*, even if Plaintiff's Amended Complaint was not time-barred as to SD, which it is, Plaintiff fails to state a claim for disability discrimination against SD, because, among other things, Plaintiff's amended pleading fully admits that: (1) SD knew that she suffered from lupus (a disability) prior to hiring her; (2) SD provided reasonable accommodations to Plaintiff, including time off for all of her medical appointments; (3) SD promoted Plaintiff numerous times throughout her employment, and it is undisputed that Plaintiff served as SD's Executive Director, the highest leadership position within the organization, at the time she recommended that it be dissolved; (4) Defendants provided another employee who also suffered from lupus, with the same accommodation Plaintiff claims she was denied; and (5) Plaintiff's employment with SD ended because the organization dissolved -- based on Plaintiff's own recommendation.

Moreover, SD did not terminate Plaintiff or subject her to any adverse action—SD ceased to exist and dissolved upon Plaintiff's recommendation. Plaintiff's remaining discrimination claims do not pertain to SD at all. Indeed, Plaintiff improperly conflates SD with other entities rather than treating them as separate and distinct without alleging any basis for attributing almost all of her claims (save one) to all Defendants. Next, the Amended Complaint fails to state a claim for retaliation because after Plaintiff lodged complaints in June 2020, SD promoted her to

Executive Director. In addition, the record demonstrates that Plaintiff's employment was terminated because of SD's dissolution; and, accordingly, there is no required causal connection between her complaints and the termination of her employment. Moreover, Plaintiff's substantive allegations, taken as true, fail to state a claim against NVF for sex or race discrimination or a hostile work environment.

Plaintiff's retaliation claim against SD fails as well because, taking her allegations as true, Plaintiff only alleges actions taken against her by other defendants.[1]

Finally, the Amended Complaint fails to state a claim for the intentional infliction of emotional distress because Plaintiff fails to plead and cannot identify any conduct that was "extreme" or "outrageous" under District of Columbia law.

Considering the above, this Court should dismiss Plaintiff's Amended Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.   <u>STATEMENT OF FACTS</u>

### A.   *SD's Background and Employment of Plaintiff*

1.      SD *was* a nonprofit organization exempt from taxation under Internal Revenue Code §501(c)(4) as a "social advocacy" organization. (Am. Compl. ¶ 4.)

2.      Plaintiff is a former employee of SD and Defendant NVF. (*Id.* at ¶ 19.)

3.      On September 26, 2019, SD hired Plaintiff as Associate Director at a salary of $110,000. (*Id.* at ¶¶ 26-27.) SD paid half of Plaintiff's salary, and VRL paid the other half. (*Id.* at ¶ 27.)

4.      SD and NVF knew that Plaintiff suffered from lupus and needed "ongoing medical treatments" prior to hiring her in September 2019. (*Id.* at ¶¶ 23, 47-48.)

---

[1] Even so, temporarily losing access privileges to online work tools and being placed on administrative leave while continuing to receive full pay are not "adverse actions."

5.      Plaintiff admits that SD and Defendants Lewis and NVF accommodated Plaintiff's requests to attend to her medical appointments.  (*Id.* at ¶¶ 48-49.)

6.      VRL and SD worked closely together and shared certain staff, including Plaintiff. (*Id.* at ¶ 6.) In fact, as of February 2020, all employees of SD were 50/50 employees with VRL/NVF, including Plaintiff. NVF provided all employee benefits to employees of SD and VRL. (*Id.* at ¶ 9.)

7.      Given SD and NVF's shared mission and goals of fighting voter suppression and transforming America's voting systems, NVF and SD worked closely together and shared certain staff, including Plaintiff. (Defendants' ***Exhibit 1*** at Exhibit A). When staff worked on VRL activities, NVF paid them. *Id.* Otherwise, SD paid its staff directly for time spent on SD activity. *Id.*

8.      On December 1, 2020, Plaintiff became the Executive Director of SD. (Am. Compl. at ¶¶ 39, 132.)  Around the same time, NVF promoted Plaintiff to VP, Advocacy at VRL. (*Id.*)

9.      Plaintiff's promotion to Executive Director of SD resulted in her attaining the highest leadership role in the organization.  (*Id.* at Ex. 15.)

***Plaintiff's Complains Internally About Discrimination***

10.      In June 2020, Plaintiff complained internally about various workplace discrimination concerns. (Am. Compl. at ¶ 55.)

11.      On December 1, 2020, Plaintiff was promoted to Executive Director of Secure Democracy and Vice President of Advocacy for non-party VRL. (Am. Compl. at ¶¶ 39, 132.)

12.      On or about October 26-28, 2021, SD and VRL held a leadership retreat. (Am. Compl. at ¶ 53.)

13.    On October 28, 2021, Plaintiff raised concerns internally with VRL's Chief of Staff, to NVF's human resources department, and to NVF's general counsel. (Am. Compl. at ¶¶ 62-64, 152-53.)

14.    Plaintiff's concerns at this time included allegations of pay inequity, inequitable and disparate treatment of people of color, alleged misrepresentations regarding benefits, alleged mistreatment of Ms. Walker at a recent staff retreat, and that VRL and Secure Democracy were inappropriately intermingled in violation the IRC and regulations applicable to tax exempt organizations. (Am. Compl. at ¶¶ 62-72.)

15.    ***Plaintiff Is Placed On Paid Leave*** On October 29, 2021, VRL Project Director Ms. Lewis notified the SD Board that SD and VRL had placed Plaintiff on ***paid*** administrative leave to investigate her complaints by hiring an outside investigator. (Am. Compl. at ¶¶ 73, 85.)

16.    Placing Plaintiff on leave pending investigation of her complaints was consistent with the NVF Policy Handbook. (*Id.* at ¶ 85.)

17.    NVF also removed Ms. Walker's access to SD's computer and email systems while she was on paid leave. (*See* Am. Compl. at ¶ 73.)

18.    On November 1, 2021, Plaintiff contacted SD Board Chairperson Heather Smith to inform the Board of her administrative leave status pending investigation, formally sought "whistleblower status" with SD, and then accused SD of retaliation. (*Id.* at ¶ 74 and exhibits thereto.) Plaintiff further complained to the SD Board that VRL lacked the authority to place her on leave on behalf of SD. (*Id.*)

19.    Between November 1 and November 3, 2021, Plaintiff emailed SD protesting being placed on administrative leave and requesting that SD restore her SD email account, Google Drive, and all other SD accounts and credit card. (*Id.* at ¶ 76.)

20.     On November 3, 2021, SD advised Plaintiff and VRL that the SD Board was not privy to any action taken against Plaintiff and did not authorize leave for Plaintiff from SD during the investigation. (*Id.* at ¶ 75.) Further, the SD Board also requested that Plaintiff's access to her SD email account, Google Drive, and corporate credit card be restored. Moreover, the SD Board advised that SD would undertake a separate, independent investigation. (*See* Declaration of Amy Epstein Gluck, Esq., dated June 2, 2023, attached hereto and hereinafter "Epstein Gluck Decl.," at ¶ 5, Ex. 5 thereto.)

21.     On November 4, 2021, SD expressed again that Plaintiff needed access to company email, Google Drive, and corporate credit card, and VRL replied to SD *and Plaintiff* that Plaintiff had access to her accounts and systems since November 3, 2021, and that the temporary cessation of access was unintentional. (*See* Epstein Gluck Decl. at ¶ 6, Ex. 6 thereto.)

22.     It is undisputed that Plaintiff's suspension from Secure Democracy was overturned on November 3, 2021, and that Plaintiff was reinstated on November 4, 2021. (*Id.* at ¶¶ 75, 76; 78; Exs. 12-13.)

**_Plaintiff Recommends The Dissolution of SD_**

23.     On November 9, 2021, Plaintiff recommended to the SD Board that SD should dissolve. (*See* Epstein Gluck Decl. at ¶ 7, Ex. 7 thereto.)

24.     Plaintiff wrote to the SD Board that after evaluating SD's "cash-on-hand, out-standing [sic] invoices, payroll and future liabilities[,] it is clear that without an injection of cash[,] SD is not viable. … My recommendation is that we let contracts up for renewal expire and notify each contractor that we are terminating their contracts with the 30 day out provisions. If we do not do this by the end of November[,] we will incur more liabilities. As it stands[,] we are not going to be able to pay our outstanding liabilities through the end of the year." (*Id*).

25.     On November 11, 2021, Plaintiff again recommended that the SD Board dissolve SD, and, immediately thereafter, advised SD staff about the proposed dissolution and instructed them to tell vendors. (*See* Epstein Gluck Decl. at ¶ 8, Ex. 8 thereto.)

26.     On November 16, 2021, Plaintiff emailed SD to "check in on the status of the dissolution of Secure Democracy" and provide updates. (*See* Epstein Gluck Decl. at ¶ 9, Ex. 9 thereto.)

27.     On November 17, 2021, at Plaintiff's recommendation, the SD Board adopted a resolution for dissolution "pursuant to § 29-412.02 of the District of Columbia Code before the end of this calendar year."(*See* Defts.' Ex.1, Secure Democracy DOL Response at Ex. C). The resolution took effect on December 2, 2021. (*Id.*)

28.     SD's last operational day was on November 30, 2021. (Am. Compl. at ¶ 82.)

29.     By December 1, 2021, SD had no remaining employees. (*Id.*) VRL/NVF offered full-time employment to the SD staff. (*Id.* at ¶¶ 79, 84.) NVF hired most of the SD employees to provide similar activities while another entity was formed and qualified (SD USA). (*See* Defts.' Ex.1, Secure Democracy DOL Response at Ex. A at 4.)

30.     On December 20, 2021, SD dissolved.  (Am. Compl. at ¶¶ 21, 82.)

31.     On January 14, 2022, Plaintiff's counsel forwarded correspondence to SD and NVF setting forth the identical claims asserted in the instant matter in a thirteen (13) page single spaced letter. (*See* Defts.' Ex. 3.)

32.     On February 11, 2022, SD responded to Plaintiff's counsel's January 14, 2022, correspondence rejecting, *inter alia* the same race, sex, disability, retaliation, and hostile work environment claims asserted by Plaintiff's claims in this matter. (*See* Defts.' Ex.1, Secure Democracy DOL Response at Ex. D).)

7

33.     On June 10, 2022, Ms. Walker filed a charge with the U.S. Department of Labor (DOL), Occupational Safety and Health Administration (OSHA), regarding her alleged complaints to NVF concerning the purported inappropriate relationship between VRL and SD, in violation of the IRC and regulations applicable to tax exempt organizations. (*See* Defts.' Ex. 2.)

34.     Plaintiff did not file the Initial Complaint in this matter until October 28, 2022. (Dkt. No. 1.).

## III.   STANDARD OF REVIEW

Dismissal of a claim or complaint is appropriate when a party has failed to set forth "a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The factual allegations in the complaint need not be "detailed"; however, the Federal Rules demand more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). If the facts as alleged fail to establish that a plaintiff has stated a claim upon which relief can be granted, a court must grant the defendant's Rule 12(b)(6) motion. *See Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.*, 922 F. Supp. 2d 56, 61 (D.D.C. 2013).

In evaluating a motion to dismiss under Rule 12(b)(6), the court must accept a plaintiff's "factual allegations . . . as true," *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir.

2015), and "construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). However, the court need not accept as true "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or "inferences . . . unsupported by the facts set out in the complaint," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). When performing the "context-specific task" of deciding whether a plausible claim has been stated, a court must "draw on its judicial experience and common sense[.]" *Iqbal*, 556 U.S. at 679.

Also, the Court may "look beyond the complaint to the record" in determining whether the complaint adequately alleges facts to survive a Rule 12(b)(6) motion. *Western Assoc. Ltd. Partnership v. Market Square Assoc.*, 235 F.3d 634, 644 (D.C. Cir. 2001). As such, in deciding whether to dismiss a claim "the court may consider . . . documents attached as exhibits or incorporated by reference in the complaint . . . or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119-20 (D.D.C. 2011) (declining to convert motion to dismiss into summary judgment motion) (internal quotes omitted); *see also Hurd v. Dist. of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017); *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (holding documents referenced in the complaint but not attached to it may be considered on a motion to dismiss).

## IV.    LEGAL ARGUMENT

The District of Columbia Code mandates the dismissal of Plaintiff's claims against SD.

### A.    *D.C. CODE § 29–412.06 BARS PLAINTIFF'S TFA CLAIMS AGAINST SD*.

D.C. Code § 29–412.06, titled "Known claims against dissolved corporation," requires a mandatory bar of Plaintiff's claims against SD. Section 29-412.06 provides:

> (a) A dissolved nonprofit corporation may dispose of the known claims against it by delivering notice to its known claimants of the dissolution at any time after its effective date.
>
> . . .
>
> (c) A claim against the dissolved nonprofit corporation **shall be barred** if the claimant: (1) That was given notice under subsection (b) of this section does not deliver the claim to the dissolved corporation by the deadline; or (2) Whose claim was rejected by the dissolved corporation does not commence a proceeding to enforce the claim within 90 days from the effective date of the rejection notice.

*Id.* (emphasis supplied).

As asserted in the first sentence of the Amended Complaint, "On October 28, 2021, at 6:06 p.m., Plaintiff Sarah Plaintiff ("Ms. Walker"), the executive director of Secure Democracy ("SD"), sent an e-mail to Andrew Schultz, the general counsel of New Venture Fund ("NVF") altering him to her growing "concerns related to accounting controls and procedures, conflicts of interest, EEO and legal compliance." (Am. Compl. at 1.) The Amended Complaint continues, "[o]n November 1, 2021, Ms. Plaintiff emailed Heather Smith, the chair of SD's Board, about the concerns that she had raised with NVF and asserted whistleblower status with Defendant SD." *Id.*

As the DOL's file related to Plaintiff's TFA claims make clear, on November 9, 2021, Plaintiff advocated for the dissolution of SD. (Epstein Gluck Decl. at ¶ 7, Ex. 7 thereto.) Critically, after evaluating SD's cash on hand, outstanding invoices, payroll, and future liabilities, Plaintiff advised:

> My recommendation is that we let contracts up for renewal expire and notify each contractor that we are terminating their contracts with the 30 day out provisions. *If we do not do this by the end of November[,]* we will incur more liabilities. As it stands[,] we are not going to be able to pay our outstanding liabilities through the end of the year . . . *I would recommend letting the Secure Democracy employees know that this is the plan and allow them to use the remainder of November to*

10

*exit contract relationships in the best possible manner and make decisions about their future*.

(*Id.*) On November 11, 2021, Plaintiff advised SD's Regional Directors that SD would be dissolved. (*See* Epstein Gluck Decl. at ¶ 8, Ex. 8 thereto.) On November 16, 2021, Plaintiff emailed Secure Democracy to "check in on the status of the dissolution of Secure Democracy" and provide updates. (Epstein Gluck Decl. at ¶ 9, Ex. 9 thereto.)  On November 17, 2021, the SD Board adopted a resolution for dissolution "pursuant to § 29–412.02 of the District of Columbia Code before the end of this calendar year." (*See* Defts.' Ex. 1 at Ex. C.)  SD's last day of operations was on November 30, 2021. (*Id.*; Am. Compl., at ¶¶ 82, 84.)

On January 14, 2022, Plaintiff's counsel forwarded correspondence to SD and NVF presenting the identical claims asserted in the instant matter in a thirteen (13) page, single spaced letter. (Defts.' Ex. 3.) On February 11, 2022, SD rejected claims asserted in by Plaintiff in this matter. (Defts.' Ex. 1 at Ex. D.)  Accordingly, Plaintiff should have filed a complaint asserting any and all claims she had against SD, including those arising under the DCHRA, by *May 12, 2022*, within the 90 days set forth in the statute, but she failed to do so until *October 28, 2022.*[2]

As a result, D.C. Code § 29–412.06 bars *all claims* asserted against SD in this matter.

**B.    *THE TFA STATUTORY SCHEME TIME-BARS PLAINTIFF'S TFA CLAIM AGAINST SD.***

Plaintiff's claim for violations of the TFA  is time-barred because none of the alleged adverse actions complained of occurred within 180 days prior to the filing of the Complaint.

---

[2] Notwithstanding, Plaintiff did not engage in protected activity within the meaning of the TFA; Plaintiff did not suffer any adverse action within the meaning of the TFA; all actions taken with respect to Plaintiff were taken for legitimate, nondiscriminatory reasons; and Plaintiff cannot demonstrate the required retaliatory intent. (Defts' Ex. 1 and Ex. A thereto.)

Under the TFA[3]'s statutory scheme, 26 U.S.C. § 7623(d)(2)(iv), an employee must file a complaint within 180 days of the date that the alleged violation occurs. (*Id.*) Here, all acts of alleged retaliation that Plaintiff asserted against SD occurred <u>more than</u> 180 days before Plaintiff filed her complaint with the DOL on ***June 10, 2022***. (Defts' Ex. 2, DOL Complt.) Accordingly, all incidents Plaintiff alleges in the Amended Complaint had to have occurred after December 12, 2021, i.e., 180 days before she actually filed the DOL complaint. However, the last act of retaliation alleged by Plaintiff in the Amended Complaint against SD occurred on or around ***November 20, 2021***. (*See* Am. Compl. at ¶¶ 81, 155.) Thus, the TFA's 180-day statute of limitations bars Plaintiff's complaint against SD because to comply with the TFA, Plaintiff had to file her complaint with the DOL by no later than ***May 19, 2022.*** She did not. As a result, Plaintiff's first cause of action purporting to assert a claim against SD for violations of the TFA is time-barred and should be dismissed with prejudice.

### C.   *THE DCHRA'S ONE YEAR STATUTE OF LIMITATIONS BARS PLAINTIFF'S SEX, RACE, AND HOSTILE WORK ENVIRONMENT CLAIMS.*

Plaintiff's claims for sex discrimination, racial discrimination, and a hostile work environment (Counts II, III, and V) are time-barred by the DCHRA's one-year statute of limitations.[4] "[A] claim under the DCHRA must be filed 'within one year of the unlawful discriminatory act, or the discovery thereof.'" *Munoz v. Bd. of Trustees of Univ. of Dist. of Columbia*, 590 F. Supp. 2d 21, 26 (D.D.C. 2008) (quoting *D.C. Code § 2-1403.16(a)*); *see also*

---

[3] The TFA prohibits retaliation against an employee who reports suspected violations of the Internal Revenue Code. 26 U.S.C. § 7623(d)(1)(A). The TFA incorporates the rules, procedures, and burdens of proof set forth in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR21"). 26 U.S.C. § 7623(d)(2)(B)(i) ("An action under subparagraph (A)(i) [of the TFA] shall be governed under the rules and procedures set forth in section 42121(b) of title 49, United States Code.").

[4] It is well settled that "if the allegations ... show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim ..." *Jones v. Bock*, 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Pappas v. D.C.*, 513 F. Supp. 3d 64, 77 (D.D.C. 2021).

