UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SARAH WALKER, ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Civil No. 22-cv-03312 (APM) |
| NEW VENTURE FUND, et al. ) ) | |
| Defendants. ) ) | |

**MEMORANDUM OPINION AND ORDER**

**I.**

Plaintiff Sarah Walker, a Black woman, is the former Executive Director of Defendant Secure Democracy ("SD"), a now defunct social advocacy organization that lobbied state legislatures to protect secure and fair elections. During her employment with SD, half of her salary was paid by a related entity, Defendant New Venture Fund ("NVF"), which served as a fiscal sponsor for certain public-interest projects that SD was involved in. In late October 2021, Plaintiff raised concerns with NVF's general counsel about "accounting controls" and other compliance issues in connection with NVF's use of taxpayer funds. The next day, Plaintiff was suspended but then was reinstated a few days later. By the end of November 2021, NVF and SD had determined that they would dissolve SD and reassign its remaining assets and liabilities between NVF and a newly created entity, Defendant SD USA. Around that same time, Plaintiff learned that all employees of SD, except her, received an offer of new employment with NVF or SD USA. SD formally dissolved on December 20, 2021, which resulted in Plaintiff losing half of her salary.

Plaintiff brings this case against all three entities—NVF, the now-dissolved SD, and SD's successor, SD USA—asserting a retaliation claim under the Taxpayer First Act and claims of sex and race discrimination, failure-to-accommodate disability, hostile work environment, and retaliation under the District of Columbia Human Rights Act ("DCHRA"). Pl.'s Am. Compl., ECF No. 12 [hereinafter Compl.]. She also asserts a common law claim of intentional infliction of emotional distress against all three organizations and Defendant Megan Lewis, who is Plaintiff's former supervisor. *Id.*

Before the court are Defendants' motions to dismiss. *See* Defs. SD USA's and Megan Lewis's Mem. of P&A in Supp. of Their Mot. to Dismiss, ECF No. 13 [hereinafter SD USA & Lewis Mot.]; Def. NVF's Mem. of P&A in Supp. of Mot. to Dismiss Compl., ECF No. 14-1 [hereinafter NVF Mot.]; Def. SD's Mem. of P&A in Supp. of Mot. to Dismiss Compl., ECF No. 15-1 [hereinafter SD Mot.]. For the reasons that follow, Defendants motions are granted in part and denied in part.

## II.

Before reaching the merits, the court addresses the threshold question of whether it has personal jurisdiction over Defendant Megan Lewis. *See Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510 (D.C. Cir. 2018) (stating the court must resolve challenges to personal jurisdiction before reaching the merits); SD USA & Lewis Mot. at 18–20. Plaintiff bears the burden of "'mak[ing] a prima facie showing of the pertinent jurisdictional facts' to survive a motion to dismiss for lack of personal jurisdiction." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56–57 (D.C. Cir. 2017) (quoting *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988)).

The Supreme Court has recognized "two types of personal jurisdiction:" general and specific. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 262 (2017). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]" *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)).

Plaintiff maintains that the court can exercise general jurisdiction over Lewis not because she resides in the District of Columbia—she is a resident of New Jersey, Compl. ¶ 23—but because the District is her "principal place of business." Pl.'s Omnibus Resp. & Mem. of Law in Opp'n to Defs.' Mots., ECF No. 17 [hereinafter Pl.'s Opp'n], at 34; *see* D.C. Code § 13-422 (providing that general jurisdiction over a person who "maintains . . . [their] principal place of business in[] the District of Columbia"). As support, Plaintiff points to the fact that "the nonprofit corporations [Lewis] founded are organized under the laws of the District of Columbia." Pl.'s Opp'n at 34. Such a bareboned assertion is not enough. Plaintiff fails to allege any facts establishing Lewis's actual presence in the District of Columbia, such as whether she has a physical office in the District or how often she travels to the District for work. The fact that Lewis may have founded organizations that operate in the District of Columbia and employed Plaintiff is not enough to establish that Lewis's "principal place of business" is in the District.