*Peterson v. Archstone*, 925 F. Supp. 2d 78, 85 (D.D.C. 2013); *Sims v. Sunovion Pharms., Inc.*, No. CV 17-2519 (CKK), 2019 WL 690343, at *7 (D.D.C. Feb. 19, 2019) (dismissing plaintiff's DCHRA claims as time-barred by the statute of limitations because the alleged discriminatory acts occurred more than one year before she filed suit).

Here, Plaintiff filed her original Complaint on ***October 28, 2022***. (Dkt. No. 1.) Therefore, to be timely, the allegedly unlawful acts must have occurred on or after ***October 28, 2021.*** D.C. Code § 2-1403.16(a). However, in Section IV. A, *supra*, the latest of Plaintiff race or sex discrimination claims occurred, respectively, on October 20, 2021 and in November 2020, *prior* to October 28, 2021, and, accordingly, all are barred by the DCHRA's statute of limitations. *Id*.[5]

### 1. Plaintiff's "Discrimination on the Basis of Sex Claim in Violation of the DCHRA" Is Time-Barred.

In Plaintiff's Third Cause of Action for sex discrimination, Plaintiff claims the following alleged acts:

- That she was advised in ***September 2019***, that "her pay was above the salary scale for her position and was non-negotiable" (*id.* at ¶¶ 26-27) and then learned that in early ***May 2020***, Luis Rodriquez "a Hispanic male" was able to negotiate for a salary of $115,000.00 per year. (*Id.* at ¶¶ 36, 125-126.)

- Mr. Rodriquez, who reported to Plaintiff and [according to Plaintiff] had less experience, education and fewer responsibilities was "being paid $115,000 per year" between "***early May 2020 . . . and at least June 30, 2020.***" (*Id.* at ¶¶ 33, 36, 126.)

---

[5]    Ms. Walker did not file a charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC) or the District of Columbia Office of Human Rights (DCOHR) to otherwise toll her statute of limitations under the DCHRA. *See Hatter v. WMATA*, 105 F. Supp. 3d 7, 10 (D.D.C. 2015) ("A charge filed with the EEOC . . . suffices to toll the one-year statute of limitations for DCHRA claims.") (citation omitted).

- Plaintiff's "male supervisor, Colin Weaver [who according to Plaintiff] also had less education and experience than Plaintiff and, at the time she was assigned his responsibilities in addition to her own, his pay was 60% higher." Plaintiff alleges that Mr. Weaver was paid this higher amount of salary **between June 2020 and November 2020.** (*Id.* at ¶¶ 28, 30, 32, 126.)

Based on Plaintiff's own admissions, her Complaint is untimely. Plaintiff does not suggest or allege that she was unaware of these alleged gender-based pay disparities within one (1) year of the last alleged act of sex discrimination, **November 2020**. (*Id.*) In fact, the Amended Complaint admits that Plaintiff was fully aware of all of these alleged events as early as **June 24, 2020.** (*Id.* at ¶ 36, 80.) However, Plaintiff did not file the initial Complaint in this matter until **October 28, 2022**, more than two (2) years later. Consequently, her "discrimination on the basis of sex" claim the DCHRA's one-year statute of limitations bars this claim in its entirety, and this Court should dismiss the Third Cause of Action with prejudice.

### 2. Plaintiff's "Discrimination on the Basis of Race Claim in Violation of the DCHRA" Is Time-Barred.

Plaintiff's race "discrimination" claim, the Second Cause of Action, consists of the following alleged acts and statements:

- Plaintiff was allegedly advised in **September 2019**, that "her pay was above the salary scale for her position and was non-negotiable" (*id.* at ¶¶ 26-27) but she learned that in **May 2020**, "a white female" Associate Director of State Government Affairs Sarah Jane Higginbotham was being paid above the pay scale for her position. (*Id.* at ¶¶ 34, 113-114.)

14

- Ms. Higginbotham who, according to Plaintiff, had less experience, education and fewer responsibilities was "being paid $132,000 per year" between "early *May 2020 . . . and at least June 30, 2020.*" (*Id.*)

- Plaintiff allegedly failed to receive a pay increase after being assigned additional work between *March 2020 and November 2020.* (*Id.* at ¶¶ 30, 32, 114.)

- Plaintiff purportedly made the same accommodation requests "*in the summer of 2021*" and "*September 2021*" (*id.* at ¶ 50) which were provided to "two similarly situated white employees, Ms. Tarazi and Ms. Harrington", but which were alleged denied as to her. (*Id.* at ¶117.)

- Plaintiff allegedly learned that she was not eligible for life insurance and disability benefits in *September 2021*, which benefits were provided to Amanda Harrington, "a white female" *on October 20, 2021*. (*Id.* at ¶¶ 44-45, 113-116.)

According to Plaintiff, the very last purported event on which this claim is based occurred on October 20, 2021. *Id.* at ¶¶ 44-45, 113-116. Plaintiff freely admits in the Amended Complaint that she was fully aware of all events upon which her race discrimination claim is based on or before October 20, 2021. (*Id.* at ¶¶ 36, 45, 80, 116, Ex.1.) As a result, the DCHRA bars Plaintiff's "discrimination on the basis of race" claim, and the Second Cause of Action should be dismissed with prejudice.[6]

### 3. Plaintiff's "Hostile Work Environment in Violation of the DCHRA" Claim Is Time-Barred.

---

[6] Plaintiff also claims: "Unlike [white] Vice Presidents, Ms. Walker had little insight into the organization's budget and was not allowed access to salary negotiations or individualized payroll information." (*Id.* at 40.) However, even if accepted as true, such conduct does not constitute an adverse action – Plaintiff was required, yet failed to allege that this alleged conduct either affected Plaintiff's work or her compensation. *See e.g., Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 149 (D.D.C. 2010); *Bright v. Copps*, 828 F. Supp. 2d 130, 148-49 (D.D.C. 2011).

The bulk of Plaintiff's "hostile work-environment" claim, (Fifth Cause of Action) is premised on the same allegations as the time-barred sex and race discrimination claims (Second and Third Causes of Action) and thus fails for the same reason – it is time-barred. (*Id.* at ¶¶ 59, 143-144.) The only other allegations specific to Plaintiffs hostile environmental claim consist of the following alleged events, which are likewise time-barred:

- The first events purported to support Plaintiff's hostile work environment claim, occurred in or about May 2020, i.e., alleged inequitable pay based on race and sex as described *supra*. (*Id.* at ¶¶ 33-34, 113-114, 125-126.)

- Non-party Liz Avore and Defendant Lewis alleged refused to implement Plaintiff's demand that Sonica Coleman [who the Amended Complaint also identifies as an "African American female" (*id.* at ¶ 31)] be disciplined in ***February 2021 and March 2021.*** (*Id.* at ¶¶ 57-58.)

- An alleged comment in ***February 2021*** by Ms. Avore: "Well you and Sonica don't experience the world the same way as Black women because you have lighter skin." (*Id.* at ¶ 57.)

- An alleged comment by Ms. Lewis on ***March 11, 2021***, that Plaintiff's "skin is much lighter than Ms. Coleman's," and that Plaintiff was "acting in a racist way towards Ms. Coleman by calling out her performance problems." (*Id.* at ¶ 58.)

- Purportedly being required to confront those individuals Plaintiff claims had discriminated against her during a retreat on ***October 26, 2021***, and although unclear, apparently not being invited to "happy hour" later that night. (*Id.* at ¶ 61.)

On the face of the Amended Complaint, each of these alleged events occurred *prior* to October 28, 2021. Therefore, for the same reasons discussed in Sections IV. C. 1. and 2., *supra*,

16

Plaintiff's "hostile work environment" claim is also time-barred and should likewise be dismissed with prejudice.

> **D.     NOT ONLY ARE PLAINTIFF'S DCHRA CLAIMS TIME-BARRED, BUT THE AMENDED COMPLAINT FAILS TO ALLEGE DISCRIMINATION CLAIMS UNDER THE DCHRA.**

Not only did Plaintiff fail to file her claims within the limitations period prescribed by D.C. Code § 29–412.06, but her claims for race, sex, and disability  discrimination under the DCHRA also fail as a matter of law.

To establish a *prima facie* case of race, sex, OR disability discrimination under the DCHRA, D.C. Code §§ 2-1402.11(a)(1)(A), 2-1402.62, Plaintiff must prove that: 1) she is a member of the protected class; 2) she was performing her job at or near the employer's legitimate expectations; 3) the adverse action occurred despite performing her job adequately; and 4) the adverse action was based on her protected characteristic. *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1512 (D.C. Cir. 1995). To demonstrate that an adverse employment action was based on her protected status, Plaintiff must offer either direct evidence of discrimination or facts that raise an inference of discrimination. *Johnson v. District of Columbia*, 225 A.3d 1269, 1280 (D.C. 2020). Plaintiff has done neither.

> **1.   Plaintiff Cannot Establish That SD Discriminated Against Her Based On a Disability.**

Even if Plaintiff timely filed her claims pursuant to D.C. Code § 29–412.06 (she did not), her Fourth Cause of Action for disability discrimination and failure to make an individualized assessment, i.e., to accommodate, still fails.

> a). <u>Plaintiff Fails to Set Forth A Viable Claim For Failure To Accommodate.</u>

To prevail on a failure to accommodate claim, a plaintiff must prove: "(1) she was a qualified individual with a disability, (2) the [employer] had notice of her disability and (3) the [employer] denied her request for a reasonable accommodation." *Waggel v. George Washington Univ.,* 957 F.3d 1364, 1371, 446 U.S. App. D.C. 390 (D.C. Cir. 2020) (alternations in original) (*quoting Ward v. McDonald*, 762 F.3d 24, 31, 412 U.S. App. D.C. 24 (D.C. Cir. 2014)). The DCHRA's one-year limitations period also applies to failure to accommodate claims. D.C. Code § 2-1403.16(a); *Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1249 (D.C. 2009). Importantly, "[a] reasonable accommodation claim under the DCHRA is based on discrete acts, not prolonged or repeated conduct." *Leftwich v. Gallaudet Univ.*, 878 F. Supp. 2d 81, 93 (D.D.C. 2012) (citing *Barrett*, 979 at 1248). "Consequently, the statute of limitations bars any claim for relief based on denials of accommodation or revocation of accommodation that occurred more than one year prior to the filing of the complaint." *Leftwich*, 878 F. Supp. 2d at 94 (citing *Barrett*, 979 at 1249).

Here, although Plaintiff claims that SD knew of her disability but allegedly made no individualized assessment to determine reasonable accommodations that would enable her to continue to perform the essential functions of her job (Am. Compl. at ¶¶ 134-136), she fails to allege that SD denied her request for a reasonable accommodation within the DCHRA's one-year statute of limitations – this failure is fatal to Plaintiff's claim. Indeed, Plaintiff claims that she was purportedly denied accommodation requests beginning in the **Summer of 2021**, continuing through **September 2021,** before a retreat scheduled to begin on **October 26, 2021**, and "no attempt was made to inquire what accommodations might be made for Ms. Walker at the retreat. (Am. Compl. at ¶¶ 50-53.) These events fall squarely <u>outside</u> of the DCHRA's one (1) year statute of limitations; and Plaintiff was fully aware of these alleged actions as they happened. (*Id.*)

Accordingly, Plaintiff's failure to accommodate claim against SD is barred by the DCHRA's one-year statute of limitations and should be dismissed with prejudice. D.C. Code § 2-1403.16(a).

Setting aside the fact that her claim is time-barred, Plaintiff's disability claim fails for an additional reason – the Amended Complaint is devoid of any allegations that she sought an accommodation from SD or the SD Board. Instead, Plaintiff's pleading conflates SD with her requests to other defendants. (*Id.*) Because a request for accommodation is essential to a failure-to-accommodate claim, Plaintiff's claim fails. *See Waggel* 957 F.3d at 1373 (holding that the plaintiff's failure to accommodate claim failed because she admittedly did not request an accommodation and therefore could not establish the third prong of her claim). Further, assuming *arguendo* that Plaintiff did seek an accommodation from SD, Plaintiff asked to work part-time and was told that she held a full-time position for VRL/SD.[7] (Am. Compl. at ¶ 52.) Plaintiff did not ask **SD** for any other accommodation – and she did not allege that she did.[8] Without this "fundamental element," a failure to accommodate claim typically cannot succeed. *See. e.g., Lurensky v. Wellinghoff*, 167 F. Supp. 3d 1, 19 n.11 (D.D.C. 2016) (noting where complaint is "devoid of any allegations that plaintiff requested and was denied an[] accommodation" it fails to state a claim). Plaintiff's Fourth Cause of Action should be dismissed with prejudice.

b). Plaintiff Fails To State A Claim For Disability Discrimination.

---

[7] *Aka v. Washington Hosp. Ctr.*, 156 F. 3d 1284, 1305 (D.C. Cir. 1998) (stating that an employer is not required to provide an employee that accommodation he requests or prefers but need only provide some reasonable accommodation.)

[8] *Flemmings v. Howard Univ.*, 198 F.3d 857, 861, 339 U.S. App. D.C. 110 (D.C. Cir. 1999) ("An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied."); *Brackett v. Mayorkas*, 2021 U.S. Dist. LEXIS 231117, at *37 (holding that the plaintiff did not make out a viable reasonable accommodation claim because she did not demonstrate that she made an actual request for a reasonable accommodation which was a required element of her claim); *Woodruff v. LaHood*, 777 F. Supp. 2d 33, 40 (D.D.C. 2011) ("The burden . . . lies with the disabled employee to request any needed accommodation.").

To state a claim for disability discrimination under the DCHRA, a plaintiff must allege that: (1) she had a disability within the meaning of the DCHRA; (2) that she was "qualified' for the position with or without a reasonable accommodation, and (3) that she suffered an adverse employment action *because of* her disability. *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015).

In this case, the Amended Complaint contains no allegations suggesting disability-based disparate treatment. Plaintiff fails to plead that she suffered an adverse employment action *because of* her disability and so cannot establish a required element of a disability discrimination claim. Rather, the Amended Complaint specifically acknowledges that:

- Defendants knew that Plaintiff suffered from lupus when they hired her. (Am. Comp. at ¶¶ 47-48.)

- Defendants accommodated all of Plaintiff's medical appointments. (*Id.* at ¶ 48.)

- Plaintiff received numerous promotions from SD, which Plaintiff admits in the Fourth Cause of Action, yet asserts that she was discriminated against because of her disability. (*Id.* at ¶ 132.)

- When SD dissolved upon Plaintiff's recommendation, Plaintiff was serving as its Executive Director – the highest leadership position within the organization. (*Id.* at Ex.15.)

- SD, NVF, and Ms. Lewis provided *the very accommodation* that Plaintiff claims she was denied *to another employee who also suffered from lupus.*[9] (Am. Compl. at ¶ 54.)

---

[9] *See e.g., Whitaker v. Nash Cnty.*, No. 5:11-CV-15-FL, 2012 WL 3840375, at *15 (E.D.N.C. Sept. 5, 2012), aff'd, 504 F. App'x 237 (4th Cir. 2013) ("Where [employee provided opportunity sought] is a member of the same protected group as plaintiff, this circumstance does not give rise to an inference of unlawful discrimination.") *c.f. Ragsdale v.*

Plaintiff's allegations that (1) SD knew she had lupus throughout her employment, Am. Compl. at ¶¶ 47-48; and (2) the very accommodation she sought was provided to another employee with lupus (Am. Compl. at ¶ 54), significantly undercut any possible inference of discriminatory intent toward Plaintiff on the basis of her disability. *See, e.g., Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 215 (4th Cir. 1994) (finding a strong inference that termination was not motivated by bias where employer hired plaintiff despite full knowledge of disability); *Lanci v. Arthur Andersen, LLP*, 96 Civ. 4009 (WK), 2000 U.S. Dist. LEXIS 3954, at *19 (S.D.N.Y. Mar. 28, 2000) ("When the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to him an invidious motivation."); *Whitaker v. Nash Cnty.*, No. 5:11-CV-15-FL, 2012 WL 3840375, at *15 (E.D.N.C. Sept. 5, 2012), *aff'd*, 504 F. App'x 237 (4th Cir. 2013) ("Where [employee provided opportunity sought] is a member of the same protected group as plaintiff, this circumstance does not give rise to an inference of unlawful discrimination.").

Further, Plaintiff cannot demonstrate that SD terminated her from her position at SD due to her disability. As the DOL's file regarding Plaintiff's TFA claim elucidates, SD terminated *all* ,its employees, including Plaintiff, on Plaintiff's recommendation that that entity be dissolved – not because of an alleged discriminatory animus. (*See* Defts' Ex. 1.) Accordingly, the Amended Complaint is devoid of any factual allegations of an adverse action taken against Plaintiff because of her disability, and this Court should dismiss Plaintiff's Fourth Cause of Action with prejudice.

### 2.  The Amended Complaint Fails to State A Claim For Sex Discrimination.

---

*Holder*, 668 F. Supp. 2d 7, 22 (D.D.C. 2009)("the simple fact that the plaintiff's supervisor, granted her advance annual leave during one pay period and then denied the same request during the next, does not give rise to an inference of intentional discrimination on the basis of the plaintiff's protected status—indeed, that fact weighs against a finding of a discriminatory animus in the decision to deny the plaintiff's request for advance annual leave.")

Plaintiff's threadbare allegations about unequal pay compared to male employees and that "Defendants" would not allow her to negotiate her salary while allowing a male to do so, Third Cause of Action (Am. Compl. at ¶¶ 33, 36, 125-26), fail to state a claim.

To establish a sex discrimination claim, Plaintiff must allege that "(1) she was doing substantially equal work on the job, the performance of which required substantially equal skill, effort, and responsibility as the jobs held by members of the opposite sex; (2) the job was performed under similar working conditions; and (3) she was paid at a lower wage than those members of the opposite sex." *Newman v. Amazon.Com, Inc.*, 2022 U.S. Dist. LEXIS 60951, at *17-18 (D.D.C. Mar. 31, 2022) (cites omitted). Courts consider DCHRA claims of unequal pay under the same standards as the Equal Pay Act. *Hawley v. Blackboard, Inc.*, 2005 U.S. Dist. LEXIS 3865, at *8 n.1 (D.D.C. Mar. 3, 2005). A *prima facie* case under the EPA requires a showing of 1) "unequal pay" and 2) "working in a 'substantially similar' (i.e., substantially equal) job." *Savignac v. Day*, 539 F. Supp. 3d 107, 116 (D.D.C. 2021). The complaint must "include factual allegations that could support the plausible inference that the work performed by the alleged comparators was substantially similar to that performed by the plaintiff." *Tolton v. Jones Day*, 2020 U.S. Dist. LEXIS 87793, at *29 (D.D.C. May 19, 2020).

No such facts are present here. Further, Plaintiff was required, yet failed, to allege *any* facts that her role and the roles of the male comparators she names included nearly identical (or even remotely similar) essential functions, or that they performed similar duties. *Id.* Plaintiff did not allege that these comparators worked in the same department, held the same level of seniority, or their job descriptions substantially matched. Although "a plaintiff need not plead [their] similarity to alleged comparators *with fine detail* in order to state a disparate treatment claim," they must allege some facts giving rise to a plausible inference that they were treated differently than

similarly situated peers outside their protected class. *Harris v. Mayorkas*, 2022 U.S. Dist. LEXIS 147683, at *18 n.7 (D.D.C. Aug. 18, 2022). Here, Plaintiff failed to do so.