Plaintiff's effort to establish specific jurisdiction fares no better. A court can exercise specific jurisdiction over "defendants less intimately connected with [the forum state], but only as to a narrower class of claims." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). "In order to establish specific jurisdiction over a non-resident defendant . . . , [the plaintiff] must plead facts that (1) bring the case within the scope of the District of Columbia's long-arm statute, D.C. Code § 13-423, and (2) satisfy the constitutional requirement of due

process." *Kopff v. Battaglia*, 425 F. Supp. 2d 76, 81 (D.D.C. 2006); *see also Urquhart-Bradley v. Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020).

Plaintiff accomplishes neither. She does no more than recite legal principles and identify the subsections of the D.C. long-arm statute that she claims confer jurisdiction. Pl.'s Opp'n at 35–37. Although her complaint contains a raft of allegations against Lewis, she does not identify any as having occurred in the District of Columbia. *See id.* Nor does Plaintiff claim injury in the District of Columbia. Compl. ¶ 19. She simply proclaims that the conduct that "Lewis effectuated through her position as Plaintiff's employer and that Plaintiff suffered in her position as employee" is sufficient to establish specific jurisdiction. Pl.'s Opp'n at 37. Such "conclusory statements" do not satisfy her burden. *Livnat*, 851 F.3d at 57. The court therefore dismisses Lewis from this action for lack of personal jurisdiction.

### III.

#### A.

The court now turns to Defendants' grounds for dismissal on the merits. To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

In evaluating a Rule 12(b)(6) motion, the court must accept a plaintiff's factual allegations as true and "construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d

471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)); Fed. R. Civ. P. 12(b)(6).

**B.**

The court first considers Defendants' arguments regarding the Taxpayer First Act ("TFA") claim, then the DCHRA claims, and finally the intentional infliction claim. Last, the court considers the issue of successor liability as it relates to Defendant SD USA.

**1.**

Defendants argue that Plaintiff's TFA claim (Count One) should be dismissed because she failed to a submit a timely complaint with the Department of Labor ("DOL") as a condition precedent to filing suit. NVF Mot. at 14; SD USA & Lewis Mot. at 13; SD Mot. at 12. The court agrees.

The TFA makes it unlawful for an employer to retaliate against an employee for providing information that "the employee reasonably believes constitutes a violation of the internal revenue laws or any provision of Federal law relating to tax fraud." 26 U.S.C. § 7623(d)(1). Before bringing suit in federal court, an individual must first file a complaint with the DOL no "later than 180 days after the date on which the violation occurs." *Id.* § 7623(d)(2)(A), (B)(iv). The parties agree that Plaintiff filed her DOL complaint on June 10, 2022. Pl.'s Opp'n at 11. The alleged retaliation, therefore, must have occurred no earlier than December 12, 2021, to be considered timely.

The court has found no case interpreting the statutory language "the date on which the violation occurs" for purposes of a retaliatory termination claim under the TFA. In an analogous setting, Title VII, the Supreme Court has said "that an ordinary wrongful-discharge claim accrues—and the limitations period begins to run—when the employer notifies the employee he

5

is fired, not on the last day of his employment." *Green v. Brennan*, 578 U.S. 547, 564 (2016) (Title VII) (citing *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258–59 (1980) (Title VII and § 1981), and *Chardon v. Fernandez*, 454 U.S. 6, 6 (1981) (per curiam) (§ 1983)). Similarly, in the context of the False Claims Act, the D.C. Circuit has held that "wrongful discharge claims accrue, and limitation periods begin to run, at the time the employer notifies the employee that she is fired, not later on the last day of her employment." *Singletary v. Howard Univ.*, 939 F.3d 287, 300 (D.C. Cir. 2019). Applying the "ordinary rule" here, the question becomes whether Plaintiff was notified of her termination prior to December 12, 2021.

While the complaint does not identify a specific date, the court can infer that Plaintiff had, at least, constructive notice of her termination from SD sometime before December 12, 2021. Around November 5, 2021, Plaintiff learned that NVF had decided to cut off funding to SD. Compl. ¶ 78. Less than two weeks later, on November 17, 2021, "Defendants created a new nonprofit organization, SD USA." *Id.* ¶ 80. On November 20, 2021, Plaintiff lost access to her SD Google Workspace accounts. *Id.* ¶ 81; Ex. 14 to Compl., ECF No. 12-1, at 62–64.[1] Then, on or around November 30, 2021, representatives of SD, NVF, and SD USA entered into an agreement to dissolve SD effective December 20, 2021. Compl. ¶ 82. Around this time, Plaintiff also learned that Defendants had offered all SD staff, except her, full-time positions with either NVF or SD USA. *Id.* ¶¶ 79, 84.[2]