Accordingly, even if Plaintiff's claims for sex discrimination in violation of the DCHRA were not time-barred, which they are, Plaintiff's Third Cause of Action fails to state a claim against SD upon which relief may be granted.

### 3. The Amended Complaint Fails To State A Claim For Race Discrimination.

In the Second Cause of Action, Plaintiff alleges that "Defendants" discriminated against her by treating her and other minority employees differently from, and less preferably than, similarly situated white employees in terms of pay, access to information, accommodations[10], and benefits. (Am. Compl. at ¶¶ 113-117.) However, she fails to allege any facts that could raise an inference that any alleged treatment was based on or because of her race. Under the *McDonnell Douglas*[11] framework, the plaintiff must first establish a prima facie case of discrimination. *Thompson v. Hicaps Inc.,* 2022 U.S. Dist. LEXIS168861, at *12-13 (D.D.C. Sep. 19, 2022). Plaintiff fails to do so.

Here, Plaintiff's generalized and conclusory allegations about unequal pay, denial of benefits, and withholding of information are self-serving at best, and legally insufficient to give rise to a race discrimination claim. Instead of including similarly situated individuals, Plaintiff vaguely alleges that all or "other white Vice Presidents" or other "white employees" had access to this information and received benefits. (Am. Compl. at ¶¶ 40, 55, 113- 118.) However, she pleads

---

[10] Plaintiff's comparator, a White female under 40, was provided accommodations in 2022, *after* the dissolution of SD. (Am. Compl. ¶ 54.) Accordingly, Amanda Harrington is **not** a comparator as to these claims against SD.

[11] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, (1973). *See Brown v. Sessoms*, 774 F.3d 1016, 1024, 413 U.S. App. D.C. 328 (D.C. Cir. 2014) (holding that *McDonnell Douglas* framework applies to DCHRA claims).

no information, as she must, as to the identity of these individuals and fails to state why they are similarly situated.

Thus, Plaintiff's race discrimination claim is not only time barred, by the DCHRA's one-year statute of limitations, but if also fails because Plaintiff did not allege *any* conduct by SD that could constitute discrimination because of her race.

### 4. Plaintiff Fails to State a Claim for Retaliation Under The DCHRA.

35. In her Sixth Cause of Action, Plaintiff alleges a hodgepodge of retaliatory acts against "Defendants" – none of which give rise to a retaliation claim against SD (Am. Compl. ¶¶ 152-158.) Against SD, specifically, Plaintiff alleges that SD had no legitimate nondiscriminatory reason for discharging Plaintiff and her position "ended with no formal notice to her." (*Id.* at ¶ 159.) Remarkably, Plaintiff asserts that "if there had been a legitimate business reason to dissolve SD, then as Executive Director, Plaintiff would have been involved in its dissolution and winding up." (*Id.*) Plaintiff makes this assertion despite the undisputed fact that she, as Executive Director of SD, recommended that SD dissolve and informed SD's staff about the dissolution. (*See* Epstein Gluck Decl. at ¶¶ 7-8 and Exs. 7 and 8 thereto.)

To state a claim for retaliation under the DCHRA, D.C. Code §§ 2-1402.61(a),(b), Plaintiff must allege that: (1) "[she] was engaged in a protected activity, or that [she] opposed practices made unlawful by the DCHRA; (2) the employer took an adverse personnel action against [her]; and (3) a causal connection existed between the two." *McFarland v. George Washington Univ.*, 935 A.2d 337, 356 (D.C. 2007).[12]

---

[12] "The elements of a retaliatory claim are the same under the DCHRA as under the federal employment discrimination laws." *Leftwich v. Gallaudet Univ.*, 878 F. Supp. 2d 81, 97 (D.D.C. 2012) (citation and internal quotation marks omitted).

36.     In this case, the Amended Complaint fails to state a prima facie case for retaliation. First, Plaintiff fails to allege that SD took an adverse action against her. To the contrary, the Amended Complaint **admits** that that as of November 4, 2021, Plaintiff *knew* unequivocally that SD was in financial distress. (Am. Compl. at ¶ 78.) Acting on this knowledge, on November 9, 2021, Plaintiff recommended to the SD Board that SD should dissolve. (*See* Epstein Gluck Decl. at ¶ 7, Ex. 7.)

To be sure, and at stark variance to Plaintiff's claim that she was not involved in the dissolution of SD (Am. Compl. at ¶ 159), Plaintiff sent the following email to the SD Board:

> [after evaluating SD's] cash-on-hand, out-standing [sic] invoices, payroll and future liabilities[,] it is clear that without an injection of cash[,] SD is not viable . . . My recommendation is that we let contracts up for renewal expire and notify each contractor that we are terminating their contracts with the 30 day out provisions. **If we do not do this by the end of November[,]** we will incur more liabilities. As it stands[,] we are not going to be able to pay our outstanding liabilities through the end of the year . . .
>
> **I would recommend letting the Secure Democracy employees know that this is the plan and allow them to use the remainder of November to exit contract relationships in the best possible manner and make decisions about their future.**

*Id.* (emphasis supplied).

Two days later, on November 11, 2021, Plaintiff *again* recommended that the SD Board dissolve SD, and, immediately thereafter, advised SD staff about the proposed dissolution and instructed them to advise SD's vendors of the same. (*See* Epstein Gluck Decl. at ¶ 8, Ex. 8.)  On November 16, 2021, Plaintiff emailed SD to "check in on the status of the dissolution of Secure Democracy" and provide updates. (*Id.* at ¶ 9, Ex. 9.) Thereafter, on November 17, 2021, at Plaintiff's explicit recommendation, the SD Board adopted a resolution for dissolution "pursuant to § 29-412.02 of the District of Columbia Code before the end of this calendar year." (Am. Compl. ¶ 82; Defts.' Ex.1, Secure Democracy DOL Response at Ex. C). The resolution took effect on

December 2, 2021. (*Id.*) SD's last operational day was November 30, 2021. (Am. Compl. at ¶ 82.) Accordingly, and based on the above, Plaintiff cannot establish that SD took any adverse action against her. This failure to satisfy a necessary element of the claim, standing on its own, warrants dismissal of the claim.

But there is more - Plaintiff also fails to establish a causal connection between Plaintiff's alleged protected activity and an adverse action. To wit:

- On ***June 2, 2020***, Plaintiff co-authored correspondence alleging that non-party Voting Rights Lab had a "white supremacist culture throughout the organization" in which "Black and Brown workers frequently feel disrespected, mistrusted, talked down to and micromanaged. Positive feedback is sporadic." (Am. Compl., at ¶ 55.)

- On ***June 5, 2020***, Plaintiff discussed with Ms. Lewis her claims of alleged discrimination and harassment in the workplace. (*Id.* at Ex.2.)

- On ***June 8, 2020***, Plaintiff authored a fourteen (14) page, single-spaced letter outlining various allegations pertaining to among other things, an alleged "toxic work environment" "differential treatment" "denial of compensation" and "illicit activity." (*Id.*)

Notwithstanding the foregoing, on ***December 1, 2020***, Plaintiff ***was promoted*** to Executive Director of Secure Democracy and Vice President of Advocacy for non-party VRL – the highest leadership positions within each organization.[13] *See McFarland*, 935 A.2d at 356–57 (*citing Brady v. Houston Independent School District*, 113 F.3d 1419, 1424 (5th Cir. 1997)McFarland (that a plaintiff was promoted after filing a complaint of discrimination is "utterly inconsistent with an inference of retaliation"). Despite Plaintiff's conclusory allegations, the Amended Complaint fails

---

[13] (Am. Compl., at ¶¶ 39, 132, Ex.15.)

to allege that Plaintiff raised any other claim related to any form of (*inter alia*) unlawful or discriminatory conduct between June 7, 2020, and October 28, 2021. As Plaintiff admits, after submitting the June 8, 2020 letter detailing her grievances, she was promoted at both VRL and SD and *not* retaliated against. (*See* Am. Compl., at ¶¶ 39, 132, Ex.15.)

Further, in the Sixth Cause of Action, while Plaintiff alleges a laundry list of alleged retaliatory actions taken, the *only* one she attributes to SD (as compared to the other Defendants)[14] is that SD discharged Plaintiff. (*Compare* Am. Compl. ¶¶ 152-158 *with* ¶ 159.) However, SD did not terminate Plaintiff or otherwise take any adverse action against her. Rather, SD dissolved, at Plaintiff's recommendation. (Defts.' Ex.1, Secure Democracy DOL Response at Ex. C and Epstein Gluck Decl. at ¶ 7, Ex. 7.)

Moreover, Plaintiff's "termination" after she expressed concerns over "EEO and legal compliance" at the end of October 2021 cannot support her claim for retaliation because she cannot establish the requisite causal connection. Temporal proximity is not sufficient. That is, the mere timing of Plaintiff's October 28, 2021, email and the termination of her employment does not establish a causal link, and to determine otherwise "would be to engage in the logical fallacy of *post hoc ergo propter hoc*, literally, 'after this, therefore because of this.'" *Turner v. Mull*, 784 F.3d 485, 493 (8th Cir. 2015). Indeed, the D.C. Circuit Court has stated that mere temporal proximity is insufficient to establish a causal link:

> Our Circuit has cautioned against inferring retaliation solely *on post hoc ergo propter hoc*, explaining that [m]ere temporal proximity is not sufficient to [defeat a proffered non-retaliatory explanation and thereby support a finding of retaliation], . . . As a result, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations [for the adverse employment action] are genuine."

---

[14] Plaintiff does not allege that SD suspended her from work, or terminated her access to email accounts, Google Drive or the corporate credit card. To the contrary, Plaintiff alleges that *others* "inform[ed] the SD board that Ms. Walker was suspended from SD." (Am. Comp. at ¶¶ 74, 154).

*Bing v. Architect of Capitol*, 2019 U.S. Dist. LEXIS 169170 (D.D.C. Sept. 30, 2019) (*quoting*

*Iyoha v. Architect of the Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019) (internal citations omitted).

Plaintiff's Amended Complaint fails to include any such "positive evidence" other than mere

proximity. Additionally, reliance on temporal proximity to establish causation is particularly

inappropriate here given Plaintiff's *admission* that she was fully aware that SD was in financial

distress at least as of November 4, 2021, coupled with the fact that *Plaintiff recommended to the*

*SD Board that SD should dissolve*. SD was dissolved *upon Plaintiff's recommendation to the SD*

*Board.* (Am. Compl., at ¶¶ 78, 82; (Defts') Ex.1, Secure Democracy DOL Response at Ex. C and

Epstein Gluck Decl. at ¶ 7, Ex. 7.) Plaintiff's own pleading belies the existence of a causal link

between Plaintiff's alleged complaints and the termination of her employment because it concedes

that she would have been terminated (along with all the other SD employees) even in the absence

of such complaints. (Am. Compl. at 2.)

Accordingly, Plaintiff is unable to make a colorable claim of retaliation because she

cannot establish the existence of a necessary element to that claim—a causal link between her

engagement in a protected activity and an alleged adverse action. This Court should dismiss

the Sixth Cause of Action of the Amended Complaint purporting to assert a claim for retaliation

against SDA in violation of the DCHRA.

     **5.**    **The Amended Complaint Fails To State A Claim For A Hostile Work Environment Under the DCHRA**.

In addition to being time barred, the Amended Complaint fails to state a claim for a hostile

work environment under the DCHRA, and it should be dismissed.

To state a claim for hostile work environment, the complaint must allege "'discriminatory

intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of

the [plaintiff]'s employment and create an abusive working environment.'" *Baloch v. Kempthorne*,

550 F.3d 1191, 1201 (D.C. Cir. 2008) (*quoting Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (explaining that to prevail on such a claim, a plaintiff must show that she suffered "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.")).[15] When evaluating a plaintiff's allegations, courts consider "all the circumstances," including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender- related jokes, and occasional teasing." *Id.* (internal citation and quotation marks omitted). Moreover, courts have refused to hold "a few isolated incidents of offensive conduct . . . amount to actionable harassment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (citations omitted); *see also Faragher,* 524 U.S. at 788 ("These standards for judging hostility are sufficiently demanding to ensure that [the DCHRA] does not become a general civility code.") Indeed, "[T]he Supreme Court has made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (internal quotation marks and citation omitted).

As set forth *supra*, Plaintiff's hostile work environment claim is nothing more than an amalgamation of her race and sex discrimination claims and should be swiftly dismissed. *See Walden*

---

[15] Courts evaluate DCHRA claims using the same framework as applied to Title VII claims. *See Wicks v. American Transmission Co., LLC*, 701 F. Supp. 2d 28, 44 (D.D.C. 2010) ("Discrimination claims brought under the DCHRA are analyzed in the same manner as claims brought under Title VII[.]") (citing cases); *Elam v. Bd. Of Trs.*, 530 F. Supp. 2d 4, 22 n.7 (D.D.C. 2007) ("The elements of a hostile work environment claim under the DCHRA mirror the federal requirements.") (citing *Lively v. Flexible Packaging Assoc.*, 830 A.2d 874, 889 (D.C. 2003)).

*v. Patient-Centered Outcomes Research Institute*, 177 F. Supp. 3d 336, 344 (D.D.C 2016) (dismissing hostile work environment claim because plaintiff pled the same allegations upon which she relied her disparate treatment and retaliation claims). Plaintiff alleges that "Defendants" treated "Plaintiff and other female employees of color worse than white female employees or male employees" in terms of pay, denial of benefits and access to "important professional networks, gave them more responsibilities without simultaneous salary increases, prevented them from accessing information necessary to perform their jobs, and made repeated racist and colorist comments that created a hostile working environment." (Am. Compl. ¶ 144.) Plaintiff conflates her alleged aggressors entirely.

Even assuming Plaintiff appropriately alleged such conduct against SD (she did not), this Court should reject Plaintiff's claim t because she alleges nothing more than vague, general, and sporadic acts that are neither severe nor pervasive, and thus cannot give rise to a hostile work environment claim as a matter of law. *See Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims ... are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult.") Indeed, Plaintiff has attempted to combine the termination of her employment with:

- A refusal to implement Plaintiff's request that a fellow African American woman be disciplined in ***February and March 2021.***

- Two alleged references to Plaintiff having lighter skin than the same employee, who Plaintiff insisted should be disciplined in ***February and March 2021.***

- Plaintiff herself allegedly having been accused of "acting in a racist way" towards that same employee in ***March 2021***; and

- Purportedly being required to confront those she claims discriminated her during a retreat and apparently not being invited to "happy hour" on **October 26, 2021.**

(*See* Am. Compl., at ¶¶ 31, 57-58, 61, 144.)

Even if the Court accepted all of Plaintiff's allegations as true, the sporadic and, at best, petty incidents alleged here fail to state a hostile work environment claim. Plaintiff has not alleged any facts to support the allegations that any differentials in her workplace were based on her inclusion in a protected class (race or sex), let alone that such conduct was severe or pervasive to the extent that it amounts to a change in the terms and conditions of employment. These are merely conclusory allegations that a factfinder need not take as true. *See Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 235 (D.D.C. 2007) ("The Court does not have to accept asserted inferences or conclusory allegations that are unsupported by facts set forth in plaintiff's complaint."). Accordingly, the Court should dismiss the Fifth Cause of Action purporting to assert a claim for hostile work environment under the DCHRA.

### E.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

Plaintiff's Seventh Cause of Action, for intentional infliction of emotional distress ("IIED"), fails to allege conduct rising to the demanding standard required under D.C. law.

Under District of Columbia law, to state a claim for IIED, a complaint must allege: "(1) extreme or outrageous conduct on the part of the defendant that (2) either intentionally or recklessly (3) caused plaintiff severe emotional distress." *Daniels v. District of Columbia*, 894 F. Supp. 2d 61, 68 (D.D.C. 2012) (*citing Pitt v. District of Columbia*, 491 F.3d 494, 505–06 (D.C. Cir. 2007)). The IIED standard is a "very demanding" one, which is "only infrequently met." *Holloway v. Howard Univ.*, 206 F. Supp. 3d 446, 453 (D.D.C. 2016) (citation omitted). Specifically, "[I]n the employment context, [the courts] traditionally have been demanding in the

proof required to support an intentional infliction of emotional distress claim." *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997). Accordingly, the behavior must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (internal quotation marks omitted); *see also Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (Employers have "no general duty of care to avoid causing mental distress, and liability is not imposed for all conduct which causes mental distress.") "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not meet this demanding standard. *Homan*, 711 A.2d at 818 (D.C. 1998).

Even accepting every allegation as true, the Amended Complaint fails to demonstrate the type of "extreme" and "outrageous" conduct required to survive a motion to dismiss. *See Kerrigan*, 705 A.2d at 628 (finding that even if true, conduct targeting plaintiff for a sexual harassment investigation, manufacturing evidence against him to establish a false claim of sexual harassment, leaking information from the investigation to other employees, and unjustifiably demoting him to the position of store manager to promote a woman to his position, was attributable to "employer-employee conflicts [that] do not, as a matter of law, rise to the level of outrageous conduct."(further citations omitted); *Hoffman v. Hill & Knowlton, Inc.*, 777 F. Supp. 1003, 1005 (D.D.C. 1991) (finding conduct not outrageous when employer intentionally interfered with employee's ability to do job, stated false, pretextual reasons for dismissing an employee knowing it would be communicated to others, and dismissed employee).

Specifically, Plaintiff's IIED claim is based on the same allegations as her discrimination, harassment, and retaliation claims. (Am. Compl., at ¶¶ 164-65.) Reduced to its essence, the

Amended Complaint recites conclusory allegations that the decision to suspend Plaintiff [16] and "terminate" her employment, as well as an alleged failure to accommodate Plaintiff's request to work part-time "constituted severe and outrageous misconduct." (*Id.* at ¶ 167.) Yet, "mere 'labels and conclusions' [that] are insufficient to meet Rule 8's pleading requirements." *Grandison v. Wackenhut Servs., Inc.*, 514 F. Supp. 2d 12, 18 (D.D.C. 2007) (quoting *Twombly*, 127 S. Ct. at 1965) (dismissing intentional infliction of emotional distress claim premised on termination of employment). Additionally, "a victim's complaint that [s]he was nervous, could not sleep, experienced stress and its physical symptoms, withdrew from activities, and was unable to concentrate at work [as alleged here] is insufficient to establish severe distress." *McKinney v. G4S Gov't Sols., Inc.*, 711 F. App'x 130, 138 (4th Cir. 2017).

For all these reasons, the Seventh Cause of Action of the Amended Complaint purporting to assert a claim for IIED against SD should be dismissed.

## CONCLUSION

For the foregoing reasons, the Amended Complaint fails to state any claim upon which relief can be granted and should be dismissed, in its entirety, under Federal Rule of Civil Procedure 12(b)(6).