So, according to her own complaint, Plaintiff had awareness of three critical facts by November 30, 2021: (1) SD's imminent dissolution, which meant she no longer would be its

---

[1] References to exhibits are to the CM/ECF page number.
[2] The precise date on which Plaintiff learned that she alone had not received a job offer, and what entity would employ the other SD employees, is unclear. In paragraph 79, she identifies November 5, 2021, as the date she acquired knowledge that "Defendants offered all SD staff full-time NVF positions." *Id.* ¶ 79. But paragraph 84 alleges that all SD employees except her "were offered new positions with SD USA on or around November 30, 2021." *Id.* ¶ 84. Ultimately, because both dates fall outside the 180-day window, this inconsistency is not material.

Executive Director, (2) she had lost access to her SD-related Google accounts, and (3) she had not been offered a position at SD USA. Plaintiff therefore was at least on constructive notice, if not actual notice, of her termination from SD, at the latest, by November 30, 2021, which was more than 180 days before she filed her TFA administrative complaint with DOL. Therefore, the TFA complaint is time barred.

Plaintiff claims that her administrative complaint was timely because SD's dissolution on December 20, 2021, is the "violation" that triggered the TFA statutory period. 26 U.S.C. § 7623(d)(2)(A); Pl.'s Opp'n at 10. According to her, "[a]lthough Defendants never informed [her] of her official last day, Plaintiff believed that she was still employed by SD until it was dissolved based in part on her belief that an investigation into her complaints was ongoing and that she received her last paycheck in January [2022]." Pl.'s Opp'n at 10. But that argument suffers from two problems.

First, Plaintiff does not allege any facts about her perceived employment status with SD as of December 2021. Nor does she allege that she received her last paycheck in January 2022. Plaintiff cannot amend her pleading through her opposition brief. *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 107 (D.D.C. 2004) ("It is clear that the plaintiffs are now, through their pleadings, attempting to amend their complaint to properly allege a claim of conversion. This tactic is clearly impermissible.") (collecting cases).

Second, even if properly alleged, Plaintiff's claimed beliefs are neither relevant nor plausible. *See Gordon v. Off. of the Architect of the Cap.*, 928 F. Supp. 2d 196, 205 (D.D.C. 2013) ("[C]ourts must focus on the employer's action, not on the employee's subjective beliefs."). Again, the accrual date is "when the employer notifies the employee he is fired, not on the last day of his employment." *Green*, 578 U.S. at 564. That Plaintiff may have remained on SD's payroll

7

beyond December 12, 2021, is therefore beside the point. *See Ricks*, 449 U.S. at 257 ("Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination."). Moreover, Plaintiff's position that she was unaware of her termination from SD before December 12, 2021, is not plausible. Plaintiff admits that, by no later than November 30, 2021, she knew Defendants had agreed to dissolve SD and that, although other SD employees had received job offers elsewhere, she had not. It is simply not plausible based on Defendants' actions that Plaintiff was not on notice of her termination before December 12, 2021.

The court quickly disposes of Plaintiff's last argument. She contends that her claim is timely under 26 U.S.C. § 7623(d)(2)(A)(ii) because "the Secretary of Labor advised Plaintiff on December 22, 2022, that she could pursue her TFA claim in federal district court." Pl.'s Opp'n at 9. But that contention fails. First, nothing in the DOL's "kickout" letter, which put her on notice that she could proceed to federal court, suggests that the agency made any timeliness determination about her administrative complaint. Ex. 1 to SD USA & Lewis Mot., ECF No. 13-1, at 2–3. Second, even if the agency had made a timeliness determination, it would not bind this court. Its review of the exhaustion issue is de novo. *See Contreras v. Ridge*, 305 F. Supp. 2d 126, 131 (D.D.C. 2004) (finding that, under Title VII, district courts are not bound by EEOC's timeliness determination) (citing *Wade v. Sec'y of the Army*, 796 F.2d 1369, 1376–77 (11th Cir. 1986) (concluding "that a district court must determine whether the employee has complied with regulatory requirements when the defendant raises the issue of failure to exhaust administrative remedies")).