DATED: June 2, 2023

Respectfully submitted,

_____
Amy Epstein Gluck, Esq. (DC Bar No. 453525)
FisherBroyles, LLP
1200 G Street, N.W., Suite 800
Washington, D.C. 20005
(301) 526-1184

---

[16] Which decision SD did not even make and, as the Amended Complaint admits, SD rescinded on November 3, 2021. (*Id.* at ¶¶ 75-78.)

33

amy.epsteingluck@fisherbroyles.com

*Counsel for Defendant Secure Democracy*

Exhibit 1

# Fisher Broyles

**Amy Epstein Gluck, Esq.**
Partner
FisherBroyles Employment Counsel

| <u>Office</u> | <u>Mail</u> |
|---|---|
| 1200 G St., NW | P.O. Box 288 |
| Suite 800 | Cabin John, MD |
| Washington, DC 20005 | 20818-0288 |

August 17, 2022

Direct: 301.526.1184
amy.epsteingluck@fisherbroyles.com

**<u>VIA EMAIL ONLY</u>**

Samantha L. Jarman
Jarman.samantha.l@dol.gov
Regional Investigator
USDOL/OSHA
1099 Winterson Rd., Suite 140
Linthicum Heights, MD 21090

> Re:   *Secure Democracy/New Venture Fund/Walker/3-0050-22-190*

Dear Ms. Jarman:

This law firm represents Secure Democracy in the above-captioned matter. This letter contains the response of Secure Democracy ("SD") to the Complaint filed against it and New Venture Fund ("NVF") by Sarah Walker ("Ms. Walker" or "Complainant") under the Taxpayer First Act of 2019 ("TFA") (26 U.S.C. 7623(d)). SD incorporates NVF's response by reference as if fully set forth herein, and it is attached as ***Exhibit A*** hereto for your convenient reference.

For the reasons set forth NVF's response, ***Exhibit A***, Complainant's Complaint is time-barred because none of the alleged adverse actions complained of occurred within 180 days prior to the filing of the Complaint. Further, even if the Complaint was not time-barred, it lacks merit and should be dismissed for the reasons set forth in ***Exhibit A***. Namely, Ms. Walker did not engage in protected activity within the meaning of the TFA; Ms. Walker did not suffer any adverse action within the meaning of the TFA; all actions taken with respect to Ms. Walker were taken for legitimate nondiscriminatory reasons; and Ms. Walker cannot demonstrate the required retaliatory intent. For all these reasons, the U.S. Department Of Labor should take no action regarding Ms. Walker's Complaint and it should be dismissed.

As a supplement to ***Exhibit A***, SD further states:

SD is a separate nonprofit organization exempt from taxation under Internal Revenue Code § 501(c)(4) as a social welfare organization. SD had its own board of directors and maintained a separate legal status. SD's mission was to promote and protect voting rights and restore confidence in the U.S. electoral system.

Samantha L. Jarman
August 17, 2022
Page 2 of 3

Contrasting with Ms. Walker's allegation that SD terminated her employment, SD dissolved on December 20, 2021, upon Ms. Walker's recommendation to the SD Board. *See* Certificate of Dissolution dated December 20, 2021, attached hereto as ***Exhibit B***. Accordingly, Ms. Walker's claims against SD are moot because SD no longer exists.

Ms. Walker cannot bring this action against a dissolved corporation. District of Columbia Code § 29–412.06, "Known claims against dissolved corporation," states, in pertinent part that "**(a)** A dissolved nonprofit corporation may dispose of the known claims against it by delivering notice to its known claimants of the dissolution at any time after its effective date. … **(c)** A claim against the dissolved nonprofit corporation shall be barred if the claimant: **(1)** That was given notice under subsection (b) of this section does not deliver the claim to the dissolved corporation by the deadline; or **(2)** Whose claim was rejected by the dissolved corporation does not commence a proceeding to enforce the claim within 90 days from the effective date of the rejection notice." *Id.*

On November 11, 2021, Ms. Walker advocated for the dissolution of SD to the SD Board. On November 17, 2021, the SD Board adopted a resolution for dissolution "pursuant to §29-412.02 of the District of Columbia Code before the end of this calendar year." (***Exhibit C***.)  Moreover, SD was aware of the alleged claims that Ms. Walker was pursuing and threatening to pursue against SD.[1] D.C. Code § subsection (c) of § 29-412.06 provides that "a claim against the dissolved nonprofit corporation ***shall be barred*** if the claimant . . . (2) whose claim was rejected by the dissolved corporation does not commence a proceeding to enforce the claim ***within 90 days from the effective date of the rejection notice***." *Id.* (emphasis supplied).

Here, on February 11, 2022, NVF issued a letter to Ms. Walker's counsel rejecting her alleged whistleblower claims (in violation of the Taxpayer First Act), and SD issued a letter on that same date rejecting the claims for the same reasons as set forth in the NVF letter. *See **Group Exhibit D***. In the letter from SD to Ms. Walker's counsel, SD "rejected" Ms. Walker's claims. (*Id.*) Accordingly, pursuant to D.C. Code § 29-412.06(c), Ms. Walker would have to had filed her complaint by May 12, 2022, which is 90 days after the date that SD sent its rejection notice. Given that Ms. Walker did not file her Complaint with OSHA until June 10, 2022, Ms. Walker's claims "shall be barred" pursuant to D.C. Code § 29–412.06.

For these reasons, including those set forth in ***Exhibit A***, NVF's response of the same date, OSHA should dismiss the Complaint against SD.

Thank you for your time and attention to this matter. If you have any questions at all, please do not hesitate to contact me.

Very truly yours,

---

[1]On November 1, 2021, Ms. Walker communicated by email to SD's Board Chair, Heather Smith, that she asserted a whistleblower claim against SD as well as NVF/VRL.

---

Samantha L. Jarman
August 17, 2022
Page 3 of 3

**FISHERBROYLES, LLP**

AMY EPSTEIN GLUCK
PARTNER

Attachments

Cc: Heather Smith

Exhibit A

# JacksonLewis

Jackson Lewis P.C.
10701 Parkridge Blvd, Suite 300
Reston VA 20191
(703) 483-8310 Direct
Teresa.Wright@jacksonlewis.com
jacksonlewis.com

ADMITTED IN:       DC, MARYLAND AND VIRGINIA

August 17, 2022

**VIA ELECTRONIC MAIL**

Samantha L. Jarman
Regional Investigator
USDOL/OSHA
1099 Winterson Rd Suite 140
Linthicum Heights, MD 21090
Jarman.samantha.l@dol.gov

Re:    Secure Democracy/New Venture
       Fund/Walker/3-0050-22-190

Dear Ms. Jarman:

This letter contains the response of New Venture Fund (NVF) [1] to the Complaint filed by Sarah Walker (Ms. Walker or Complainant) under the Taxpayer First Act of 2019 (TFA) (26 U.S.C. § 7623(d)). As an initial matter, the Complaint is time-barred. None of the alleged adverse actions complained of occurred within 180 days prior to the filing of the Complaint. Second, even if the Complaint was not time-barred, it lacks merit and should be dismissed. Ms. Walker did not engage in protected activity within the meaning of the TFA. Ms. Walker also did not suffer any adverse action within the meaning of the TFA, and all actions taken by NVF with respect to Ms. Walker were taken for legitimate nondiscriminatory reasons. For all of these reasons, the USDOL should dismiss Ms. Walker's Complaint.

## I.    Facts

New Venture Fund (NVF) is a charitable and educational organization that is tax exempt as a public charity under section 501(c)(3) of the Internal Revenue Code. It acts as a fiscal sponsor for projects initiated by philanthropic donors. NVF executes some of

---

[1] Secure Democracy, a social welfare organization separately incorporated pursuant to Internal Revenue Code § 501(c)(4) and the other respondent in this matter, dissolved on December 20, 2021.

**JacksonLewis**

Samantha L. Jarman
Regional Investigator
USDOL/OSHA
August 17, 2022
Page 2

philanthropy's most complex domestic and international projects and partners with many of the nation's leading foundations. It supports (is a fiscal sponsor to) a number of donor-driven projects ranging in interests from conservation and global health to public policy and education.

Fiscal sponsorship is a relationship where an existing nonprofit that is exempt under section 501(c)(3) as a public charity, like NVF, serves as a host for various projects and initiatives that align with and further NVF's mission. Fiscal sponsors receive tax deductible contributions that are then allocated in support of projects. The board of directors of the fiscal sponsor is responsible for how the funds are used.

NVF is a fiscal sponsor to its various projects around the country. At all times, NVF (1) retains control and discretion over the use of the funds contributed by donors; (2) maintains records establishing that the funds were used for exempt purposes; and (3) ensures distributions further NVF's and each of its project's charitable purposes.

Each NVF project has its own advisory board, internal structure, and leadership driving its operations. Each project has been delegated authority by the NVF board of directors and has some autonomy to make certain decisions, including hiring and compensation of its employees. Most projects are led by an executive director who is an NVF employee. While staff work for a specific project, NVF typically hires all employees and contractors working on that project, and provides HR, compliance, financial, legal, and operational support across all projects.

Until June 16, 2022, one of NVF's projects was Voting Rights Lab (VRL). VRL is a nonpartisan project accelerating the movement for free and fair elections through expert analysis, research, and innovations. Fiscally sponsored projects such as VRL are not legal entities. Instead, they derive legal non-profit corporate status from the fiscal sponsor, here NVF. VRL tracks election-related legislation and current law in all 50 states and the District of Columbia. It focuses on policies that restrict or expand voting access and policies that interfere with the nonpartisan administration of our elections.

Ms. Walker was hired by NVF on February 19, 2020 as the Associate Director, State Affairs for VRL. She was promoted to Vice President (VP), Advocacy on December 15, 2020. As VP, Advocacy, Ms. Walker was responsible for VRL's policy change advocacy at the federal, state, and local levels. She was the head of the Advocacy Department, which includes regional, campaign, program, engagement, and administrative staff. The VP of Advocacy is a member of VRL's Leadership Team and reports to VRL's Executive Director. In her role, Ms. Walker was required to demonstrate proficiency in voting policy and a deep expertise in political analysis and campaign strategy. At the time she was hired, she had been a lobbyist for several years. She was to collaborate with other departments to develop VRL's annual policy agenda, along with other responsibilities.

**JacksonLewis**

Samantha L. Jarman
Regional Investigator
USDOL/OSHA
August 17, 2022
Page 3

Throughout her employment with NVF/VRL, Ms. Walker was a part-time employee of NVF and was simultaneously employed by Secure Democracy (SD) as Executive Director. She spent 50% of her time working for the VRL project and the other 50% working for SD. SD is a separate nonprofit corporation exempt from taxation under Internal Revenue Code Section 501(c)(4) as a social welfare organization, with its own board of directors and separate legal status. Its mission is to promote and protect voting rights and restore confidence in the U.S. electoral system.

As is common within the nonprofit sector and because of the shared mission and goals of fighting voter suppression and transforming America's voting systems, NVF/VRL and Secure Democracy worked closely together and certain shared staff. The IRS requires 501(c)(3) and 501(c)(4) organizations that share staff or resources to institute procedures for tracking the use of each organization's resources, including staff time, and to take reasonable steps to ensure that the 501(c)(3) organization is fully reimbursed and is not assuming these costs for any use of its resources by a 501(c)(4) organization. NVF maintains these procedures and trained the NVF/VRL staff, including Ms. Walker, on these procedures. VRL project staff also created a manual for employees to use on an ongoing basis, which was reviewed by NVF. As a department head who was trained and responsible for herself and her subordinate staff, Ms. Walker was or should have been well-versed in the content of this manual. NVF's procedures required use of the employees' time sheets to calculate reasonable allocations of NVF resources being used by SD and then to reimburse NVF for that use from SD funds. Shared staff, including Ms. Walker, were paid directly by each organization (e.g. NVF and SD) for the time spent on each respective organization's activities.

Ms. Walker was well aware of the steps taken to ensure appropriate accounting between SD and NVF. Ms. Walker was not a low-level employee without sufficient knowledge of these matters; as mentioned above, she was a highly skilled, experienced member of VRL's Leadership Team.

On October 28, 2021, at 6:06 p.m., Ms. Walker sent an email to NVF's General Counsel (GC), Andrew Schulz, raising a number of concerns.[2] She described her concerns as involving "accounting controls and procedures, conflicts of interest, EEO and legal compliance." For example, she expressed concern that two employees spent the majority of their time on matters related to SD but they were 100% paid by NVF.[3] Ms. Walker stated that she had recommended that both of those employees cease their work for SD "until a point that the costs are shared between the two entities." She

---

[2] Because her email was after-hours, Mr. Schulz was not at work the following morning, he did not see Ms. Walker's email until approximately 11:15 a.m. the next day, after she had already been placed on paid administrative leave for other nondiscriminatory reasons.

[3] As noted above, the relevant question is not which entity paid the individuals, but instead whether the 501(c)(3) organization is fully reimbursed and therefore is not assuming these costs for use of its resources by the 501(c)(4) organization.

**JacksonLewis**

Samantha L. Jarman
Regional Investigator
USDOL/OSHA
August 17, 2022
Page 4

referred to other examples of interactions between NVF and SD, and she described these issues as "legal compliance failures."[4] As NVF understands it, based on Ms. Walker's communications during this time period, she expressed concerns that:

- NVF allegedly was paying for staff time that she thought SD should be paying for. These included certain SD employee wages, including those of NVF employees who substantially worked for SD and including NVF employees who were publicly identified as affiliated with SD;
- NVF was allegedly subsidizing certain other SD expenses that should have been allocated for payment by SD;
- NVF was allegedly making impermissible payments for lobbying and political campaign intervention; and
- NVF employees were allegedly exercising too much legal, financial, and operational control over operations of SD.

Three days later, on November 1, 2021 at 8:45 a.m., Ms. Walker raised these same issues with Heather Smith, the Chair of the Board of Directors for SD, and asserted that having sought "whistleblower status" with NVF she sought "whistleblower status" with SD.

Around this time, Ms. Walker also raised concerns about race and disability discrimination. NVF immediately commenced an investigation of her claims using an outside investigator, Crystal Twitty.

On October 29, 2021, at 9:36 a.m., Ms. Walker was placed on paid administrative leave by Anthony Dale, Vice-President of Operations & Chief of Staff for VRL. NVF took this action because (1) Ms. Walker stated in an email to Anthony Dale on October 29 at 8:57 a.m. that she did not intend to continue performing her job duties; and (2) to insulate her from further alleged harassment or discrimination while her claims were investigated by Ms. Twitty.

On November 11, 2021, SD counsel and board members met, and upon the recommendation of Ms. Walker, dissolved SD. Ms. Walker immediately informed staff, instructed them to tell vendors, and took other steps to wind down operations. By December 1, 2021, SD had no remaining employees other than Ms. Walker, who remained to assist with the dissolution.

Ms. Walker refused to cooperate with the investigator who had been retained to investigate her claims of discrimination, so the investigation was discontinued on

---

[4]  NVF is confident that Ms. Walker's complaints have no merit. However, the ultimate merits of her complaints are irrelevant to her claim under the TFA so they are not addressed here.

**JacksonLewis**

Samantha L. Jarman
Regional Investigator
USDOL/OSHA
August 17, 2022
Page 5

November 12, 2021. Ms. Walker remains employed by NVF, and on paid administrative leave, to this day.[5]

## II. Legal Analysis

Under 26 U.S.C. § 7623(d), no employer or employee may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in reprisal for any lawful act done by the employee to provide information regarding underpayment of tax or any conduct that the employee reasonably believes constitutes a violation of the internal revenue laws or any provision of Federal law relating to tax fraud, when the report is made to any person with supervisory authority over the employee, or any other person working for the employer who has the authority to investigate, discover, or terminate misconduct. The "TFA provides for employee protection from retaliation when the employee engages in protected activity pertaining to underpayment of tax or any conduct which the employee reasonably believes constitutes a violation of the internal revenue laws or any provisions of Federal law relating to tax fraud." 29 CFR § 1989.100(a). An action under subparagraph (A)(i) of section 7623(d) is governed under the rules and procedures set forth in section 42121(b) of title 49, United States Code, the Wendell H. Ford Aviation Investment and Reform Act. Accordingly, courts look to similar or analogous whistleblower programs managed by the Occupational Safety and Health Administration, including the Wendell H. Ford Aviation Investment and Reform Act and the Sarbanes-Oxley Act (SOX), 18 U.S.C. § 1514A.

In order to demonstrate a prima facie whistleblower retaliation claim under 49 U.S.C. § 42121, a claimant must show that: (i) she engaged in protected activity; (ii) her employer knew of the protected activity; (iii) she suffered an adverse employment action; and (iv) the protected activity was a contributing factor to the adverse action. *See* 29 CFR § 1980.104(e)(2); *Taylor v. Fannie Mae*, 65 F. Supp. 3d 121, 125 (D.D.C. 2014) (applying this standard in a SOX case). To demonstrate that the protected activity was a contributing factor to the unfavorable action, a showing of retaliatory intent is required. *Murray v. UBS Securities, UBS AG,* Docket Nos. 20-4202 and 21-56 at 12 (2d Cir. August 5, 2022) (citing *Bechtel v. Admin. Rev. Bd.*, 710 F3d 443 (2d Cir. 2013).

Ms. Walker cannot demonstrate prongs i, iii, and iv. Moreover, all of her claims are time-barred. Accordingly, her Complaint should be dismissed.

---

5 Ms. Walker alleges in her Complaint that she was terminated by NVF on or about June 16, 2022. This is untrue. Ms. Walker remains on administrative leave and continues to collect her paycheck from NVF.

JacksonLewis

Samantha L. Jarman
Regional Investigator
USDOL/OSHA
August 17, 2022
Page 6

A.  <u>Ms. Walker's Complaint is Time-Barred in its Entirety</u>

To seek redress for retaliation under the TFA, an employee must file a complaint not later than 180 days after the date on which the violation occurs. 26 U.S.C. § 7623(d)(2)(iv). The procedures for adjudicating such a claim are found in 26 U.S.C. § 7623(d) and 49 U.S.C. § 42121(b).

Ms. Walker filed the instant Complaint on June 10, 2022. One hundred and eighty days before June 10, 2022 is December 12, 2021. Therefore, all of the incidents Ms. Walker complains of must have occurred after December 12, 2021.

Ms. Walker's own complaint states that she was placed on paid administrative leave, and restricted from performing her work activities, on October 29, 2021. Accordingly, these actions occurred too long ago to be included in her June 10, 2022 Complaint.

In addition, Ms. Walker claims she was terminated from employment with NVF on June 16, 2022. Ms. Walker was not terminated from employment; she remains on administrative leave and continues to collect a paycheck from NVF.[6]

In addition, prior to the 180 day window, all SD staff were separated from employment, at Ms. Walker's recommendation, because the organization was winding down. Ms. Walker remained employed to help complete the dissolution. Accordingly, Ms. Walker can make no claims based on her separation from SD.

For all of these reasons, Ms. Walker did not experience any adverse actions during the 180 days prior to her Complaint, and her Complaint should be dismissed.