The court, therefore, dismisses Count One of Plaintiff's complaint.

**2.**

Plaintiff asserts that Defendants violated the DCHRA in a variety of ways. They (1) discriminated against her on the basis of race and gender (Counts Two and Three); (2) failed to accommodate her disability (Count Four); (3) created a hostile work environment (Count Five); and (4) retaliated against her for statutorily protected activities (Count Six). The court considers in turn Defendants' objections to each claim.

**a.**

Defendants argue that Plaintiff's race and gender discrimination claims are time-barred under the DCHRA's one-year limitations period, D.C. Code § 2-1403.16(a). Plaintiff filed this action on October 28, 2022. Therefore, to be timely, the discriminatory acts must have occurred no earlier than October 28, 2021.

The following alleged discriminatory acts support Plaintiff's race and gender discrimination claims: (1) in June 2020, she learned that a Hispanic male, Luis Rodriguez, and a White woman, Jane Higginbotham, who both reported to Plaintiff and had less experience, were paid more than her, Compl. ¶¶ 34–36; (2) between June 2020 and November 2020, she was forced to take on the responsibilities of her male supervisor, who was paid 60% more than her, without any additional compensation, *id.* ¶¶ 28, 30, 32, 126; (3) at and after the time of her promotion to Vice President of SD in December 2020, other Vice Presidents who were White received access to pay information, *id.* ¶ 40; (4) minority employees were channeled into working for SD, whose focus involved partnering with Republicans, instead of "progressive Democratic-aligned groups," which limited their professional opportunities, *id.* ¶ 42; (5) during 2021, Defendants permitted a similarly situated White woman, Samantha Tarazi, to work a modified schedule due to a disability but, in September 2021, denied Plaintiff's request for the same and/or access to disability benefits,

9

*id.* ¶¶ 50–52; and (6) on or around October 20, 2021, she learned that another similarly situated White woman, Amanda Harrington, received disability benefits through NVF, while she and recently hired employees of color were classified as SD employees and did not receive those benefits, *id*. ¶¶ 44–45, 113–116.  Each of these discrete discriminatory acts occurred before October 28, 2021.  Her race and sex discrimination claims are thus untimely.

Plaintiff does not suggest that she was unaware of these allegedly discriminatory acts prior to the one-year statutory period before she filed suit.  In fact, the opposite is true.  She admits that she learned of Rodriguez's and Higginbotham's higher salaries when she received a copy of SD's payroll by mistake in June 2020.  *Id.* ¶ 36.  She and other female minority employees began meeting in June 2020 about equity issues, which culminated in a letter sent to management that decried the treatment of minority employees.  *Id.* ¶ 55.  Plaintiff learned in September 2021 that SD employees were ineligible for disability and life insurance benefits.  *Id.* ¶ 44.  And she knew in September 2021 that Tarazi was permitted to work a modified schedule.  *Id.* ¶ 51.  Instead, Plaintiff asserts that "[t]he disparate treatment based on race and sex began when [she] started work at NVF and SD . . . continued on October 28, 2021, when [she] reiterated that she was being treated differently because of her identity as a black female."  Pl.'s Opp'n at 23.

But Plaintiff's theory that "continued" discrimination extends the statute of limitations period is unsupported by case law.  "A discrete . . . discriminatory act 'occurred' on the day that it 'happened'.  'Each discrete discriminatory act starts a new clock for filing charges alleging that act.'"  *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 889 (D.C. 2003) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) (noting the Supreme Court's distinction between discrete discriminatory actions and a hostile work environment; only the latter is a "continuing violation")); *see also Hammel v. Marsh USA Inc.*, 206 F. Supp. 3d 219, 230 (D.D.C.

2016) (holding that the plaintiff's disparate pay claims under the DCHRA did not constitute "a continuing violation" and were therefore subject to the one-year limitations period). As discussed, the last alleged discriminatory act against Plaintiff occurred in September 2021, when she learned that Tarazi was allowed a more favorable work schedule. Her race and sex discrimination claims thus began to accrue more than one year before she filed suit.