B.  <u>Ms. Walker's Complaint Lacks Substantive Merit and Should Be Dismissed</u>

1.  <u>Ms. Walker Did Not Engage In Protected Activity Under The TFA.</u>

To demonstrate that a claimant engaged in protected activity under the analogous procedures and precedents applicable to SOX complaints, she must show that she reasonably believed the employer's conduct violated an enumerated federal fraud provision set out in 18 U.S.C. § 1514A.[7]  Reasonable belief requires both a subjective and an objectively reasonable belief that "the conduct ... complained of constituted a violation of relevant law."  *Taylor*, 65 F. Supp. 3d at 125 (quoting *Sylvester v. Paraxel*

---

[6] It is unclear how Ms. Walker could be alleging that she was terminated on June 16, 2022 when her Complaint purportedly was filed on June 10, 2022, but in any event her employment with NVF has not been terminated.
[7] For the TFA, this would mean a reasonable belief that the employer's conduct was an underpayment of tax or any conduct which the employee reasonably believes constitutes a violation of the internal revenue laws or any provisions of Federal law relating to tax fraud. 26 U.S.C. § 7623(d).

# JacksonLewis

*Int'l LLC*, No. 07-123, 2011 DOL Ad. Rev. Bd. LEXIS 47, at *14-15 (DOL Adm. Rev. Bd. May 25, 2011)); *see also Welch v. Chao*, 536 F. 3d 269, 275 (4th Cir. 2008); *Livingston, v. Wyeth, Inc.*, 520 F.3d 344, 352 (4th Cir. 2008). While the employee "does not need to prove an actual violation, the employee does need to prove that [her] belief was objectively reasonable under the circumstances." *Allen v. Admin. Review Bd.,* 514 F.3d 468, 480, n.9 (5th Cir. 2008).[8] An employee must show both that she actually believed the conduct complained of constituted a violation of pertinent law and that "a reasonable person in [her] position would have believed that the conduct constituted a violation." *Livingston*, 520 F.3d at 352. Mere speculation of a violation of law is not sufficient to meet the objectively reasonable belief standard. *Ronnie v. Office Depot, Inc.,* No. 2019-0020, 2020 DOL Ad. Rev. Bd. LEXIS 303, *6 (Admin. Rev. Bd. September 29, 2020); *Day v. Staples, Inc.*, 555 F.3d 42, 55 (1st Cir. 2009) ("While a plaintiff need not show an actual violation of law, or cite a code section he believes was violated, 'general inquiries' …do not constitute protected activity.").

Objectively reasonable belief is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee. *Taylor*, 65 F. Supp. 3d at 125. Sophisticated whistleblowers are held to a higher standard in establishing SOX's "objectively reasonable belief" requirement. *See Wallace v. Andeavor Corp.*, 916 F.3d 423 (5th Cir. 2019) (concluding plaintiff lacked an objectively reasonable belief that company violated the law where the plaintiff was the Vice President of Pricing and Commercial Analysis, and a sub-certifier of defendant's financial statements, and could have conducted a limited investigation to determine that defendant properly disclosed its treatment of certain taxes as revenue in an SEC filing). For example, in *Allen*, the plaintiff claimed she had engaged in protected activity when she reported her belief — based on assumption — that the company's financial statements included accounting information she considered materially false, when in fact the false information was not included in the reported statements. The Fifth Circuit held that her belief was not objectively reasonable, taking into account the specialized knowledge attendant to her profession, because she had the ready ability to test her assumption by basic research. *Allen,* 514 F.3d at 477, 479. In *Taylor*, 65 F. Supp. 3d at 126-127, the court found no reasonable belief of a violation of SOX where "[a] reasonable person would not consider" the "mistaken use of" an incorrect statistic "as anything more than a misunderstanding," especially, when the mistake was discovered and retracted. *Id.* Of note, that court based its decision at least in part on the fact that the plaintiff and the person he made his report to about another's use of the statistic were both operational risk professionals who had knowledge of the various mechanisms for reporting illegal or potentially fraudulent activity at Fannie Mae. *Id.*

---

[8] The objective reasonableness standard applicable in SOX whistleblower claims is similar to the objective reasonableness standard applicable to Title VII retaliation claims. *Sylvester*, 2011 DOL Ad. Rev. Bd. LEXIS 47, at*33.

**JacksonLewis**

Samantha L. Jarman
Regional Investigator
USDOL/OSHA
August 17, 2022
Page 8

In this case, Ms. Walker alleged problems with "accounting controls and procedures, conflicts of interest, EEO and legal compliance." A series of emails sent by Ms. Walker in the days leading up to her complaint on October 28, 2021, showed that, in sum, her complaints were:

- NVF allegedly was impermissibly subsidizing certain SD employee wages, including those of NVF employees who substantially worked for SD and including NVF employees who were publicly identified as affiliated with SD;
- NVF was allegedly subsidizing certain other SD expenses that should have been allocated for payment by SD;
- NVF was allegedly making impermissible payment for lobbying and political campaign intervention; and
- NVF employees were allegedly exercising too much legal, financial and operational control over operations of SD.

But as VP, Advocacy, Ms. Walker had numerous high-level responsibilities. She was responsible for VRL's policy change advocacy at the federal, state, and local levels, and she was the head of the Advocacy Department and a member of VRL's Leadership Team. She reported to the VRL Executive Director. In her role, Ms. Walker was required to demonstrate proficiency in voting policy and a deep expertise in political analysis and campaign strategy. She was to collaborate with other departments to develop VRL's annual policy agenda, along with other responsibilities.

Importantly, she had received training in the procedures instituted for tracking the use of each organization's resources, including staff time, and to take reasonable steps to ensure that NVF, as the 501(c)(3) organization, would be fully reimbursed in due course and not assuming these costs for use of its resources by SD. At minimum, she knew from her experience that these are complex accounting and legal issues. She should have understood that the procedures adopted were designed for compliance in conjunction with sophisticated tax and legal advice from accounting and law professionals with expertise she does not possess.

Given her level of sophistication, Ms. Walker cannot have had an objectively reasonable belief that VRL had violated tax laws. Although NVF/VRL and SD worked closely together and shared certain staff, NVF maintained strict procedures to track the use of each organization's resources, including staff time, and to ensure that the 501(c)(3) organization is fully reimbursed and is not assuming these costs for any use of its resources by a 501(c)(4) organization. NVF trained the NVF/VRL staff, including Ms. Walker, on these procedures, and VRL staff also created a manual for employees to use on an ongoing basis, which was reviewed by NVF. Ms. Walker was or should have been well-versed in the content of this manual. NVF's procedures required use of the employees' time sheets to calculate reasonable allocations of NVF resources being

**JacksonLewis**

Samantha L. Jarman
Regional Investigator
USDOL/OSHA
August 17, 2022
Page 9

used by SD and then to reimburse NVF for that use from other funds. Certain staff, including Ms. Walker, were paid by NVF for the time spent on VRL activities. SD paid staff, including Ms. Walker, directly for time they spent on SD activity.

Ms. Walker was not a low-level employee without sufficient knowledge of these matters; she was a member of VRL's Leadership Team. She certainly knew the difference between 501(c)(3) and 501(c)(4) organizations. She is not herself a tax accounting or tax law expert, but she is a seasoned executive who has worked and managed in the tax-exempt arena. As such, she knew that even if she had questions, she did not have answers. At the same time, because Ms. Walker was, or should have been, well aware of the steps taken to ensure appropriate accounting between SD and NVF, whatever questions she may have had about why (or even whether) the procedures already in place were sufficient, a reasonable person in her position cannot have had an objectively reasonable belief that NVF was violating tax laws and her claim should be dismissed. *See, e.g., Wallace, Allen*, and *Taylor*, discussed above.

> 2. Ms. Walker Was Not Subjected To An Adverse Action Within The Meaning Of The TFA.

An adverse employment action includes "actions short of an outright firing," "but not all lesser actions by employers count." *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002). "Purely subjective injuries, such as dissatisfaction with a reassignment ... or public humiliation or loss of reputation ... are not adverse actions." *Id*. at 1130-31 (internal citations omitted). Where reassignment of duties does not result in loss of pay or change in benefits, it is not an adverse action. *Forkkio*, 306 F.3d at 1131; *see also Weigert v. Georgetown Univ.*, 120 F. Supp. 2d 1, 19 (D.D.C. 2000) (less substantial work assignments not an adverse action in ADA retaliation claim).

Ms. Walker alleges that in retaliation for making her complaint to the NVF GC, she was "placed on administrative leave, restricted from work functions, terminated and was refused to be rehired." None of these allegations has merit.

As an initial matter, certain of her allegations are untrue. Ms. Walker remains employed by NVF, collecting her full paycheck while on paid administrative leave. Moreover, Ms. Walker did not suffer any adverse action by SD. Indeed, Ms. Walker recommended the dissolution of SD during a November 11, 2021 Board meeting, and she was instrumental in winding down and dissolving this entity, resulting in the termination of all employees from SD.

As for her placement on paid administrative leave, this is not an adverse action. *See Joseph v. Leavitt*, 465 F.3d 87, 90-91 (2d Cir. 2006) (placement on paid administrative leave does not constitute adverse action in the Second, Fourth, Fifth, Sixth, and Eighth Circuits). Ms. Walker also alleges that she has been restricted from her work duties in

**JacksonLewis**

retaliation for raising concerns. But if being placed on administrative leave is not an adverse action, then being restricted from work activities – which necessarily follows from being placed on administrative leave – also cannot qualify.

For all of these reasons, Ms. Walker was not subjected to an adverse action within the meaning of the TFA and her Complaint should be dismissed.

> 3.  No Alleged Protected Activity Was A Contributing Factor To Any Unfavorable Action.

In order to demonstrate that protected activity was a contributing factor to the unfavorable action, a showing of retaliatory intent is required. *Murray* at 12 (citing *Bechtel v. Admin. Rev. Bd.*, 710 F3d 443 (2d Cir. 2013). A mere temporal connection between the alleged protected activity and the retaliatory act is not sufficient to show liability. *Id.* at 16. Even if Ms. Walker had engaged in protected activity and had been subjected to adverse action(s) after submitting her email to the NVF GC and VRL's Chief of Staff, there is no nexus between those adverse actions and any such protected activity. All of the actions Ms. Walker complains of were the result of legitimate business decisions and not due to any retaliation under the TFA.

First, Ms. Walker was placed on paid administrative leave because (1) Ms. Walker stated in an email to Anthony Dale on October 29 at 8:57 a.m. that she did not intend to continue performing her job duties; and (2) to insulate her from further alleged harassment or discrimination while her claims were investigated by Ms. Twitty.

Second, Ms. Walker was restricted from performing her work activities because she was on paid administrative leave. Because the reasons she was placed on administrative leave are legitimate business reasons unrelated to her protected activity, her claims cannot succeed.

Third, as noted above, Ms. Walker was not terminated from employment with NVF. From the date of her email to the GC and Chief of Staff, to the present day, Ms. Walker consistently has been employed by NVF.

Finally, Ms. Walker's employment with SD was never "terminated"; rather, it ended when that organization dissolved at her recommendation.

III. Conclusion

For all of the foregoing reasons, Complainant's Complaint should be dismissed. All of the actions she complains of are time-barred, and even if the Complaint was not time-barred, it lacks merit. Ms. Walker did not engage in protected activity within the meaning of the TFA, and she did not suffer any adverse action within the meaning of the TFA.

**JacksonLewis**

Finally, all actions taken by NVF with respect to Ms. Walker were taken for legitimate discriminatory reasons. For all of these reasons, Ms. Walker's Complaint should be dismissed.

Very truly yours,

JACKSON LEWIS PC

Teresa Burke Wright

# Exhibit B

Initial File #: N00005837622

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
### DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
### CORPORATIONS DIVISION



# C E R T I F I C A T E

**THIS IS TO CERTIFY** that all applicable provisions of the District of Columbia Business Organizations Code have been complied with and accordingly, this ***CERTIFICATE OF DISSOLUTION*** is hereby issued to:

SECURE DEMOCRACY

**Effective Date:** 12/20/2021

**IN WITNESS WHEREOF I** have hereunto set my hand and caused the seal of this office to be affixed as of 12/20/2021 1:10 PM

Business and Professional Licensing Administration



*Josef G. Gasimov*
_____
JOSEF G. GASIMOV
Superintendent of Corporations,
Corporations Division

Muriel Bowser
Mayor

Tracking #: LLbb8jjp

# Exhibit C

### UNANIMOUS WRITTEN CONSENT IN LIEU OF SPECIAL MEETING
### OF THE DIRECTORS OF
### SSECURE DEMOCRACY

The undersigned, constituting all of the incumbent Directors of Secure Democracy, a District of Columbia nonprofit corporation (the "Organization"), in accordance with § 29-406.21 of the District of Columbia Code, and section 3.12 of the Organization's Bylaws (the "Bylaws"), for  purposes of taking action required or permitted to be taken at a Special Meeting of the Directors, hereby adopt the following resolutions, as of  December 2, 2021, with the same force and effect as though such resolutions had been adopted at a duly convened Special Meeting of the Board of Directors of the Organization at which a quorum was present and acting:

WHEREAS, the Board of Directors has determined that it is in the best interests of the Organization to wind up its affairs and dissolve; and

WHEREAS, the Board of Directors has determined that it is in the best interests of the Organization to distribute the remaining non-monetary assets of the Organization to  have been discharged, to New Venture Fund,  a nonprofit corporation exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1986 as amended ("NVF") which sponsors a project, known as the "Voting Rights Lab,"  which project substantially shares the mission of the Organization; and to SD USA, a nonprofit corporation exempt from taxation under section 501(c)(4) of the Code, which substantially shares the mission of the Organization; all to comply with the provisions of the Organization's Articles of Incorporation and in consideration of the agreement of NVF and SD USA, jointly and severally, to assume responsibility for satisfying all of the net liabilities of the Organization and for indemnifying the Organization for any unasserted or unliquidated liabilities; and

WHEREAS, a draft agreement with NVF and SD USA reflecting the foregoing terms, with a cap of $500,000 on the obligations of NVF and SD USA, excluding unasserted claims (the "NVF-SD USA Agreement"), has been circulated to the Board of Directors; and

WHEREAS, the Board of Directors has determined that it is in the best interests of the Organization to enter into the NVF-SD USA Agreement;

**NOW THEREFORE, BE IT RESOLVED**: That the Organization enter into the NVF-SD USA  Agreement; and

**FURTHER RESOLVED**: That director Heather Smith, be and she hereby is authorized and directed to execute and deliver the NVF-SD USA Agreement on behalf of and in the name of the Organization; and .

**FURTHER RESOLVED**: That Ms. Smith be and she hereby is authorized and directed to take all actions she deems necessary or appropriate to implement the NVF-SD USA Agreement, provided that the proposal for dissolution provided for therein be subject to review and approval by the Board; and

**FURTHER RESOLVED**, two or more originals of this Written Consent may be signed by the members of the Board of Directors of the Organization, each of which shall have the status and force of an original and all of which together shall constitute but one and the same Written Consent.

Pursuant to District of Columbia Code § 29-406.23, and Article III, section 3.8 of the Bylaws, each director, by signing this consent, waives notice of the time, place and purpose of the Special Meeting of the Board of Directors and agrees to the transaction of the business of the Meeting by unanimous written consent of the directors in lieu of such Special Meeting.

**APPROVED:**

_____

**Heather Smith**

_____

**Ryan Else**

Exhibit D

# JacksonLewis

Jackson Lewis P.C.
10701 Parkridge Blvd, Suite 300
Reston VA 20191
(703) 483-8310 Direct
Teresa.Wright@jacksonlewis.com
jacksonlewis.com

ADMITTED IN:        DC, MARYLAND AND VIRGINIA

February 11, 2022

**<u>VIA ELECTRONIC MAIL</u>**

Zeke DeRose
The Lanier Law Firm, PC
10940 W. Sam Houston Pkwy N.
Suite 100
Houston, TX 77064
Zeke.DeRose@LanierLawFirm.com

Re:     Sarah Walker

Dear Mr. DeRose:

I am writing to respond to the tax-related allegations in your letter dated January 14, 2022 ("Letter"). Many of Ms. Walker's alleged claims rest on her allegation that New Venture Fund (NVF) and Voting Rights Lab (VRL) have engaged in "serious… federal tax violations." Letter at p. 1.[1] These tax-related allegations provide the foundation for Ms. Walker's alleged damages, which you assert would be "measured by the scope of the problematic conduct she reported…" This letter addresses the faulty legal premises upon which Ms. Walker's allegations of tax improprieties rest. We expect that after reviewing this letter you will conclude that Ms. Walker's alleged damages are far lower than the Letter suggests.

Prior to receiving the Letter, NVF had already conducted a regular cyclical review of tax compliance matters. This review began even before we first received notice on November 8, 2021 that Ms. Walker had retained counsel. Your letter misstates, and Ms. Walker appears to misunderstand, the law that applies to her tax claims. As a result of these misunderstandings, a significant portion of the claims and alleged damages

---

[1] NVF cannot respond on behalf of Secure Democracy (SD), which is not part of NVF.

# JacksonLewis

asserted in the Letter are not viable. These legal principles include, but are not limited to, the following:

- A public charity that is exempt under section 501(c)(3) may engage in lobbying – it is simply subject to limits on the total amount of resources it may dedicate to the activity. NVF adheres to IRS limits on its lobbying activities.

- The IRS requires 501(c)(3) and 501(c)(4) organizations that operate side-by-side to institute procedures for tracking the use of each organizations' resources, including staff time, and to provide reimbursements from a 501(c)(3) for the use of its resources by a 501(c)(4). NVF maintains these procedures and trained the VRL staff on them when VRL became a fiscally-sponsored project of NVF. VRL then created a manual for employees to use on an ongoing basis, which was reviewed by NVF ("Manual").

- The whistleblower provisions of Sarbanes-Oxley are inapplicable to Ms. Walker's claims. NVF is not a "company with a class of securities registered under section 12 of the Securities Exchange Act of 1934" or one that has to file reports under that law, nor a subsidiary or affiliate whose information appears on those reports.

- With regard to Forms 990, the questions on Part V (and Part VII) relate to employees who receive a W-2 from the filing organization. NVF is confident that its Form 990 was properly prepared.

- NVF employees were instructed on how to account for their time in NVF's organization-wide tracking system, per the Manual, which included explanations of relevant lobbying rules and definitions. Timesheets, which were required to be submitted at least monthly by all employees, would be used to calculate amounts to be reimbursed to NVF from 501(c)(4)-appropriate funding sources. This arrangement is typical among 501(c)(3) and 501(c)(4) organizations that work side-by-side and does not result in NVF employees being treated as SD employees.

- The IRS does not require organizations that operate side-by-side, as NVF/VRL and SD did, to track each organization's use of specific shared resources. Rather, IRS rules require a reasonable allocation, which NVF's procedures provided.

**JacksonLewis**

- NVF and SD are not "related organizations" because NVF does not control SD nor does SD control NVF. As relevant to NVF and SD, the IRS specifically defines "Control" of a nonprofit organization to mean having the power to remove and replace a majority of a nonprofit organization's directors, or if the majority of the filing organization's directors are directors, employees or agents of the controlling organization. (*See* Instructions for Schedule R, Form 990 at 1-2.) NVF and SD do not meet that definition, so any disclosures required under Form 990 for "related organizations" would not apply to NVF and SD.