Nor can Plaintiff save her claims by pointing to her complaints of ongoing discrimination that she made on October 28, 2021. Compl. ¶ 62; Pl.'s Opp'n at 23. The court is aware of no case that stands for the proposition that protesting discrimination within the limitations period can revive otherwise time-barred claims, and Plaintiff cites none. Accordingly, Plaintiff's race- and gender-based discrimination claims are dismissed as untimely.

**b.**

Defendants argue that Plaintiff's claim for failure-to-accommodate her disability (lupus) is likewise time-barred. Plaintiff alleges that she twice requested accommodations. She first asked Defendant Lewis and the Voting Rights Lab ("VRL")[3] in the summer of 2021 about the feasibility of working part-time and followed up with them in September 2021. Compl. ¶ 50. Then, on October 28, 2021, Plaintiff again asked VRL for an accommodation. *Id.* ¶ 63. Plaintiff does not dispute that a failure-to-accommodate claim based on the September 2021 request would be too late. *See* Pl.'s Opp'n at 23. The parties only dispute whether a claim based on the October 28, 2021, request is timely.

A plaintiff cannot extend the DCHRA's limitations period on a reasonable accommodation claim "by reiterating an identical request that was previously denied." *Barrett v. Covington &*

---

[3] VRL became a fiscally sponsored project of NVF around February 2019. Compl. ¶¶ 3, 29. At that time, all VRL employees were hired by NVF either as full-time employees or part-time employees with their salary even split between NVF and SD. *Id.* ¶ 29

11

*Burling LLP*, 979 A.2d 1239, 1249 (D.C. 2009).  But an "identical request" is precisely what Plaintiff has alleged here.  *See* Pl.'s Opp'n at 23 (arguing that she "*reiterated* her request for an accommodation of her disability" on October 28, 2021) (emphasis added).  According to Plaintiff, in the summer of 2021 and in September 2021, she asked Walker and a human resources representative at VRL, Megan DeSmedt, "about working part-time."  Compl. ¶ 50.  That request was not granted.  *See* Pl.'s Opp'n at 23 (stating that she requested an accommodation in "the fall of 2021—to no avail").  Mere weeks later, Plaintiff emailed DeSmedt "with another request for an accommodation for her disability."  Compl. ¶ 63.  DeSmedt replied: "I am just following up on your message inquiring about our policies and practices that allow individuals to opt for part time work, as full-time employees."  *Id.*; Ex. 3 to Compl., ECF No. 12-1, at 28.  DeSmedt identified Plaintiff's questions as, (1) "[I]s this an option made available to any full-time employee who has a documentable health concern?" and (2) "At what point does someone in a full-time position opt for disability vs be afforded the opportunity for half-time work with benefits?"  *Id.*  Plaintiff's inquiry on October 28, 2021, thus was not a new request for an accommodation.  It was merely another attempt to work part time.  Thus, the October 28, 2021 request did not trigger a new accrual period.

Nor did her communication with Arabella Advisors on that same day restart the clock.  According to Plaintiff, on October 28, 2021, she "met with a human resources representative from Arabella Advisors," an advisory firm that did administrative work for Defendants and others, and "shared her concerns, including her fear of retaliation."  Compl. ¶ 64.  That allegation is not sufficiently specific for the court to reasonably infer that Plaintiff requested any accommodation.

Accordingly, the court dismisses Plaintiff's failure-to-accommodate claim (Count Four) as untimely.

c.

Defendants seek dismissal of Plaintiff's hostile work environment claim on two grounds. First, they contend that the hostile work environment is time-barred because the "bulk of [this] claim . . . is premised on the same allegations as the time-barred sex and race discrimination claims." SD Mot. at 16; *see* NVF Mot. at 22–23. They identify the most recent allegation of race- or sex-based harassment as having occurred on October 26, 2021, during a leadership retreat. SD Mot. at 16; NVG Mot. at 22–23. That argument misses the mark.