- NVF is permitted to engage in lobbying. Federal tax law provides that lobbying may not be a substantial percentage of the activities that NVF funds – as a whole organization, not just VRL – but there is no prohibition on lobbying by employees of a 501(c)(3) organization.

- Moreover, the IRS defines "lobbying" as attempts to influence specific legislation. Contacts with executive branch officials and employees to influence executive branch action are not lobbying for IRS purposes, and it is permissible for a 501(c)(3) to undertake these activities, without limitation.

- Your letter misinterprets *Regan v. Taxation with Representation*, 461 U.S. 540 (1983). In that case, the Supreme Court considered a First Amendment challenge to the prohibition against substantial lobbying by 501(c)(3) organizations. The Court did not question that 501(c)(3)s may engage in insubstantial lobbying, the definition and contours of which are established by IRS rules and an entirely different line of judicial precedent.

We trust this letter adequately explains why all of Ms. Walker's claims or damages based on alleged tax violations are without merit. As for Ms. Walker's other claims, we are continuing to evaluate them but at this stage, based on our review of relevant facts, they also appear to be baseless. Rather than continue to undertake costly efforts to gather and comprehend the facts relating to those claims, as to which the parties are

# JacksonLewis

likely to disagree, we are willing to engage in substantive negotiations as to those claims before the parties incur further costs.

Very truly yours,

JACKSON LEWIS PC

Teresa Burke Wright

cc: Amy Epstein Gluck

# Fisher Broyles

**Amy Epstein Gluck, Esq.**
Partner
FisherBroyles Employment Counsel

<u>Office</u>                    <u>Mail</u>
1200 G St., NW          P.O. Box 288
Suite 800                   Cabin John, MD
Washington, DC 20005   20818-0288

Direct: 301.526.1184
amy.epsteingluck@fisherbroyles.com

February 11, 2022

**<u>VIA EMAIL ONLY</u>**

Zeke DeRose III
zeke.derose@lanierlawfirm.com
The Lanier Law Firm, PC
10940 W. Sam Houston Pkwy, Suite 100
Houston, TX 77064

>    *Re:    Sarah Walker*

Dear Zeke:

As you know, this firm represents Secure Democracy (SD). SD concurs with the information set forth in New Venture Fund's (NVF's) letter of the date.

Your January 14, 2022, letter accuses SD of participation in certain alleged "federal tax violations." Like NVF, SD maintains that it has complied with all applicable federal, state, and local tax requirements and all other laws and regulations. NVF's letter explains why all of Ms. Walker's claims or damages based on alleged tax violations as to SD are without merit.

SD is willing to engage in substantive negotiations concerning Ms. Walker's tax claims.

Very truly yours,

**FISHERBROYLES, LLP**

AMY EPSTEIN GLUCK
PARTNER

cc: Teresa Burke Wright

ATLANTA  |  AUSTIN  |  BOSTON  |  CHARLOTTE  |  CHICAGO  |  CINCINNATI  |  CLEVELAND  |  COLUMBUS  |  DALLAS
DENVER  |  DETROIT  |  HOUSTON  |  LONDON  |  LOS ANGELES  |  MIAMI  |  NAPLES  |  NEW YORK  |  PALO ALTO
PHILADELPHIA  |  PRINCETON  |  SALT LAKE CITY  |  SEATTLE  |  WASHINGTON D.C.

# Exhibit 2

**U.S. Department of Labor**

Occupational Safety and Health Administration
Philadelphia Regional Office
1835 Market Street
Mailstop OSHA-RO/19
Philadelphia, PA 19106-2968
Telephone: (215) 861-4900
Fax:        (215) 861-4904



**SENT VIA UPS**

July 14, 2022

Secure Democracy
611 Pennsylvania Ave SE #143
Washington, DC 20003

Re: Secure Democracy/New Venture Fund/Walker/3-0050-22-190

Dear Respondent Representative:

We hereby serve you notice that a complaint has been filed on June 10, 2022 with this office by Ms. Sarah Walker is alleging retaliatory employment practices in violation of Taxpayer First Act of 2019, 26 U.S.C § 7623 (d). A copy of the complaint is enclosed.

The Occupational Safety and Health Administration (OSHA) is responsible for enforcing the whistleblower provisions of TFA and will conduct its investigation following the procedures outlined in 26 USC § 7623(d)  . You may obtain a copy of the pertinent statute and regulations at http://www.whistleblowers.gov.  Upon request, a printed copy of these materials will be mailed to you.

Under these procedures, OSHA will disclose to the parties information relevant to the resolution of the case as well as provide all parties an opportunity to fully respond.  As such, both you and Complainant will receive a copy of each other's submissions to OSHA that are responsive to the above referenced whistleblower complaint.

***Per Presidential Memorandum – Managing Government Records, we request that any future documents you submit to OSHA be submitted electronically to the investigator's email address of*** jarman.samantha.l@dol.gov. ***Please be advised, when submitting your response and additional documentation, the preferred format for doing so is .pdf, utilizing the bookmaking procedure to properly identify each exhibit/document within your submission. Additionally, we request that whatever you submit to OSHA, you also send a copy to Complainant's Representative at the address below:***

Zeke DeRose
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas 77064
(713) 659-5200
Zeke.DeRose@lanierlawfirm.com

If the information provided contains personal, identifiable information about individuals other than Complainant, such information, where appropriate, will be redacted before disclosure. OSHA may contact the party directly for the un-redacted copy, if necessary.
In addition, if a redacted version is sent to the Complainant, please include that in your submission to OSHA.

We would appreciate receiving from you within 20 Days, a written account of the facts and a statement of your position with respect to the allegation that you have retaliated against Complainant in violation of the Act.  Please note that a full and complete initial response, supported by appropriate documentation, may help to achieve early resolution of this matter.

Due to governmental guidelines during the ongoing COVID 19 Pandemic, effectively immediately and until further notice a moratorium on in-person meetings is in effect. Departmental, counsel(s), client(s) and Whistleblower personnel meetings will be conducted by telephone, video conference (using DOL approved software), and or by submitting supporting documents in lieu of in person meetings. The ARA/Whistleblower may grant, based on compelling reasons, for an in-person meeting where all parties are in the same physical location only if necessary.

Attention is called to your right and the right of any party to be represented by counsel or other representative in this matter.  In the event you choose to have a representative appear on your behalf, please have your representative complete the Designation of Representative form enclosed and forward it promptly.  All initial communications and submissions regarding this matter should be made to:

Initial Point of Contact:          Jarman, Samantha L., Regional Investigator
                                   USDOL/OSHA
                                   1099 Winterson Rd Suite 140
                                   Linthicum Heights, MD 21090
                                   Ph: 410-303-2204
                                   Email: jarman.samantha.l@dol.gov

Your cooperation with this office is invited so that all facts of the case may be considered. Voluntary adjustment of complaints can be effected by way of a settlement agreement at any time.

To assist the parties in voluntary resolution of whistleblower complaints, OSHA offers an Alternative Dispute Resolution (ADR) Program at no cost to the parties.  The OSHA ADR Program provides the services of a **neutral, Confidential Intermediary** allowing the parties to resolve concerns expeditiously and in a mutually satisfactory manner in lieu of an investigation. The process may also allow the parties to preserve or repair the employment relationship or part ways on a professional basis.  For more information or to request to participate in the OSHA ADR Program, please complete and return the attached ADR Request Form.  If the parties request early resolution and the Regional Alternative Dispute Resolution Coordinator (RADRC) finds there is common ground for settlement, OSHA will stay the investigation.

If the parties do not elect to participate in or do not reach a voluntary resolution of the complaint through the ADR Program, OSHA will follow the normal investigative process.

Sincerely,

Samantha Jarman
For Celmouth A. Stewart, Jr.
Assistant Regional Administrator
Whistleblower Protection Program
Region III Philadelphia, PA

Enclosures:   (1) Designation of Representative Form
              (2) REQUEST TO PARTICIPATE IN THE OSHA ADR PROGRAM
              (3) "Alternative Dispute Resolution (ADR) Frequently Asked Questions"
              (4) Copy of Complaint (OSHA-87)

# DESIGNATION of REPRESENTATIVE FORM

**PLEASE COMPLETE THE INFORMATION IN THE BOXES BELOW.  USE BLUE OR BLACK INK. RETURN THIS FORM TO OSHA AS SOON AS POSSIBLE.**

**RE**:  Secure Democracy/New Venture Fund/Walker/3-0050-22-190

**The designated representative named below will represent the party named below in this matter. Generally, OSHA will communicate with and send any correspondence to the designated representative.  Additionally, the designated representative agrees to accept service of any subpoena on behalf of the party.**

| Party's Name (Type or print in the box below) | Representative's Name (Type or print in the box below) |
|---|---|
|  |  |
| Signature (Sign below) | Street Address or P.O. Box (Type or print in the box below) |
|  |  |
| Date (Type or print in the box below) | City, State, ZIP (Type or print in the box below) |
|  |  |
| Telephone (Type or print in the box below) | FAX (Type or print in the box below) |
|  |  |
| E-mail Address (Type or print in the box below) | |
|  | |

## REQUEST TO PARTICIPATE IN THE OSHA ADR PROGRAM

Re. Secure Democracy/New Venture Fund/Walker/3-0050-22-190

OSHA's ADR Program is a voluntary program that allows the parties to resolve a whistleblower retaliation complaint outside of the investigative process. In ADR, the parties attempt to negotiate a settlement with the help of a neutral OSHA facilitator who is not involved in the investigation of the complaint. While ADR is ongoing, the investigation will be put on hold.

Communications during ADR are kept confidential, to the extent permitted by law, except that the neutral OSHA facilitator may share ADR communications with Department of Labor (DOL) officials when it is necessary for administrative and supervisory purposes, or to seek legal or policy guidance on novel or complex questions that arise during the ADR proceeding. However, the neutral OSHA facilitator will not share ADR communications with any DOL official who will be involved in any further investigations or proceedings related to the whistleblower complaint if a settlement is not reached through ADR. Additionally, if a settlement is not reached through ADR, the parties may share any of their own communications made during the ADR proceeding with the OSHA Investigator.

If the parties decline to pursue ADR, or if they pursue ADR but fail to reach a settlement, the Investigator identified in the opening letter will proceed with an investigation. However, the parties, with or without the assistance of the Investigator, may still enter into a settlement agreement at any time during OSHA's investigation. Settlement agreements of whistleblower retaliation complaints reached through ADR or during OSHA's investigation must be submitted to OSHA for its review and approval prior to signing.

If you are interested in participating in the OSHA ADR Program, please complete and return this form to the Regional Whistleblower Investigator (RWI) or Regional Supervisor Investigator (RSI) identified in the notification letter. The RWI or RSI will facilitate referral of this complaint to the Regional Alternative Dispute Resolution Coordinator who serves as the Confidential Intermediary for the OSHA ADR Program.

_____ I am interested in participating in the OSHA ADR Program.


_____
Signature                                              Date



_____
Print Name                          Daytime Phone Number                          Email

## Alternative Dispute Resolution (ADR) Frequently Asked Questions

### *What is the ADR program?*
ADR is a voluntary program that allows the parties to resolve a whistleblower retaliation complaint outside of the investigative process. The parties attempt to negotiate a settlement with the help of a neutral facilitator who is not involved in the investigation of the complaint.

### *What are the benefits of ADR?*
ADR allows the parties to reach a certain and final resolution of the complaint on their own terms rather than by Agency Dismissal, Merit Finding or recommendation for litigation in Federal District Court. Successful ADR processes avoid potentially time-consuming, resource-intensive investigations and appeals to achieve prompt resolution of complaints. ADR may also allow the parties to repair the relationship or part ways on a professional basis.

### *Is ADR Confidential?*
Yes. Communications during ADR are kept confidential by law, to the extent permitted by law, and are not disclosed to anyone without the mutual consent of the parties. If the complaint is not resolved during ADR, the materials developed in ADR remain confidential and neither party may share any information disclosed during ADR with the assigned Investigator. All ADR case files are maintained electronically in a separate file system with access only available to the Regional ADR Coordinator and the Assistant Regional Administrator for Whistleblower Programs.

### *What happens to the investigation during ADR?*
When a complaint is accepted into the ADR process, the investigation will be put on hold pending the outcome of the process.

### *Does attempting ADR delay the investigation?*
Not necessarily. In most cases an investigation does not begin immediately whether or not the parties pursue ADR.

### *How do I sign up for ADR?*
If you would like to pursue ADR, please complete the attached Request for ADR form and return to the assigned Investigator or Regional Supervisory Investigator identified in the Notification letter within 10 days of receipt to facilitate case processing. Requests made after 10 days will still be processed for possible approval.

### *How much does ADR cost?*
There is no charge to participate in OSHA's ADR Program.

### *What happens if I want to pursue ADR but the other party does not agree?*
ADR is voluntary. All parties must agree to participate. If either party does not wish to participate, OSHA will proceed with an investigation.

### *What happens if both parties ask for ADR?*
If both parties request ADR, the ADR Coordinator will provide contact each party separately to establish initial expectations and answer questions and will provide them a letter acknowledging the acceptance into the ADR process. The ADR Coordinator facilitates the ADR process through calls, email, conferences and mediation. If the parties reach a settlement during the ADR process, the Coordinator will either draft or review a proposed settlement agreement following the procedures outlined in the Whistleblower Investigations Manual (WIM) available at https://www.whistleblowers.gov.

### *Who is the ADR Coordinator?*

The Regional Alternative Dispute Resolution Coordinator (ADRC) is a confidential intermediary, who is separate from the Whistleblower Protection Investigative Program. The ADRC is a Whistleblower Protection Programs subject matter expert with training, knowledge, skills and abilities in Whistleblower Protection and facilitating resolution of disputes.

### *What happens if ADR fails to produce an agreement?*

If the parties fail to reach a settlement during ADR, the complaint will be referred for investigation. If the ADRC determines that the negotiations are unlikely to result in an agreement, will notify the parties in advance of returning the complaint for investigation.

### *Is settlement possible outside ADR?*

Yes. The parties may enter into a settlement agreement at any time during the course of the investigation, but before they are signed, all settlements must be reviewed and approved by OSHA before the case can be closed.

### *How can I learn more about OSHA's ADR program?*

Please contact the assigned Investigator or Regional Supervisory Investigator identified in your Notification letter.  Further information about the ADR process can be found here: https://www.whistleblowers.gov/alternative-dispute and information about the process of settling a whistleblower case can be found here: https://www.whistleblowers.gov/settling-a-case.

**U.S. Department of Labor**

Occupational Safety and Health Administration

# Whistleblower Case Activity Worksheet

Note: A separate worksheet form must be completed for each complainant.

| Case Type: | ☐OSHA | ☐ACA | ☐SPA | ☐FSMA | ☐CFPA | | |
|---|---|---|---|---|---|---|---|
| ☐STAA | ☐AHERA | ☐ISCA | ☐SDWA | ☐FWPCA | ☐TSCA | ☒TFA | ☐CAA |
| ☐CERCLA | ☐ERA | ☐AIR21 | ☐SOX | ☐PSIA | ☐FRSA | ☐NTSSA | ☐CPSIA |

| Statutory Implications: | | ☐OSHA | ☐ACA | ☐SPA | ☐FSMA | ☒TFA | |
|---|---|---|---|---|---|---|---|
| ☐STAA | ☐AHERA | ☐ISCA | ☐SDWA | ☐FWPCA | ☐TSCA | ☐SWDA | ☐CAA |
| ☐CERCLA | ☐ERA | ☐AIR21 | ☐SOX | ☐PSIA | ☐FRSA | ☐NTSSA | ☐CPSIA |

## Complainant Information

| Last | | First | | Middle | |
|---|---|---|---|---|---|
| Walker | | Sarah | | | |

| Address | | | | | |
|---|---|---|---|---|---|
| 10940 West Sam Houston Pkwy N, Suite 100 | | | | | |

| City | | State | | Zip | |
|---|---|---|---|---|---|
| Houston | | TX | | 77064 | |

| Phone 1 | | Email | | | |
|---|---|---|---|---|---|
| 713-659-5300 | | Zeke.derose@lanierlawfirm.com | | | |

| Phone 2 | | | | | |
|---|---|---|---|---|---|
| | | Complainant is represented by Zeke DeRose, his information is provided in the address, phone number and email listed above. | | | |

| Phone 3 | | | | | |
|---|---|---|---|---|---|

## Respondent Information

| Name | | | ☒Company ☐Individual |
|---|---|---|---|
| Secure Democracy | | | |

| Address | | | |
|---|---|---|---|
| 611 Pennsylvania Ave SE, #143 | | | |

| City | | State | Zip |
|---|---|---|---|
| Washington | | DC | 20003 |

| Phone 1 | | Email | |
|---|---|---|---|
| 202-595-1061 | | megan@votingrightslab.org | |

| Phone 2 | | | |
|---|---|---|---|

| Phone 3 | | | |
|---|---|---|---|

| # of employees | | Unionized? | |
|---|---|---|---|
| | | No | |

## Respondent Information

| Name | | | ☒Company ☐Individual |
|---|---|---|---|
| New Venture Fund | | | |

| Address | | | |
|---|---|---|---|
| 1201 Connecticut Ave NW, STE 300 | | | |

| City | | State | Zip |
|---|---|---|---|
| Washington | | DC | 20036 |

| Phone 1 | | Email | |
|---|---|---|---|
| 202-595-1061 | | | |

| Phone 2 | | | |
|---|---|---|---|

| Phone 3 | | | |
|---|---|---|---|

| # of employees | | Unionized? | |
|---|---|---|---|
| | | No | |

Summary of the alleged retaliation (protected activity, respondent knowledge, adverse action, nexus)

On or about October 28, 2021, Complainant informed Chief Staff and General Counsel for New Venture fund she believed there were illegal activities taking place regarding workers doing jobs for one company and being paid with funds from another company – in addition to issues with using funds from a 501 (c)(3)f or 501(c)(4) activity. Complainant alleges that she engaged in protected activity.

On or about October 29, 2021, Complainant was placed on paid administrative leave. Complainant was also prohibited from participating in any work-related activities during this time.

On or about December 20, 2021, complainant was terminated by Secure Democracy. Complainant alleges that on about December 20, 2022, Secure Democracy began operating as Secure Democracy USA, and maintained all Secure Democracy employees with the exception of Complainant.

On or about June 16, 2022, Complainant alleges that she was terminated from New Venture Fund.

**U.S. Department of Labor**
Occupational Safety and Health Administration

Complainant alleges she was placed on administrative leave, restricted from work functions, terminated and was refused to be rehired in retaliation for engaging in protected activity.