Unlike discrete discriminatory acts, "[a] hostile work environment claim is comprised of a series of separate acts that collectively constitute one unlawful employment practice." *Lively*, 830 A.2d at 891. "All of the component acts comprising the hostile work environment claim need not have taken place within the one-year period," so long as at least one act occurs with that period. *Id.* Here, Plaintiff alleges that in November 2021, "Defendants continued to single out Plaintiff for mistreatment based on her identity as a Black female" by instructing employees not to follow Plaintiff's instructions. Pl.'s Opp'n at 25 (citing Compl. ¶ 96). Defendants retort that this allegation is lacking any connection to race- or sex-based animus and therefore cannot render her hostile work environment claim timely. Def. SD's Reply in Supp. of Its Mot. to Dismiss Compl., ECF No. 20 [hereinafter SD Reply], at 18–19; Def. NVF's Reply in Supp. of Mot. to Dismiss Compl., ECF No. 19 [hereinafter NVF Reply], at 15–16. But, at this stage, the court must view the allegations in the light most favorable to Plaintiff. The claim is thus timely.

Next, Defendants argue that Plaintiff fails to state a plausible claim. To make out a hostile work environment claim, a plaintiff must show that she was subjected "to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Baloch v. Kempthorne*,

13

550 F.3d 1191, 1201 (D.C. Cir. 2008) (internal quotation marks omitted). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998). Defendants contend that Plaintiff's hostile work environment claim "is simply an amalgamation of her race and gender discrimination claims," NVF Mot. at 25, and that she "has not alleged any facts to support the allegations that any differentials in her workplace were based on her inclusion in a protected class (race or sex)." SD Mot. at 31. The court disagrees.

Plaintiff alleges that as a result of Defendants' misconduct, she and other employees were treated differently based on their race "in terms of pay, access to information and networks, eligibility for benefits, and accommodations for disabilities." Compl. ¶ 55. More specifically, Plaintiff contends that despite NVF's public messaging regarding racial equity, Defendants "reduc[ed] the value of minority employees." *Id.* ¶¶ 9, 43. Unlike their White counterparts, employees of color were strategically placed in public facing roles when Defendant Lewis "believed that [their] presence [] would lend 'credibility' to the work of VRL[.]" *Id.* But internally, Plaintiff and other minority employees had unequal access to resources compared to their White colleagues. *Id.* ¶¶ 38, 40. Female minority employees had taken these concerns to VRL leadership by at least June 2020. *Id.* ¶ 55.

These allegations standing alone might not suffice, but Plaintiff supplements them with specific instances in which White colleagues denigrated Plaintiff based on her race and sex. First, in February 2021, Plaintiff reached out to a VRL Vice President, Lize Avore, a White woman, regarding work performance concerns about her supervisee, a Black woman. Avore responded that "the [supervisee's] performance problems were due to racial microaggressions from

14

[Plaintiff]," because Plaintiff did not "experience the world the same way as Black women because [she] ha[d] lighter skin." *Id.* ¶ 57.  A month later, Plaintiff raised this issue with Defendant Lewis, who also responded by questioning Plaintiff's identity as a Black woman, noting that Plaintiff's "skin is much lighter" than her Black colleague's and accusing Plaintiff of being racist.  *Id.* ¶ 58.  Plaintiff also alleges experiencing harassment during the October 26–28, 2021 leadership retreat when Defendant Lewis instructed Plaintiff to publicly share her concerns regarding SD's and NVF's discriminatory conduct in front of all the other employees.  *Id.* ¶ 61.

These specific allegations "change[] the picture" and make Plaintiff's hostile work environment claim at least plausible.  *Mkwanazi v. Nat'l Pub. Radio, Inc.*, 20-cv-2231 (BAH), 2020 WL 6701084, at *8 (D.D.C. Nov. 13, 2020); *Holmes-Martin v. Leavitt*, 569 F. Supp. 2d 184, 193 (D.D.C. 2008) (finding plaintiff's allegations that supervisor's "hostility [toward her] manifested itself through isolation, subjection to public ridicule and harmful treatment" were sufficient to survive a motion to dismiss).  It therefore survives Defendants' motions to dismiss.

### d.

Defendants assert that Plaintiff has not stated a retaliation claim.  "The elements of a retaliation claim under the DCHRA are the same as those under the federal employment discrimination laws."  *McCain v. CCA of Tenn., Inc.*, 254 F. Supp. 2d 115, 124 (D.D.C. 2003).  A plaintiff must plead "that (1) she engaged in statutorily protected activity; (2) her employer took an adverse personnel action against her; and (3) a causal connection exists between the two."  *Carney v. Am. Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998).  Defendants argue that Plaintiff's pleading fall short on the elements of adversity and causation.  NVF Mot. at 27–31; SD Mot. at 24–28.