I certify that the complaint was filed on: 6/10/2022

Print Name: Samantha Jarman

| Signature | Title Investigator | Date 7/14/2022 |
|---|---|---|

For local use: Secure Democracy/New Venture Fund/Walker/3-0050-22-190

OSHA-87 (rev. 07/2011)

# Exhibit 3



**HOUSTON**
The Lanier Law Firm, PC
10940 W. Sam Houston Pkwy N.
Suite 100
Houston, TX 77064
713.659.5200
Fax 713.659.2204

**NEW YORK**
The Lanier Law Firm, PLLC
Tower 56
126 East 56th Street
6th Floor
New York, NY 10022
212.421.2800
Fax 212.421.2878

**LOS ANGELES**
The Lanier Law Firm, PC
21550 Oxnard Street
3rd Floor
Woodland Hills, CA 91367
310.277.5100
310.277.5103

January 14, 2022

*Via Email*

New Venture Fund
Attn: Teresa Burke Wright, Esq.
Jackson Lewis P.C.
10701 Parkridge Blvd., Suite 300
Reston, VA 20191

Secure Democracy
Attn: Amy Epstein Gluck, Esq.
FisherBroyles LLP
1200 G. Street, NW, Suite 800
Washington DC 20005

Re:  Sarah Walker v. New Venture Fund and Secure Democracy

Dear Mses. Wright and Gluck:

We write in follow-up on our December 2, 2021, and December 10, 2021, calls with respect to our client Sarah C. Walker. Pursuant to the published New Venture Fund Whistleblower policy, our client notified New Venture Fund (*NVF*), and its tax-exempt entities Secure Democracy (*SD*) and Voting Rights Lab (*VRL*), of serious workplace and federal tax violations. Guided by well-established statutory and decisional law, this letter sets forth the pertinent—and highly troubling—facts with respect to both categories of violations.

NVF is a billion-dollar *a year* juggernaut. Indeed, in 2020 alone, NVF disbursed nearly $500 million to address issues such as racial justice.[1] NVF proclaimed its *commitment* to Race Equity, Equity, Diversity, and Inclusion in its "Mission and Values" statement:

Race, Equity, Diversity, & Inclusion Commitment

We envision a more equitable world, built on fair treatment, access, opportunity, and advancement for all.

As changemakers building the most effective charitable projects, we know that advancing race equity, equity, diversity and inclusion (REDI) is essential to solving our world's most pressing problems. As such, we dedicate ourselves to integrating REDI into our work and our culture. As we learn more, we will do more — ours is a continuous journey of learning, growth, and innovation.[2]

---

[1] Joe Schoffstall & Cameron Cawthorne, *Liberal Dark Money Juggernaut Raises$1.6 billion to Flood Left-Wing Groups with Cash, Tax Forms Reveal*, Fox News Nov. 26, 2021, https://www.foxnews.com/politics/dem-dark-money-juggernaut-raises-1-6-billion-flood-liberal-groups-cash-tax-forms (last visited Jan. 14, 2022).
[2] https://newventurefund.org/who-we-are/mission-and-values/ (last visited Jan. 14, 2022).

It is regrettable that an organization purportedly committed to "unapologetically integrating REDI in [its] work culture"[3] is actually a *do-as-I-say-and-not-as-I-do* organization that retaliated against one of its own employees who courageously called out NVF's own wrongdoings.

Ms. Walker is an African American woman with a physical disability (lupus), which is exacerbated by stress. Her disability was fully disclosed to NVF and SD at the time she was hired. When Ms. Walker spoke up about the workplace injustice and tax fraud at NVF and SD, those organizations swiftly retaliated against her. In addition to furthering a hostile work environment that severely compromised her ability to perform her duties for SD and NVF, the ongoing hostile work environment has worsened her physical disability and damaged her professional reputation. Unsurprisingly—and in seeming acknowledgement of the substantial tax violations that Ms. Walker alleged, the 501(c)(4) implicated in the misconduct was *dissolved* less than two months after she reported the systemic fraudulent tax practices.

NVF's retaliatory acts to silence Ms. Walker about workplace injustices and the flagrant tax violations truly reads like a multi-series investigative exposé into what really goes on behind closed doors at one of America's most powerful "nonprofit" funds.

This case involves a plethora of race-based workforce discrimination claims encompassing benefit eligibility and potential ERISA violations, disability discrimination, and retaliation, as well as the filing of false tax returns, *viz.* illegal subsidies from NVF to SD involving both employee compensation and operating expenses actually incurred, *as well as* illegal control by the 501(c)(3) over the 501(c)(4) (including assigning key NVF employees SD emails to use when conducting their political and lobbying activities). In short, SD was NVF's alter ego used to engage in abusive tax reporting practices.

When Ms. Walker discovered the improper tax issues (in late October, 2021) she was advocating for her workers to receive equal treatment and benefits. After reviewing the applicable Internal Revenue Code provisions and learing about the comprehensive tax fraud, she exposed it, which then triggered NVF's retaliatory response.

In the opening section below, we outline various instances of race-based workforce discrimination and retaliation ensuing from Ms. Walker acting as a Whistleblower. Highlighting the accuracy of Ms. Walker's disclosure that SD was simply an alter ego controlled by NVF, after Ms. Walker raised the above issues NVF's Megan Lewis informed SD that she had unilaterally suspended Ms. Walker's access to SD's electronic assets and email. Ms. Lewis also placed Ms. Walker on administrative leave from both NVF and the purportedly "separately" run SD.

Finally, we outline NVF's repeated failures to comply with the Internal Revenue Code provisions applicable to tax-exempt organizations, *particularly* when, as is the case here, those entities are affiliated. When Ms. Walker came forward as a Whistleblower challenging NVF's multi-million-dollar fraud, NVF retaliated against her, despite the NVF Employee Handbook describing the organization's obligations to someone in exactly Ms. Walker's position. This retaliation was intentionally effected in a manner damaging to Ms. Walker's professional reputation and her personal health. It was also carried out in violation of multiple local and federal

---

[3] *Id.*

legal protections in place to deter such egregious behavior targeting Whistleblowers, including the Taxpayer First Act of 2019, 26 U.S.C. § 7623(d).

## PART ONE:  RACE-BASED WORKFORCE DISCRIMINATION[4]

Collectively and individually, the directors and officers of NVF indisputably discriminated against Ms. Walker—and numerous other employees—based on race. This conduct violated both the District of Columbia Human Rights Act (DCHRA), DC Code § 2-1401.01 *et seq.* (2021) and of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* As discussed in greater detail below, NVF discriminated against Ms. Walker *and other employees of color* by (i) sidelining their work while contemporaneously advancing inferior work product produced by white employees; (ii) exploiting the racial identity of Ms. Walker and other employees of color at their expense and for the sole benefit of NVF; (iii) providing Ms. Walker and other employees of color significantly less compensation than less-qualified white employees; and (iv) denying Ms. Walker and other employees of color equal benefits to those provided to white employees. NVF was put on notice of this racial discrimination as early as June 2020. Nevertheless, NVF did nothing to address repeated concerns raised by its employees of color. Instead, when Ms. Walker informed NVF of specific misconduct, she was immediately, in practical effect, terminated.

### A.  RACIAL DISCRIMINATION BY NVF

NVF paid employees of color at VRL and SD less than white employees who had less experience and education and fewer responsibilities, even when the white employees **were subordinate to** the employees of color. On June 8, 2020, Ms. Walker brought these concerns to Christian LoBue, then Chief of Staff, and NVF co-founders Ms. Lewis and Sam Tarazi (*C2*), and in additional communications with Ms. Tarazi and Colin Weaver that same month (*C3-C6*). Unequal pay persisted even after Ms. Walker brought these concerns to management's attention (*C7*). Beyond the circumstance of unequal pay, employees of color were disrespected, not given proper authority or information to perform their jobs, put through far more stringent hiring processes, and sidelined into work where they would be unable to collaborate with progressive nonprofits and donors with whom they could develop and expand important professional networks. When employees of color were asked to interact with progressive donors or partners, it was not because of their expertise, but rather, in Ms. Lewis' words, it was to lend "credibility" to VRL's work.

As indicated, Ms. Walker was not the only employee of color who voiced discrimination-related concerns. Other employees of color likewise made the similar range of complaints concerning lack of pay equity, lack of empowerment in their work, and unequal application of employment policies. All employees of color at the organization began meeting in January 2020 about these concerns and submitted a letter to Ms. Lewis and Ms. Tarazi on June 2, 2020, raising the serious problem of racial discrimination within the organization. Ms. Lewis' response acknowledged that workflows, hiring processes, and budgetary authority were inconsistent and non-transparent (*C8*). However, no improvements were forthcoming, and many employees of color were thereafter terminated.

As with its compensation-related decisions, NVF consistently demonstrated an intention not to follow the law with respect to employee classification and benefits eligibility. As detailed below, whether employees were classified as full-time VRL or shared VRL/SD employees was

---

[4] *See* the Appendix C materials.

entirely disconnected from where they actually performed the majority of their work (*B16-B21, C10*). This arbitrariness caused discrimination in the availability of certain employment benefits. When VRL became a fiscally-sponsored project of NVF in April 2020, all employees were informed that they would be eligible for short-term disability, long-term disability, and life insurance, in addition to healthcare benefits. Job postings indicated availability of these benefits (*C9*). In reality, employees who were not full-time VRL employees were *not* eligible for STD, LTD, and life-insurance benefits.

It is a question of fact both *whether* and *when* NVF leaders knew of this difference in benefit status and whether they made knowingly false statements to employees about the matter. When Ms. Walker learned of the benefit-status difference in September 2021, she was told that leadership was not going to inform employees, potentially exposing the organization to serious penalties under the Employee Retirement Income Security Act of 1974 (**ERISA**), 29 U.S.C § 1149. It is a related question of fact whether NVF and SD constituted a single employer under ERISA regulations, potentially affecting compliance for other employee-benefit plans. If this matter proceeds, we believe documents related to the administration of the NVF employee-benefit plans will prove helpful to determine the full extent of potential ERISA violations which may be pursued in private actions.

Continuing the narrative, as recently as September and October 2021, NVF/VRL hired three new employees, two persons of color and one white person (Amanda Harrington). All three worked primarily for SD, but the two persons of color were classified as 50% VRL employees thus making them *ineligible* for benefits. In contrast, Ms. Harrington was classified as a full-time VRL employee expressly so she *could* access long-term and short-term disability benefits (C10). In addition to possible ERISA violations, the benefit differential constitutes race-based discrimination prohibited by DCHRA, and, as Ms. Walker shared with Chief of Staff Anthony Dale and NVF Human Resources (*C12, C13*), the employee benefit disparity was particularly meaningful for Ms. Walker, since she was dealing with severe health problems made worse from the stress caused by the continuing hostile work environment.

NVF cannot defend these practices or otherwise produce "admissible evidence from which the trier of fact [could] rationally conclude that the employment action [was not] motivated by discriminatory animus but, rather, reflected a legitimate, nondiscriminatory reason for its action." *Cain v. Reinoso*, 43 A.3d 302, 306 (D.C. 2012). Under District of Columbia law we believe we will be able to prove that NVF's decision-making was not tied to legitimate business needs. Indeed, rather than articulating clear reasons for decisions, NVF and SD sought to cover up their malfeasance by offering on-the-spot raises or promising future changes to their decision-making and budgetary authority processes (*C8*). In particular, the nearly immediate decision to dissolve SD is highly probative of this ongoing prohibited practice. NVF's attempts at correction were no more tied to legitimate reasons than was the differential treatment of Ms. Walker and other employees of color in the first place.

It bears noting that in response to the racial-justice protests that broke out in summer 2020, NVF commissioned a report, *Leveraging Fiscal Sponsorship for Racial Equity*, written in June 2021, discussing how fiscal sponsors could support grassroots groups focused on racial equity issues. Significantly, the report did not address racial equity concerns within NVF's own fiscally-sponsored groups. The hypocrisy of NVF's purporting to teach others about racial equity while discriminating against its own non-white employees makes it a particularly unsympathetic defendant.

## B. DISABILITY DISCRIMINATION

NVF intentionally refused to accommodate Ms. Walker's chronic health condition while accommodating the health condition of a similarly situated white employee. NVF was aware that Ms. Walker suffers from lupus and related conditions of pericarditis, arthritis and neuropathy in the hands. In addition, NVF was aware that the stress of her work environment made her symptoms worse. In repeated communications during fall 2021, Ms. Walker informed leadership that her health was deteriorating and inquired about the availability of part-time work or disability benefits (*C12-C14*).

In another instance of refusing to follow the law, NVF ignored Ms. Walker's request for a reasonable accommodation due to a chronic health condition, as required by 42 U.S.C. § 12112. NVF failed to engage in any interactive process to determine what accommodation would be appropriate. Instead, in response to Ms. Walker's request for a part-time schedule, Ms. Lewis suggested that the organization would have to reduce the scope of its work, impliedly signaling that providing an accommodation for Ms. Walker would create an undue hardship for the business. Consequently, no accommodation was even proposed, much less provided.

In contrast, the organization was able to accommodate a request by another leader, Ms. Tarazi, a white woman. Like Ms. Walker, Ms. Tarazi was a director who supervised people in 2020 and was promoted to Vice President during an organizational restructure in November 2020. Unlike Ms. Walker, Ms. Tarazi was able to change to a limited, part-time schedule in 2021. Not only was Ms. Walker not afforded this same benefit, but at the leadership retreat held October 26–28, 2021, she was told she had to accommodate Ms. Tarazi's "mold sensitivity" (we revisit the pivotally important events at the leadership retreat in the paragraphs that follow). All the while, the organization belittled concerns related to Ms. Walker's serious chronic health condition as "lifestyle" choices (*C11*).

Even more troubling was NVF's response to Ms. Walker's recent requests for a reasonable accommodation. In her October 28, 2021, email to Mr.. Dale, , Ms. Walker stated: "To ensure that my health related concerns are taken seriously and are treated with equal weight I would like someone to advise me on the medical information needed from me to ensure proper and fair consideration" (*C15*). A clearer request for accommodation could scarcely be crafted. Unfortunately, the response was equally clear: The next day, Ms. Walker was placed on administrative leave.

## C. RETALIATION

It is indisputable that NVF retaliated against Ms. Walker due to her Whistleblowing about the numerous categories of NVF's illegal conduct. The retaliation against Ms. Walker for her claims of racial discrimination began during the VRL/SD leadership retreat held October 26-28, 2021. From her perspective, it appeared the retreat was structured in a way to intimidate Ms. Walker for previously raising concerns, an action prohibited under DC Code § 2-1402.61(b). Although the moderator confirmed that Ms. Walker's concerns were consistent with others interviewed, she was singled out and appeared as though she was the lone complainant. During the first day of the retreat, under the pretense that it would help build trust, Ms. Walker was forced to share her complaints of discrimination against the two white co-founders of the organization (who held or previously held supervisory authority over her). Ms. Walker had to endure this intimidating treatment in front of an audience that included the very same white colleagues who had belittled her.

The numerous acts of discrimination during Ms. Walker's employment—and the hostile environment at the retreat—created a situation "that would seriously affect a reasonable person's psychological well-being," which is clearly prohibited under Title VII. *Daka, Inc. v. Breiner*, 711 A.2d 86, 93 (D.C. 1998). The retreat represented the most intense iteration of the ongoing hostile work environment to which Ms. Walker had been subjected. Although her work performance had never faltered, the hostility evidenced at the retreat was so severe that it visibly affected Ms. Walker. Anthony Dale, VRL Chief of Staff, told her on the second day of the retreat (October 27th) that he and Megan Lewis were concerned about Ms. Walker's mental and physical well-being and suggested that she might want to leave the retreat early. Ms. Walker expressed shock that he would suggest that she shouldn't participate. In addition to the perceived disability claim to which his comments give rise, they also illustrate the degree to which the discrimination against Ms. Walker amounted to an actionable hostile work environment claim.

In the face of this intimidation, Ms. Walker left the retreat early. On October 28, 2021, Ms. Walker sent emails to multiple individuals at NVF expressing various concerns. To Mr. Dale., she discussed the hostile work environment stemming from ongoing racial discrimination, and, as previously mentioned, asked for a reasonable accommodation (*C12*). She also asked Mr. Dale and Ms. DeSmedt of HR directly for an accomidation (*C14*). Ms. Walker informed Mr. Dale of these same concerns, and they discussed IRS compliance concerns in detail due to the VRL/SD employee misclassifications (*C15*). Finally, pursuant to NVF's whistleblower policy, she also emailed NVF General Counsel Andrew Schulz (*C16*).

NVF's response was immediate retaliation against Ms. Walker. The day after Ms. Walker sent these emails, her email account and access to all SD electronic assets were suspended without warning to her or even to the SD board (*C18-C22, B50*). These actions prevented Ms. Walker from: performing her job (including her management and leadership of employees), attending high-profile meetings, authorizing expenses, and communicating with contractors and funders. Ms. Walker was never given an NVF email and has been on administrative leave at NVF since October 29, 2021, so the actions on the 29th made her completely unable to work and perpetuated the hostile work environment.

Given the close proximity of NVF's actions to all of these complaints, NVF's actions can only be interpreted as an act of retaliation for each of these claims: (i) prior assertions of racial, disability and benefit-eligibility discrimination, in violation of DC Code § 2-1402.61(a) and 42 U.S.C. § 2000e-3(a); (ii) failure to provide a reasonable accommodation as required by 42 U.S.C. § 12203(b); (iii) the assertion of discrimination and mismanagement of employee benefit plans, in violation of 29 U.S.C. § 1140; and (iv) Whistleblower claims, in violation of the Taxpayer First Act of 2019, 26 U.S.C. § 7623(d).

In a brazen additional act of retaliation, NVF effectively terminated Ms. Walker two weeks later. On or around November 20, 2021, Mr. Dale contacted Google to claim ownership of the SD accounts, ending Ms. Walker's access to SD accounts (*C23*). On November 17, 2021, a new entity, SD USA was created. SD dissolved December 20, 2021. This new entity looks for all intents and purposes the same as Secure Democracy and employs the same people (*C24-C25*), except for Ms. Walker. It is clear that SD USA was created in order to perpetuate NVF's wrongdoing and to end Ms. Walker's employment. Given these actions, we believe we will be entitled to documents and information related to SD USA, SD, and NVF to fully understand the facts and circumstances related to the above-described actions.

## PART TWO: FILING OF FALSE OF FALSE TAX RETURNS

In Ms. Walker's October 28, 2021 email, she described three significant failures by NVF under the Internal Revenue Code in relation to its funding and operations of SD. This detailed email was sent to NVF's General Counsel Andrew Schultz. It is uncontested this email communication fully complied with the Whistleblower policy (*C1*, *C16*). Notwithstanding Ms. Walker following the NVF policy for reporting such suspected violations, NVF retaliated against her by effectively ending her employment (*C18-C25*). The damages Ms. Walker is entitled to recover for NVF's tax violations in this case are permitted by at least two separate, but independent, legal theories.

First, it is important to note that when considering liability for retaliation claims, the amount and scope of the reported problematic conduct that was the cause of the retaliation can be considered. *See* Sarbanes Oxley Act (SOX), Pub. L. No. 107-204; 18 U.S.C. § 1514A (authorizing civil action to prohibit retaliation against Whistleblowers in fraud cases).