An action is adverse in the retaliation context "if it could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Ali v. D.C. Gov't*, 697 F. Supp. 2d 88, 92 (D.D.C. 2010) (internal quotation marks omitted). Defendants focus on whether placing Plaintiff on administrative leave qualifies as an adverse action. NVF Mot. at 27–29; SD Mot. at 24–26. But the court need not dwell on that issue, because Plaintiff pleads a plainly adverse action: her termination. Compl. ¶¶ 159–161; *Clipper v. Billington*, 414 F. Supp. 2d 16, 22 (D.D.C. 2006) (noting that "a termination of employment" constitutes an adverse employment action).

Defendants' contention that the causation element is lacking is equally without merit. "Temporal proximity between the protected activity and the adverse action can establish the causal connection" for a DCHRA retaliation claim. *Propp v. Counterpart Int'l*, 39 A.3d 856, 868 (D.C. 2012). Here, Plaintiff alleges that the last protected activity occurred on October 28, 2021. Compl. ¶ 153. Defendants terminated her from SD, at the latest, by November 30, 2021, which resulted in losing half of her salary. *Id.* ¶¶ 84, 97. That close temporal proximity is sufficient to establish causation at the motion-to-dismiss stage. *See Hollins v. Fed. Nat'l Mortg. Ass'n*, 760 A.2d 563, 579 (D.C. 2000) ("The causal connection . . . may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity.") (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (1985).

### 3.

That brings the court to Plaintiff's final claim for intentional infliction of emotional distress ("IIED") (Count Seven). Defendants assert that the alleged conduct was not sufficiently outrageous to state a claim. The court agrees.

"The tort of intentional infliction of emotional distress consists of (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes

the plaintiff severe emotional distress." *Kotsch v. District of Columbia*, 924 A.2d 1040, 1045 (D.C. 2007) (internal quotation marks omitted). To survive a motion to dismiss, the defendant's "behavior must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Heasley v. D.C. Gen. Hosp.*, 180 F. Supp. 2d 158, 173 (D.D.C. 2002) (quoting *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991)).

The employment-related conduct that Plaintiff alleges—failing to accommodate her disability, paying her less than her non-minority colleagues, placing her on administrative leave, and ultimately terminating her employment, Compl. ¶ 167; Pl's Opp'n at 32–33—does not rise to that strict standard. *See, e.g.*, *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997) (holding that allegations that the employer "targeted [the plaintiff] for a sexual harassment investigation, manufactured evidence against him in order to establish a false claim of sexual harassment, leaked information from the investigation to other employees, and unjustifiably demoted him to the position of store manager in order to promote a woman to his position" did not make out an intentional infliction claim). The D.C. Circuit has distinguished IIED claims where the plaintiff does "not merely plead intra-workplace mistreatment." *Kassem v. Washington Hosp. Ctr.*, 513 F.3d 251, 256 (D.C. Cir. 2008); *cf. King v. Kidd*, 640 A.2d 656, 677–78 (D.C. 1993) (finding that supervisor's retaliatory conduct was sufficiently outrageous where the supervisor colluded with the employee's sexual harasser to "pressure her to help" her harasser defend against the harassment accusations). But here, "all of [Plaintiff's] allegations involved acts that took place within the workplace and that had no consequence other than [the] adverse employment action." *Kassem*, 513 F.3d at 256.

Plaintiff's additional assertion that Defendant Megan Lewis "lied to her regarding the source of funds" used to pay SD employees does not move the dial. Pl.'s Opp'n at 31; Compl. ¶ 65; *see Kerrigan*, 705 A.2d at 628; *Williams v. District of Columbia*, 9 A.3d 484, 493–94 (D.C. 2010) (upholding dismissal of IIED claim on the ground that the plaintiff failed to allege sufficiently extreme and outrageous conduct, where the plaintiff alleged that his employer's agents had spread false rumors that the employer had terminated him for embezzlement).

\*    \*    \*

So, here is where things stand. Plaintiff's TFA claim (Count One) and her DCHRA claims for race (Count Two) and sex (Count Three) discrimination and failure-to-accommodate (Count Four) are dismissed. So, too, is her IIED claim (Count Seven). What remains are her claims for hostile work environment (Count Five) and retaliation (Count Six) under the DCHRA.