Second, when the retaliation against a Whistleblower employee is, as here, based substantially on the company's failure to operate within the bounds of the federal tax laws, this constitutes a separate and discrete violation of federal law. 26 U.S.C. § 7623(d) provides "No employer … may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee … in reprisal for any lawful act" such as Ms. Walker providing information regarding conduct "which the employee reasonable believes constitutes a violation of the internal revenue law[.]") and which the NVF Employee Handbook deems to be her "responsibility" (*C1*).

Third, the compensatory damages the employee retaliated against may claim "***shall*** include. . . the following items: compensation for any special damages sustained as a result of the reprisal, including litigation costs, expert witness fees, and reasonable attorney fees" (emphasis supplied). 26 U.S.C. § 7623(d). There is no question we can pursue both theories of recovery.

Fourth, the above referenced remedies at Ms. Walker's disposal caused by NVF's retaliation against her in response to her Whistleblower report of federal tax violations, entitles her to fully litigate the various types of 501(c)(3) offenses committed by NVF (*A1-A65*).  Her emails overall referred to the following areas of fraudulent tax reporting by NVF (and SD) and the relevant Forms 990, including:

(i)     NVF omitting its subsidizing of numerous SD employee wages;

(ii)    NVF underreported other consultant and operating costs NVF illegally paid f to benefit SD  using public charity 501(c)(3) funding;

(iii)   NVF misreporting its subsidizing of numerous NVF/501(c)(3) employees who substantially worked for SD/501(c)(4) and including NVF employees who misrepresented to the public their true employer's identity;

(iv)    omitting its subsidizing of various SD expenses; and

(v)     the near total legal, financial and operational control exercised by Ms. Lewis of NVF over all operations of its affiliated 501(c)(4) organization, SD, as well as the total control over actual operations regarding decision making.

Due to the bad acts of NVF, there is at least some risk these entities will be collapsed and NVF will lose its tax-exempt status going back potentially to 2019.

## A.   ILLEGAL NVF/C3 SUBSIDIES TO SD/C4

*#1.   Subsidized SD Employees.* This violation was committed in two specific ways. First, numerous employees were 100% compensated by NVF (*A61*). However, these employees in fact worked 80-90% of the time for SD (*A1-A23*). This compensation arrangement is blatantly unlawful. We anticipate current and former employees will corroborate Ms. Walker's accounts, including, but not limted to: Jay Reistenberg, Amanda Soncia Coleman,  Michael King, Portia Allen Kyle, Christian LoBue, Jegath Athilingam (Geronimo), Mila Al-Ayoubi, Sofia Mankin, Megan DeSmedt, Karina Provost, Sarah Jane Higginbotham, Abigail Fields,  and Jessica Herrera, among others.

Further proof of this particular fraudulent practice is evidenced in the SD Form 990 (Part V) stating that SD had only one employee in 2019, and just 5 SD employees in 2020. These statements describing SD's workforce are materially false.[5] Although Ms. Walker saw the list of SD employees in her role as its Executive Director, and observed there were more employees providing substantial services to SD than reflected on the payroll, she was never told why this practice was implemented by NVF's management.

The alternative improper approach involved certain employees, such as Ms. Walker, who were paid 50% by SD and 50% by NVF.  However, these employees also worked 80-90% of their time on SD projects and objectives. This practice was followed so that the 501(c)(3) could pay benefits to certain employees who in reality worked overwhelmingly for the 501(c)(4). **There is no acceptable threshold for a 501(c)(3) entity to subsidize an affiliated 501(c)(4)'s workforce indirectly with employee benefits.** Strong proof of NVF's *intentional* violation of the IRS rules applicable to tax-exempt entities is the total lack of accurate time sheets (or other work studies) to determine the reasonable value of the services provided by NVF's 501(c)(3) employees to its affiliated 501(c)(4) organization (*A61*). These types of documents are created, and reviews are performed, so that the 501(c)(4) entity may reimburse the affiliated 501(c)(3) entity for the actual fair value of the shared employees' services. Such analysis is performed when there is a scintilla of intent to lawfully operate in accordance with applicable IRS guidelines. No such actions were taken by NVF because there was never an intent to comply with this cardinal principle of operating affiliated tax-exempt organizations. Indeed, why would management create a record consisting of accurate timesheets (or other documentation of the value of shared services) if there was no intention for the 501(c)(4) entity to reimburse the 501(c)(3) taxpayer-subsidized nonprofit corporation? Not only would it have been a fool's errand to create a meaningless document satisfying an IRS rule the organization intended to ignore, but this action *would also have created affirmative proof of the dollar amount by which the 501(c)(3) was violating the law.*[6]

---

[5] Schedule O of SD'S Form 990 references Part VI, Line 11B, and states the "Governing Body" (i.e., the three board members) was involved in the submission of this (false) document to the IRS by making the following admission: "FORM 990 IS PROVIDED TO THE GOVERNING BODY AND LEGAL COUNSEL FOR REVIEW AND APPROVAL PRIOR TO FILING."

[6] It is our understanding that as much as 90% of employee communications were conducted using the Slack platform. We believe that review of Slack communications as well as emails and text messages will establish not only further foundation for the conduct discussed in this letter, but also additional violations. And *see* Mr. Pedigo's Litigation Hold Letter dated November 2, 2021, addressed to NVF, VRL, and SD, as a reminder that these entities are under an obligation to preserve internal communications, including such Slack communications among employees.

**Potential Tax Violations**:  The estimated dollar amount of the violations in the form of NVF subsidizing SD's workforce includes: the 100% NVF employees; the 50-50% shared NVF employees; and the benefits paid by NVF to each group of employees. The annual unlawful subsidy is estimated to be in the range of:

- $3 million in 2019
- $4 million in 2020
- $4.5 million in 2021

Accordingly, Ms. Walker's meritorious Whistleblower complaint—and NVF's retaliation against her—allow one to take into account the dollar amount of the underlying tax violations related to the subsidized employees. We believe this discrete issue of improper tax reporting is in an amount exceeding **$10 million**.

**#2.  Subsidized SD Expenses.** The other type of subsidy referenced in the NVF General Counsel email (and Ms. Walker's follow-up Whistleblower email on November 1, 2021, to Heather Smith) involves SD operations that NVF "subsidized extensively." SD's illegally subsidized operational expenses—being provided to SD at *no charge* by NVF—included: Slack, political magazine subscriptions, travel costs, computers, training, website costs, and hiring various categories of consultants including research consultants, data consultants, and digital and design consultants. Again, a review of the SD Form 990 fraudulently reflects "$0" as the amount received from "Related organizations" (see Part VIII, line 1f), and it substantially understates the SD expenses incurred on Part IX (Statement of Functional Expenses).)

**Potential Tax Violations**:  The estimated dollar amount of the annual violations in the form of NVF subsidizing SD expenses that were not properly reported to the IRS to be in the range of:

- $1.5 million in 2019
- $2.0 million in 2020
- $2.5 million in 2021

Accordingly, Ms. Walker's meritorious Whistleblower complaint—and NVF's retaliation against her—allow one to take into account the dollar amount of tax non-compliance in the form of unreported subsidized expenses. We believe this category of improper tax reporting is in the amount of approximately **$6 million**.

## B.  Illegal Control by NVF/C3 of SD/C4[7]

A separate category referenced in Ms. Walker's email with respect to NVF's Internal Revenue Code violations as a 501(c)(3) involves its pervasive management and control over essentially every aspect of SD's daily operations, legal/accounting decisions, and management. At every instance, NVF's management (i.e., Ms. Lewis) made the day-to-day decisions with respect to all aspects of SD's operations. This total control by NVF covered the following range of actions and topics:

- Requiring NVF to approve  all literature for, and used by, SD;
- Approving all SD legislative campaigns and actions;
- Interviewing all SD potential employees;

---

[7] *See* the Appendix B materials.

9

- Approving the SD budgets;
- Hiring consultants on behalf of SD;
- Placing Ms. Walker on administrative leave without consulting the SD Board;
- Ms. Lewis signing the credit card contract with AmEx on behalf of SD; and
- Ms. Lewis signing as a fiduciary of SD documents for its 401(k) plan. (This discrete act potentially constitutes another type of misconduct involving pension and retirement benefits with associated penalties.)

## C. POLITICAL MOTIVE FOR ENGAGING IN UNLAWFUL CONDUCT

NVF subsidized SD employees for financial reasons. That is clear. There was a political motive for this deceptive conduct as well. For example, many of the 501(c)(3) employees engaged in legislative lobbying activities although this practice is strictly prohibited by the IRS. It is axiomatic that the federal fisc should not subsidize overt lobbying activities. *Regan v. Taxation with Representation*, 461 U.S. 540 (1983). Examples of this misconduct involved: contacting various state legislatures, contacting members of Congress, and even Ms. Lewis coordinating requests for donations to the Georgia Secretary of State Brad Raffensberger to be made on behalf of SD. The donation to Raffensberger's campaign is expressly prohibited under Section 501(c)(3), as 501(c)(3) assets were used to intervene in a political campaign. *See* Rev. Rul. 07-41, 2007-25 I.R.B. The indirect intervention in a political campaign means that NVF is not operated exclusively for charitable purposes. *See id.*

The IRS regularly revokes the tax-exempt status of organizations not operated exclusively for charitable purposes because, as the Tax Court has noted, "the presence of a single substantial purpose that is not described in section 501(c)(3) precludes exemption from tax under section 501(a) regardless of the number or the importance of the purposes that are present and described in section 501(c)(3)." *Korean-American Senior Mut. Ass'n v. Commissioner*, No. 21829-17X, 2020 Tax Ct. Memo (T.C. Sep. 9, 2020). Further, the revocation or modification of an organization's tax-exempt status "may be retroactive if the organization *omitted or misstated a material fact . . .*" in its communications with the IRS. 26 C.F.R. § 601.201(n)(6)(i) (emphasis added).

Compounding the problem of shared employees NVF improperly paid when they in fact substantially worked for SD, one related circumstance is particularly egregious. As established above, employees of a taxpayer subsidized 501(c)(3) entity are prohibited from engaging in specific legislative lobbying. If a nonprofit organization is caught engaging in such activity, a 501(c)(3) entity can expect to receive a severe penalty from the IRS. Therefore, armed with the knowledge of the illegal conduct NVF was directing its employees to engage in, NVF's so-called 'solution' was for certain key employees to send emails and otherwise *represent themselves to be employees and/or representatives of* the 501(c)(4) Secure Democracy. There is no reason for an entity to instruct its employees to lie about their employer's identity as a C3 entity **_unless_** it was understood that disclosing their status as a 501(c)(3) compensated employee/representative was tantamount to an admission the governing 501(c)(3) tax laws were being broken.

This improper practice was neither isolated nor random behavior of a rogue employee(s). Rather, it was a systemic and entity-wide deception perpetrated, including even by Ms. Lewis (*B1, B2, B22, B31*). There is simply no innocent rationale to justify or explain away perpetrating this fraud on third parties. The NVF employees undoubtedly knew they were paid by a 501(c)(3) entity and thus were not allowed to engage in this type of prohibited lobbying activity. Consequently, they misled third parties with whom they were dealing by claiming to be

SD's own employees/representatives. This conduct and misrepresentation by SD/NVF/VRL employees can and will be corroborated by elected officials, lobbyists, reporters, and communication consultants. Again, this was a widespread pattern of misconduct which only happens on such a large scale when management has colluded with this group of employees to tell the same lie regarding "who" was providing their paycheck.[8]

### PART THREE: BASIS FOR SUBSTANTIAL PUNITIVE AND COMPENSATORY DAMAGES

Given NVF's numerous instances of discrimination and its reckless and willful disregard of the rights of Ms. Walker and of other employees of color, we believe we would prevail with claims for damages in the District of Columbia for the DCHRA violations alone. *See Arthur Young & Co. v. Sutherland*, 631 A.2d 354 (D.C. 1993), (affirming jury award for lost income, compensatory damages for discrimination and retaliation claims, and punitive damages); *United Mine Workers of America v. Moore*, 717 A.2d 332 (D.C. 1998) (employer's actions caused employee severe emotional distress because they negatively impacted the employee's ability to remain working in her chosen field). The *Sutherland* court found that the award of punitive damages was justified because the employer's actions "had a significant adverse effect on [the plaintiff's] career, her professional reputation, and her financial wellbeing." *Id.* at 372.

Similarly, NVF's ongoing discriminatory conduct and its retaliation against Ms. Walker had a significant adverse effect on her career, reputation, and financial well-being. The chaos resulting from Ms. Walker's hostile work environment made the organization look disorderly and chaotic to external partners in the voting rights field and reflected poorly on Ms. Walker as SD's executive director. In addition to impacting Ms. Walker's ability to work, NVF's misconduct has caused long-term damage of her professional image within the voting rights community, impacting her ability to find a new position commensurate with her experience.

The retaliation against Ms. Walker on October 29th was intentionally done in a way that would be most damaging to *both* her professional reputation and personal health. The resultant stress caused her symptoms of lupus to become even worse. On December 2, 2021, Ms. Walker had to be admitted to the emergency room for acute Lupus Pericarditis and hand immobility. She is still recovering. Expert testimony will corroborate claims that NVF's actions were the proximate cause of her hospitalization. We believe this was an intentional infliction of emotional distress with a fact pattern that is particularly troubling.

DC courts allow taking into consideration the defendant's net worth when determining an appropriate damages award. In *Daka, Inc. v. Breiner*, 711 A.2d 86 (D.C. 1998) the District of Columbia's high court upheld a damages award thirty-nine times the compensatory damages awarded. The *Breiner* court stated that since "the purpose of punitive damages is to punish a tortfeasor and deter future conduct, the amount of such damages should be enough to inflict punishment, while not so great as to exceed the boundaries of punishment and lead to bankruptcy." *Id.* at 101. In so doing, the jury should "consider the net worth [of the defendant] when determining what damages would be sufficient to serve as a deterrent." *Id.* (upholding punitive damages that were less than 3% of the defendant's gross income from plaintiff's worksite). *See also Modern*

---

[8] For example, the July 7, 2021 press release announced to the public that Jay Riestenberg was joining Secure Democracy—despite Mr. Riestenberg never being employed by Secure Democracy, "Jay Riestenberg is joining Secure Democracy as associate director of state comms. He previously was deputy comms director at Common Cause." Politico Playbook, Jul. 7, 2021, (last visited Jan. 14, 2022), https://www.politico.com/newsletters/playbook/2021/07/07/putin-ignores-bidens-tough-talk-493490

*Mgmt. Co. v. Wilson*, 997 A.2d 37, 59 (D.C. 2010) (upholding punitive damages of over $3 million when defendant had a net worth of $10 million).

Courts in whistleblower cases use similar considerations when determining award amounts. Whistleblowing claims under Sarbanes-Oxley (SOX) are illustrative because the TFA, like the SOX whistleblower protection provisions, allows for compensatory and uncapped "special damages." These include damages for emotional distress, mental anguish, humiliation and injury to reputation. *See, e.g., Lockheed Martin Corp. v. Admin. Rev. Bd.*, 717 F.3d 1121 (10th Cir. 2013) (upholding an award of "noneconomic compensatory damages" for "emotional pain and suffering, mental anguish, and humiliation"); *Hanna v. WCI Communities*, Inc., 348 F.Supp.2d 1332, 1334 (S.D.Fla.2004) (holding that employee must be made whole by "being compensated for damages for reputational injury that diminished plaintiff's future earnings capacity"). Courts may consider the defendant's wealth in determining these awards. *See CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.*, 499 F.3d 184, 193 (3d Cir. 2007); *Parexel Int'l Corp. v. Feliciano*, No. 04-cv-3798 (E.D. Pa. Dec. 3, 2008) (affirming $1.7 million punitive damages award based in part on defendant corporation's substantial wealth).

Significantly, like SOX, the TFA does not "diminish the rights, privileges, or remedies of any employee under *any* Federal or State law" (emphasis added). Whistleblowing claims under SOX have been coupled with state anti-retaliation claims to provide the plaintiff with both special and punitive damages. In one such case, the whistleblower received damages nearly double the amount of special damages. *Wadler v. Bio-Rad Labs., Inc.*, No. 15-cv-02356-JCS (N.D. Cal. May 10, 2017). Accordingly, Ms. Walker is eligible for uncapped special damages and compensatory damages, as well as punitive damages, which there is every reason to expect should be measured against NVF's net worth.

In summation, NVF's conduct showed:

(i)     an ongoing and willful disregard for the rights of Ms. Walker and other employees of color;

(ii)    a reckless disregard of her need for an accommodation;

(iii)   intentional acts of retaliation;

(iv)    flagrant violation of tax rules; and

(v)     utter hypocrisy in discriminating against employees of color while at the same time profiting by externally espousing values of race equity, equity, diversity, and inclusion.

And to remove any doubt as to its across-the-board reprehensible misconduct, NVF attempted to cover up its problems by dissolving SD nearly immediately after Ms. Walker brought the problems to NVF's attention.

Taken together, Ms. Walker's Whistleblower complaint involved in the approximate range of $16 million of fraudulent tax reporting for the years of 2019-2021. We would note that NVF had almost $400 million in cash at the end of 2019 (and both the budget and cash reserves amount are now likely a multiple of that balance based on the article cited in footnote 1). Accordingly, all of this information is relevant when determining an award against NVF for its retaliation against Ms. Walker for the '*offense*' of unwittingly trusting the NVF published Whistleblower policy and

reporting *meritorious and substantial* fraudulent financial behavior permeating the operations of these two affiliated tax-exempt organizations.

The rampant and egregious violations of the 501(c)(3) regulations, in conjunction with the endemic fraud perpetrated on third parties by NVF employees portraying themselves as counterfeit SD employees *while* engaged in prohibited lobbying activities, presents an existential threat to the continued viability of the NVF.

## **CONCLUSION**

NVF created and maintained a discriminatory and hostile workplace environment for Ms. Walker as well as others and retaliated against Ms. Walker in violation of her federal and statutory protections. In addition to the workplace harms to Ms. Walker, the rampant and egregious violations of the 501(c)(3) regulations orchestrated and carried out by NVF leadership described above, represent multiple *prima facie* tax violations.

This organization's illegal conduct was compounded by retaliating against Ms. Walker *qua* Whistleblower. As noted above, the scope of damages Ms. Walker is entitled to seek (including punitive damages) is not based simply on her compensation or the harm to Ms. Walker but we expect the award to be measured by the scope of the problematic conduct she reported as well as the net worth of the employer.

We are open to setting up an in-person mediation in an effort to reach an amicable and just resolution to the above-referenced conduct. To facilitate a more-productive discussion, we will compile any additional documents and information needed to sufficiently quantify the scope of the violations. Please let us know by January 26, 2022, when you are available to discuss next steps in an effort to reach a confidential and final resolution to this matter.

Respectfully,

Zeke DeRose III

cc:
W. Mark Lanier, The Lanier Law Firm
Alex Brown, The Lanier Law Firm
Kenneth W. Starr, The Lanier Law Firm
K. Lawson Pedigo, Miller Keffer & Pedigo, PLLC
Jennifer Hoffpauir, Parlatore Law Group