**4.**

Lastly, the court considers whether Defendant SD USA can be held liable as a successor entity to SD for the surviving DCHRA claims. SD USA claims that it cannot be held liable for those claims because they are untimely under D.C. Code § 29-412.06(c)(2). SD USA & Lewis Mot. at 18. As relevant here, that statute provides that "[a] claim against [a] dissolved nonprofit corporation shall be barred if the claimant . . . whose claim was rejected by the dissolved corporation does not commence a proceeding to enforce the claim within 90 days from the effective date of the rejection notice." D.C. Code § 29-412.06(c)(2). SD USA maintains that SD rejected all of Plaintiff's claims on February 11, 2022, in a letter responding to her counsel's settlement demands. SD USA & Lewis Mot. at 18; *see* Ex. 3 to SD USA & Lewis Mot., ECF No. 13-3, at 28 [hereinafter February 11, 2022 Letter]. Ninety days after that date was May 12, 2022.

Because Plaintiff brought her claims on October 28, 2022, SD USA contends, they are untimely under § 29-412.06(c)(2).

This argument suffers from two defects. First, it is unclear whether SD USA is covered by § 29-412.06(c)(2). The statute's protections extend only to a "dissolved nonprofit corporation." It does not, on its face, purport to protect such dissolved corporation's alleged successor entity.

Second, SD USA is wrong when it argues that SD rejected Plaintiff's DCHRA claims on February 11, 2022. In fact, it never "rejected" them. The February 11, 2022 Letter states that "[l]ike NVF, SD maintains that it has complied with all applicable [tax laws]" and concurs with "NVF's letter explain[ing] why all of Ms. Walker's . . . alleged tax violations as to SD are without merit." *Id*. The letter goes on to say that "SD is willing to engage in substantive negotiations concerning Ms. Walker's tax claims," *id.*, but counsel later clarified that "she miss[tated]" SD's position and that SD, like NVF, "[was] [only] willing to engage in substantive negotiations as to Ms. Walker's *other claims* at this stage." Ex. A to SD Reply, ECF No. 20-1, at 2 (emphasis added). Thus, even if SD USA is covered by § 29-412.06(c)(2), the February 11, 2022 Letter only outright refuted Plaintiff's TFA-related allegations, not her DCHRA claims. Because Plaintiff's DCHRA claims were not "rejected" on February 11, 2022, the 90-day clock did not run on that date.

SD USA also seeks dismissal on the grounds that the claims are "factually impossible" because it never employed Plaintiff and most of the alleged acts occurred *before* SD USA was created on November 17, 2021. SD USA & Lewis Mot. at 13–14. But this argument overlooks Plaintiff's well-pleaded successor liability theory. Under District of Columbia law, "a business entity which acquires the assets of another business is not liable for its predecessor's liabilities and debts." *Bingham v. Goldberg. Marchesano. Kohlman. Inc.*, 637 A.2d 81, 89 (D.C. 1994). There are, however, "several recognized exceptions to this general rule," including where "the buyer

19

expressly or impliedly agrees to assume such debts." *See id.* (internal citation omitted); *Sodexo Operations, LLC v. Not–For–Profit Hosp. Corp.*, 930 F. Supp. 2d 234, 236 (D.D.C. 2013). To plead that exception, the plaintiff must allege the existence of such an agreement. *Id.*

Here, Plaintiff asserts that "representatives of SD, NVF, and SD USA entered into an agreement to dissolve SD and to dispose of its remaining liabilities to NVF and SD USA," including "asserted and potential legal claims[.]" Compl. ¶ 82. It thus had pleaded the existence of an express agreement by SD USA to assume SD's liabilities. That allegation is sufficient at this stage to establish potential successor liability for SD USA.

**V.**

In conclusion, the court grants in part and denies in part Defendants' motions to dismiss, ECF Nos. 13, 14, 15. Defendant Lewis is dismissed from this action. The court dismisses Counts One, Two, Three, Four, and Seven, but Plaintiff may proceed to discovery on Counts Five and Six.

Dated: March 14, 2024

Amit P. Mehta
United States District Judge